WIRT ADAMS, STATE REVENUE AGENT, *v.* YAZOO & MISSIS-
SIPPI VALLEY RAILROAD COMPANY

AND

YAZOO & MISSISSIPPI VALLEY RAILROAD COMPANY *v.* WIRT
ADAMS, STATE REVENUE AGENT.

1. RAILROADS.  *Consolidation.*

The power of one railroad company to consolidate with another
is wholly derived from the state, and being a mere license, and
not resting in contract, a charter provision authorizing con-
solidation "on such terms as they [the corporations concerned]
may agree upon" must be construed as meaning such terms as
are consistent with the law as announced in their charter or
otherwise.

2. SAME.  *Effect of consolidation in other states.*

The effect of consolidation of two railroad companies in other
states in which the railroads are located, is pertinent in de-
termining the effect of consolidation in this state, as creating a
new company or not.

3. SAME.  *Stock.  New corporation.  When created.*

A new corporation, rather than a mere merger of two corpora-
tions, necessarily results from a consolidation of their stock,
and the existence of the new company begins at the date of the
consolidation, and not that of the legislation authorizing it.

4. SAME.  *Statutory construction.  Laws 1882, p. 932.*

No consolidation, except such as would create a new company, is
authorized by legislation providing that a certain railroad com-
pany may consolidate with any other under the name (not the
name and charter) of one or both, and that when such con-
solidation should be effected, "said company" should be entitled
to all the benefits, franchises, property, etc., of every descrip-

tion belonging to the companies "so consolidated," especially in
the absence of any term expressing merger, or that the words
"said company" referred to any other company than the new
one resulting from consolidation.

5. SAME.  *Laws* 1882, *p.* 843.

A new company, and not a mere merger by union, results from
the consolidation of two railroad companies under an act in-
corporating one of them, and providing that the same might
consolidate with any other company, and that thereupon the
consolidated company "should have and enjoy all the property,
rights, privileges, powers, liberties, immunities, and franchises"
therein granted.

6. SAME.  *Deed of consolidation.*

Facts considered in a case where there was a consolidation of the
stock of two railway companies, and held to create a new com-
pany instead of effecting a mere merger, although the deed of
consolidation referred simply to a merger of the stock, property
and franchises of the one company, which had fifty thousand
shares, with and into the stock, property and franchises of the
other company, which had six thousand shares, "without dis-
turbing the corporate existence" of one of the companies, "or
the formation of any new distinct corporation."

7. SAME.  *New corporation.  Status.  Date of consolidation.*

On the consolidation of two railroad companies whose existence
is thereby extinguished, the new corporation comes into being
exactly as if it had been organized under a charter granted at
the date of consolidation.

8. CORPORATIONS.  *Corporate franchise.  Existence.  Consolidation.  Con-*
*stitution* 1890, *section* 180.

Both the right to exist as a corporation and the power to con-
solidate with another corporation are within section 180, consti-
tution of 1890, providing that grants of "corporate franchises"
under which organizations have not taken place shall be subject
to constitutional provisions, one of which prohibits exemptions
from taxation.

9. SAME.  *New company.  Exemption from taxation.  Constitution of*
1890, *sections* 180, 181.

A new corporation resulting from a consolidation of two railroad
companies since the adoption of the constitution of 1890 pro-

hibiting exemptions from taxation, is not entitled to an exemption from taxation contained in the charter of one of the consolidating companies, although such charter was granted prior to the adoption of the constitution.

10. SAME. *New company. Constitution 1890, sections 181, 279.*

A corporation which, since the adoption of the constitution of 1890, has lost its individual corporate existence by a consolidation with another company, can claim no benefit from the constitutional provisions that exemptions from taxation to which corporations are legally entitled at the adoption of the constitution shall thereby be not impaired, and that the rights of bodies corporate and charters of incorporation shall continue under the constitution.

11. SAME. *Constitution 1890, section 180.*

An exemption from taxation contained in the charter of a railroad company, which afterwards loses its corporate existence by consolidation with another company, is cut off by the adoption of a state constitution prohibiting such exemptions while the right to consolidate remains unexecuted, although the charter expressly provided that such exemptions shall pass to any consolidated company that might be afterwards formed.

12. TERMS OF CHARTER. *"Immunities." Taxing power. Favorable construction.*

If it be doubtful that a charter exempts a corporation from taxation, the doubt must be resolved in favor of the taxing power; and such an exemption contained in the charter of one of two consolidating railroad companies, does not pass to the new company resulting from the consolidation under a charter granting to the same all the rights, privileges, etc., of the constituent companies, but failing to employ the word "immunities."

13. SAME. *Res adjudicata. Estoppel.*

A decision in a suit between a tax collector of a county and a railroad company upholding the latter's claim of exemption from taxation under its charter in that county, is not *res judicata*, and does not estop the state revenue agent in a suit for unpaid taxes against a different railroad company claiming exemption under its charter, which is an entirely different charter.

14. SAME. *Different subject-matter of suit.*

Although the same contention be involved, a decision concerning the taxes of a particular year is not *res judicata* so as to preclude suit for the taxes of another year.

15. SAME.   *Pleading.   Evidence.*

The thing adjudicated, and not the reason given therefor, is that which makes a previous decision operate as an estoppel, and, to be effective, such decision must be pleaded or offered in evidence by way of estoppel.

16. SAME.

A decision enjoining a tax collector from collecting taxes on the property of a railroad company within his county for a certain year, is *res judicata* as to the taxes on the property for the year in question, and precludes a suit for the same by the revenue agent against a corporation resulting from the subsequent consolidation by such company with another.

17. CORPORATIONS.   *Exemption from taxation.   Constitution* 1869, *section* 13, *article* 12.

The provision of the constitution of 1869, section 13, article 12, that the property of all corporations for pecuniary profit shall be "subject" to taxes the same as that of individuals, together with the other provision (sec. 20) requiring that taxation shall be equal and uniform throughout the state, and all property taxed in proportion to its value, is mandatory, and deprives the legislature of all power to exempt the property of such corporations from taxation. *Mississippi Mills* v. *Cook,* 56 Miss., 40, and *Railroad Company* v. *Lambert,* 70 Miss., 779, overruled.

18. STARE DECISIS.   *Identity of charters construed.*

The doctrine of *stare decisis* cannot be invoked on the construction of a particular charter unless the charter previously construed was identical therewith.

19. SAME.   *Taxing power.*

And the courts are reluctant to recognize this doctrine when invoked by a private corporation for profit in order to abridge the taxing power. *Peck* v. *Allen,* 58 Miss., 173; *Lombard* v. *Lombard,* 57 *Ib.,* 177, cited.

20. RAILROADS.   *Taxation.   Ad valorem and privilege taxes.   Exemption. Code* 1880, §§ 597 *to* 608, *inclusive; Laws* 1884, *p.* 29; *Laws* 1886, *p.* 23; *Laws* 1890, *p.* 12.

When the chapter of the code of 1880, subjecting all railroads to taxation, but making it optional with them whether they paid *ad valorem* or privilege taxes, was amended by the act of 1886 (Laws, p. 23) providing that every railroad in the state should

thereafter pay a privilege tax at certain fixed rates, without alluding to any exemption, such amendment operated as a repeal of all repealable exemptions from taxation, and the act of 1890 (Laws, p. 12) purporting to continue, if still in existence, an exemption in favor of the Natchez Railroad Company, recognized by the act of 1884 (Laws, p. 29), but repealed by act of 1886, is wholly ineffective.

21. SAME.  *Code* 1892, §§ 3379, 3744, 3875.  "*Nontaxable*" *property.*

The provisions of the code of 1892 imposing a privilege tax on all railroads (§ 3379), and providing that certain property, not embracing that of railroads, "and no other," should be exempt from taxation (§ 3744), repeals all exemptions contained in statutes not irrepealable, since the word "nontaxable," as employed in that code (§ 3875), imposing *ad valorem* taxes, and requiring every railroad company in the state, without exception, to return all of its property and its value, nontaxable as well as taxable, means property like government bonds that are not taxable in any event.

22. PRACTICE.  *Compromise verdict.*

A compromise verdict on an indivisible issue as to liability for four years taxes will be set aside where the finding is for plaintiff for three years and defendant for one.


ON MOTION TO STRIKE OUT OPINION.

23. SUPREME COURT.  *Opinion.  Mandate.  Code* 1892, § 4352.

It is not essential, under § 4352, code 1892, to the authority of an inferior court to proceed in a cause which has been remanded on reversal of its judgment, that the opinion of the supreme court should accompany its mandate.

24. SAME.  *Revision of opinions.*

In its opinion filed after trial in the lower court of a remanded cause, the supreme court may include other reasons for reversal in addition to those set out in its summary of holdings filed at the time of its decision.

25. SAME.  *Due process of law.  Constitution United States, amendment* 14.

The decision or judgment remaining undisturbed, the revision of an opinion which expresses but the reasons of the decision does not involve "due process of law" as guaranteed by the federal constitution.

SECOND APPEAL.

26. REMOVAL OF CAUSES. *Time of application.* 24 *Stat. U. S., c.* 373, *p.* 554; 25 *Ib., c.* 866, *p.* 435.

The statutes of the United States imperatively require that application to remove a cause from a state court to a federal court be made before the plea is due under the laws and practice of the state.

27. CORPORATIONS. *Consolidation of railroad companies.*

When a new corporation resulting from the consolidation of two railroad companies is sued for taxes which accrued after consolidation, it is immaterial that the new company relied on a decision of the supreme court recognizing an exemption from taxation like that contained in the charter of one of the constituents, since the exemption was lost by the consolidation.

28. RAILROADS. *Exemption from taxation.* *Constitution* 1869. *article* 12, *section* 13.

Legislative recognition of an exemption from taxation granted to a railroad company prior to the adoption of the constitution of 1869, does not involve judicial recognition of a like provision in the charter of another railway company granted after the property of all corporations had been, by that constitution, subjected to taxation the same as individuals.

29. SAME. *Ad valorem and privilege taxes.* *Code* 1880, §§ 597, 608; *Laws* 1870, *p.* 327; *Laws* 1878, *p.* 268.

The provisions of the code of 1880, subjecting all railroads to taxation, and providing that they may, at their option, pay privilege instead of *ad valorem* taxes. must be taken to include a company the privilege tax whereon is fixed by another provision of that code, notwithstanding an exemption from taxation contained in its repealable charter granted prior to the adoption of that code, the payment of privilege taxes being a mode of escaping *ad valorem* taxes secondary to the main purpose of the legislation.

30. SAME. *Privilege taxes.* *Express reference to particular company.* *Code* 1880, § 806.

The reasons for naming a particular railway company in imposing privilege taxes do not exist in the case of *ad valorem* taxes, since each company is required to pay a privilege tax graduated according to its class.

31. SAME. *Repeal of exemption.* *Code* 1892, § 3875; *Laws* 1882, *p.* 838.

The code of 1892, subjecting all railroads to taxation, repealed an exemption therefrom contained in a charter granted in 1882.

FROM the circuit court of Hinds county, first district.

HON. ROBERT POWELL, Judge.

The state revenue agent, proceeding under the authority conferred upon him by chapter 126, code 1892, and the act of 1894, amendatory thereof, instituted three successive actions of debt to recover from the Yazoo & Mississippi Railroad Company and from the Illinois Central Railroad Company taxes which had been assessed by the state railroad assessors under authority conferred upon them by the revenue chapter of the code and by the aforesaid act of 1894, against the railroad property which formerly had belonged to the Louisville, New Orleans & Texas Railway Company, and had been acquired by the Yazoo & Mississippi Railroad Company by a consolidation effected October 24, 1892.

The taxes assessed and sued for were for the years 1892, 1893, 1894, and 1895, respectively. The defendants, in response to said action, pleaded the grant made to the said Louisville, New Orleans & Texas Railway Company, by sec. 5 of the act of March 3, 1882, under which act the said company had been organized. Said sec. 5 extended to said company the right and privilege conferred upon the Mobile & Northwestern Railroad Company by sec. 21 of its charter. Said sec. 21 of the Mobile & Northwestern charter so extended to the Louisville, New Orleans & Texas Railway Company, was, so far as is material to be set forth herein, as follows:

"All taxes to which company shall be subject for the period of thirty years are hereby appropriated and set apart, and shall be applied to the payment of the debts and liabilities which the said company may have incurred in the construction of said road, and it shall be the duty of the tax collector in every county, in each and every year, to give to the said company a receipt in full for the amount of said taxes, upon receiving

from said company affidavit made by the president or cashier of said company that the amount of said taxes had actually, and in good faith, been paid and applied to said company during the year, in payment of the debts incurred, or money borrowed as aforesaid, which receipt, so given, shall be in full of all taxes, county, state, and municipal, to which said company shall be subject."

The plea interposed by the defendants set forth the performance of the conditions of the said statute. To this plea the plaintiff interposed fourteen replications, seven of which were held bad on demurrer, the remainder resulting in issues of fact on which the three cases were consolidated into one. The fifth replication to the defendants' plea was as follows:

"And for further replication the plaintiff says that by the consolidation of the said Louisville, New Orleans & Texas Railway Company and the said Yazoo & Mississippi Railroad Company, a new corporation was formed, after the adoption of the present constitution of this state, and that by reason thereof, all the property of said consolidated railroad company became and was liable to taxation; and this he is ready to verify," etc.

There was a trial of the consolidated cause before a jury at the July term, 1896, which resulted in a verdict and a judgment for the defendants as to the taxes of 1892, 1893, and 1894, and a verdict in favor of the plaintiff as to the taxes of 1895.

From the judgment so rendered in favor of the defendants as to taxes of 1892, 1893, and 1894, the state revenue agent appealed, and from the judgment in favor of plaintiff as to the taxes of 1895 the defendants took a cross appeal.

The constitutional and statutory provisions mentioned in the opinion of the court in disposing of this appeal, are the following: Const. 1869, sec. 13, art. 12: "The property of all corporations for pecuniary profit shall be subject to taxation the same as that of individuals." *Ib.*, sec. 20, art. 12: "Tax-

ation shall be equal and uniform throughout the state; all property shall be taxed in proportion to its value, to be ascertained as directed by law." Const. 1890, sec. 180: "All existing charters or grants of corporate franchise under which organizations have not, in good faith, taken place at the adoption of this constitution, shall be subject to the provisions of this article." *Ib.,* sec. 181: "The property of all private corporations for pecuniary gain shall be taxed in the same way and to the same extent as the property of individuals." *Ib.,* sec. 279: "All writs, actions, causes of actions, proceedings, and rights of individuals and bodies corporate, and of the state, and charters of incorporation shall continue."

Act 1882 incorporating New Orleans, Baton Rouge, etc., Railroad Company, approved March 9, 1882 (Laws, pp. 920, 932, sec. 25): "That the company shall have power and authority to purchase and hold any connecting railroad and operate the same, or to consolidate the company with any other company, under the name of one or both, but when such purchase is made, or consolidation is effected, the said company shall be entitled to all the benefits, rights, franchises, lands, and property of every description belonging to said road or roads so sold or consolidated."

Act of 1882, incorporating Yazoo, etc., Railroad Company, approved February 17, 1882 (Laws, pp. 838, 849, sec. 5, p. 843): "Said company may consolidate with any other railroad company in or out of the state of Mississippi, upon such terms as the consolidating companies may agree upon, and it may lease its railroads and all its property and franchises, rights, privileges, and immunities then owned, or thereafter to be acquired, or lease other railroads, in or out of this state, for a term of years or in perpetuity, and upon such consolidation the consolidated company shall have and enjoy all of the property, rights, privileges, liberties, and immunities and franchises herein granted, but such consolidation shall not have the effect of exempting from taxation the railroad or property

owned by such other consolidating company prior to its con-
solidation with the company hereby chartered, nor of exempting
from taxation any property which the consolidated company
may, after such consolidation, acquire under the provisions of
the charter of such consolidating company," etc.

Code 1830, § 597, provides that each railroad company
operating in this state shall, on or before the third Monday in
August in each year, file with the auditor of public accounts
a schedule of its property for *ad valorem* taxation, and pre-
scribes what such schedule shall contain by way of description,
valuation, etc.

Section 598 provides that the Mobile & Ohio Railroad Com-
pany shall, on or before August 1, 1880, make out and file with
the auditor of public accounts (in addition to what is required
in the preceding section) a sworn statement of the capital ex-
pended in the construction of its road. Sections 599, 600, 601,
602 regulate the assessment of railway property for *ad valorem*
taxation.

Section 603 provides for the due ascertainment and cer-
tification of the amount of *ad valorem* taxes due by each com-
pany.

Sections 604, 605, provide how such *ad valorem* taxes shall
be collected.

Section 606 provides for municipal taxation of railroad prop-
erty for municipal purposes.

Section 607 is as follows: "Each and every railroad company
which shall accept this act, and annually pay to the auditor of
public accounts the taxes hereafter provided for, and will
signify their acceptance in writing, shall be exempt (except
from the last preceding section) from the provisions of the
foregoing sections of this act until otherwise ordered and
provided by law, and the payment of the same shall be in full
of all state and county taxes, fifty per centum of which said
tax shall be placed to the credit of the counties through which
said railroads may pass, to be drawn by the county treasurers

of the counties in proportion to the number of miles of said roads in said respective counties; *provided,* that lands owned by railroad companies, and not used in operating the railroads, shall be taxable as other properties and for all purposes."

Section 608 is as follows: "Each railroad company whose line is in whole or in part in this state shall, if it accepts the provisions of this act, pay to the state treasurer on the warrant of the auditor, on or before the thirty-first day of December, in each year, a privilege tax as follows, to wit: The Mobile & Ohio Railroad Company, and its branches, $80 per mile. . . . . . Provided, that no railroad company shall be subject to taxation under this chapter while the same is in process of construction, but if any part of any road shall be finished and used for profit, the part so finished shall be taxed, although the whole may not be finished."

The act of 1884 (Laws, p. 29) was one to amend §§ 607 and 608 of the code of 1880 as to accepting the provisions for payment of a privilege tax in lieu of *ad valorem* taxes, and in fixing the rate, per mile, of each railroad company, employs the following language: "The Natchez, Jackson & Columbus Railroad Company, forty dollars per mile; after expiration of exemption, as provided in its charter and amendments thereof."

The exemption referred to is expressed in the act of August 8, 1870, extending the exemption in favor of the Mobile & Northwestern Railroad Company, heretofore quoted, to the Natchez & Jackson Railroad Company, which afterwards became, by change of name, the Natchez, Jackson & Columbus Railroad Company. Laws 1870, p. 327.

By the act of 1886 (Laws, p. 23), is was provided as follows: "And hereafter all the railroads in this state shall pay the privilege taxes assessed against them, under all the pains and penalties prescribed in § 589 of the code of 1880."

The act of 1890 (Laws, pp. 12, 13) fixes the rate, per mile, of the privilege tax to be paid by the several railroad companies

of the state, the Natchez, Jackson & Columbus Railroad Company among others, and contains a proviso that "no railroad shall be subjected to taxation while exempt by its charter," etc.

Code 1892, § 3379, divides all the railroads of the state into four classes, levying a specific privilege tax on each class, and provides that the railroad commission shall annually classify the several railroads according to the gross earnings of each, and that the privilege taxes thereon shall be paid on or before the first day of December.

Section 3744 of the same code prescribes what property shall be exempt from taxation, and mentions no railroad property.

Section 3875 provides that each railroad company owning and operating a railroad shall file with the commission a schedule of its property for assessment of taxes, prescribing in detail what such schedule shall contain.

The case was decided on the 20th day of June, 1898, and resulted in a reversal on both the appeal and the cross appeal. The court then delivered the summary of holdings set out in the opinion on the motion to strike out the opinion outlined by the summary. The opinion outlined by the summary (post, p. —) was filed November 22, 1898, and is the one next following herein.

*Critz & Beckett,* for appellant and cross appellee.

We insist, first, that the exemption claimed in this case was unconstitutional and void, under secs. 13 and 20, of article 12, of the constitution of December 1, 1869. Such seems now to be the settled rule under similar constitutional provisions. *Louisville* v. *Palmes,* 109 U. S., 248; *St. Louis* v. *Berry,* 113 U. S., 475; *Keokuk* v. *Missouri,* 152 U. S., 303, 310-312, and authorities cited in *Mississippi Mills* v. *Cook,* 56 Miss.

But there is another idea we wish to impress on the court. It is that this twenty-first section of the Mobile & Northwestern charter is different from the charter passed on in the Missis-

sippi Mills case, in that it expressly provides in the body of it that it shall be "irrepealable." Now, it seems to have been generally accepted that the Mississippi Mills case settled the principle that the legislature could grant temporary exemptions repealable at will, and no one has raised this distinction, or called the attention of this court to it. What was settled in the Mississippi Mills case was that the legislature could not grant an irrepealable exemption. So it seems to us that this provision was undoubtedly unconstitutional, and being part of the body of the section and not severable, rendered the whole section illegal. *Fant* v. *Gibbs,* 54 Miss., 396, 411, 412; *Baldwin* v. *Franks,* 120 U. S., 685, 686; *Field* v. *Clark,* 143 U. S., 695, 696; see Mr. Lamar's opinion, 143 U. S., 700.

The pretended exemption of the L., N. O. & T. Ry. Co. has twice been brought before this court on a purely imaginary state of facts, and passed on in that shape. In both cases it appeared that this L., N. O. & T. Ry. Co. was formed by a consolidation of the Memphis & Vicksburg and Mississippi Valley & Ship Island Railroad companies, both of which had these exemptions; whereas, the undisputed evidence shows, and it is now openly admitted by all parties, that it was formed by the consolidation of said Memphis & Vicksburg with the New Orleans, Baton Rouge, Vicksburg & Memphis Railroad Company, which latter company never did have any exemption. *McCullough* v. *Stone,* 64 Miss., 393; *L., N. O. N T. Ry. Co.* v. *Taylor,* 68 Miss., 364.

*Second, the Lambert case.*—But opposite counsel insist that this case is settled by the Lambert case in 70 Miss., which is claimed to be *res adjudicata.*

*Res adjudicata* is "a thing adjudged." It is essential that the subject-matter must be the same, and that the parties, directly or derivatively, must be the same. In the Lambert case, the parties were the N. J. & C. R. R. Co. and the sheriff of Adams county, and the subject-matter was a railroad held by the L., N. O. & T. Ry. Co. under an alleged purchase from the

N. J. & C. R. R. Co., and the exemption claimed was under the charter of the N. J. & C. R. R. Co. In the case at bar, the parties are the I. C. R. R. Co. and Y. & M. V. R. R. Co. on the one side, and the state revenue agent on the other, and the exemption is claimed under the charter of the L., N. O. & T. Ry. Co., an entirely different, but similar, charter. So neither the parties nor the subject-matter are the same. See *Wilmington* v. *Alsbrook*, 146 U. S., 279, 302. Besides, *res adjudicata* must either be pleaded, or offered in evidence, where there is no opportunity to plead it, and neither was done in this case, although there was opportunity for both. George's Dig., p. 215, sec. 6; *Majors* v. *Majors*, 58 Miss., 806; *Land* v. *Kiern*, 52 Miss., 347; *Marshall* v. *Hamilton*, 41 Miss., 235; Freeman on Judgments, secs. 283, 284. And it is not the reasons which a court gives, but the thing it adjudges, which is *res adjudicata*. *Buckner* v. *Calcote*, 28 Miss., 432. And a conclusive reason is that in the Lambert case itself it is expressly held not to be *res adjudicata* in a case like this. The L., N. O. & T. Ry. Co. filed a bill in its own name, enjoining the collection of the taxes for the year 1891 on its own line, and the decision was against it, and this decision was pleaded as *res adjudicata* to the suit filed in the name of the N. J. & C. R. R. Co., and court very properly said that the decision in the L., N. O. & T. Ry. Co. case was not *res adjudicata*, because it "had no reference to the N. J. & C. railroad, but to a different one," and the converse must be equally true. *Railroad Co.* v. *Lambert*, 70 Miss., 781, 782, 790, 791.

*Third.*—The consolidation forming the L., N. O. & T. Ry. Co. was made on August 12, 1884. The main line was built before that time by the Baton Rouge company, which had no exemption. The exemption conferred by the fifth section of the act of 1882 was prospective, and only applied to such road as should be built by the consolidated company, and none was built by it. The Riverside division was a partly built road purchased from the Memphis & New Orleans Railroad &

Levee Company, and afterwards connected with the main line by a continuation from its north and south ends. There was no authority to build this division under any of the constituent charters of the consolidated company. It was built, and could only have been built, under the charter of the purchased road, which had no exemption (see Laws of 1882, p. 876), and hence no exemption was transferred in its sale under the act of 1884, p. 935. *Wilmington* v. *Alsbrook,* 146 U. S., 279; *L. & N. R. R. Co.* v. *Kentucky,* 161 U. S., 685, 686; *Keokuk* v. *Missouri,* 152 U. S., 311.

*Fourth.*—The decision of the railroad commission in assessing the property for taxation is, under the code of 1892, §§ 3875, 3877, a judicial act, and cannot be assailed collaterally. Burroughs on Tax., p. 238, sec. 102; 2 Desty on Tax., p. 625, note 2; Cooley on Tax., p. 749, note 1; *Louisville Water Co.* v. *Clark,* 94 Ky., 47, etc. And under sec. 112 of the constitution of 1890, when an assessment has been made, no county, at least, can be denied the right to levy and collect the taxes.

*Fifth.*—A general exemption from taxation does not embrace privilege or occupation taxes, such as are imposed by § 3379 of the code of 1892. Cooley on Tax., pp. 205, 206, notes 1 & 2.

*Sixth.*—The consolidation as actually made was not authorized by the acts of 1882 and 1884, under which it was claimed to have been made, but, to be sustained, must be referred to the powers of consolidation contained in the charters of the original constituent companies. Sec. 1 of the act of 1882, under which the L., N. O. & T. Ry. Co. claims to be formed, only gave the consolidated company the rights, powers, and immunities now possessed by the companies which may enter into such consolidation. Acts 1882, pp. 1011, 1012. The word "now" is peculiar, and for that reason due effect must be given to it. If the legislature uses an unusual word, used in no other charter, they must have intended it to have its proper meaning. It is not such rights as the consolidated company may have at the date of the consolidation, but "now," at the date of the act,

March 3, 1882. The N. O., B. R., V. & M. R. R. Co. was
not chartered till March 9, 1882. Acts of 1882, p. 932. Hence
a consolidation with it as a constituent part could not have been
contemplated. Now, the purpose of the act of 1882 is plain.
Its prime object was to authorize a consolidation of M. & V.
R. R. Co. with the M., V. & Sh. I. R. R. Co., and thus insure
a great thoroughfare for the State of Mississippi from or near
Ship Island, by way of Vicksburg and Memphis, to the marts
of the west and northwest. It has always been a cherished
hope, a dream of the people of Mississippi, to have a great sea-
port of their own. The M. & V. R. R. Co. could build from
Memphis to Vicksburg, and the M., V. & Sh. I. R. R. Co.,
from Vicksburg to Ship Island, or in its vicinity. Acts of
1871, p. 237; acts of 1873, p. 562. But the M., V. & Sh. I.
R. R. Co. would not consolidate under the act of 1882, and
the legislature, by the act of 1884, authorized the M. & V.
R. R. Co. to consolidate with any railroad company or com-
panies, whether the M., V. & Sh. I. R. R. Co. went into the
consolidation or not, but gave to the consolidated company only
the "rights, privileges, and immunities" mentioned in the act of
1882. Laws of 1884, p. 936. Now, what were those rights
and privileges? Manifestly and primarily to build a railroad
from Ship Island, by way of Vicksburg, to Memphis. They
had the power to consolidate under secs. 16 and 25 of their
own charters, and there was no possible excuse for claiming to
consolidate under the act of 1882, except to escape taxation.
This court should hold that, as a matter of law and fact, they
consolidated under their own charters, and never were exempt
from taxation, as the Baton Rouge company had no exemption,
and that of the Memphis & Vicksburg had been repealed by
the code of 1880, as decided in the Lambert case. 70 Miss., 787.
The scheme of the consolidation provided for in the act of
1882 was for the building of a railroad from Ship Island.
Certainly that act could never have intended to extend any

exemption to a railroad from Vicksburg to New Orleans. Such a railroad was outside the pale.

*Seventh.*—That the consolidation created a new company, into which an exemption could not enter under the constitution. It is true that sec. 181 provides that "exemptions from taxation, to which corporations are legally entitled at the adoption of this constitution, shall remain in force," etc., but it is certain that a new corporation, formed after the adoption of the constitution, could not be legally or otherwise entitled to an exemption at its adoption. That would be a perversion of terms and a reversal of the flight of time. Was the consolidated company, formed on the 24th of October, 1892, a new company? Now, in the Lambert case, this court approves the case of *Tennessee* v. *Whitworth,* 117 U. S., 139, which expressly holds that the effect of a consolidation is to form a new company, and that a new company was formed in that case. 117 U. S. Rep., 139, 149, 150. The difference between the Whitworth and Lambert cases and this one is that in those cases no new constitution intervened. If a new constitution had intervened in the Whitworth case, then, under every precedent laid down by the United States supreme court, it would have prevented the exemption from passing into the new company. This is universal. *Keokuk* v. *Missouri,* 152 U. S. 304-312; *Trask* v. *McGuire,* 18 Wall., 391; *Shields* v. *Ohio,* 95 U. S., 320-324; *R. R. Co.* v. *Georgia,* 98 U. S., 360, 361, 363, 364; *L. & N. R. R. Co.* v. *Palmes,* 109 U. S., 248, 254; *Memphis* v. *Commers,* 112 U. S., 621-623; *St. Louis* v. *Berry,* 113 U. S., 466-468. And as to the Whitworth case, the court expressly holds that a new constitution, forbidding future exemptions, would have prevented the exemption from passing into the consolidation, and would not have been "the impairment of the obligation of a contract." *Keokuk* v. *Missouri,* 152 U. S., 311, 312. Permission in the charter of a railroad to consolidate is not a right, but a mere license, and if not availed of before the policy of the state has changed, the license is considered with-

drawn. *Pearsall* v. *G. N. Ry. Co.,* 161 U. S., 667; *L. & N. R. R. Co.* v. *Kentucky,* 161 U. S. 695; *Keokuk* v. *Missouri,* 152 U. S., 312; 2 Morawetz Priv. Corp. secs. 945, 948.

Opposite counsel laid stress on the provision in the charter of the Y. & M. V. R. R. Co. (Laws of 1882, sec. 5, p. 843), that the Y. & M. V. R. R. Co. might consolidate with any other railroad company "upon such terms as they may agree upon," but this only means such terms as are consistent with the powers of the other company under its charter, and the charter of the Memphis & V. R. R. Co. expressly provides that any consolidation shall be "on such terms as may be consistent with the powers conferred upon said company." Acts of 1870, sec. 16, p. 326. But even where there is no such express restriction, the same construction is given to such general words like those in the Y. & M. V. R. R. Co. charter, which occur in many charters. *Keokuk* v. *Missouri,* 152 U. S., 302, 308, 309; *Atlantic* v. *Georgia,* 63 Ga., 486; *R. R. Co.* v. *Georgia,* 98 U. S., 360-364; *St. Louis* v. *Berry,* 41 Ark., 518; *Arkansas Midland* v. *Berry,* 44 Ark., 22, 23.

Now, the question of whether there is any consolidation, and many administrative features, are questions of fact, but the settled law is that the effect of a consolidation depends wholly on the law of the charters under which it was made. A corporation has no powers, and can do nothing not authorized by its charter. 2 Morawetz Priv. Corp., secs. 944, 945, 948; *Keokuk* v. *Missouri,* 152 U. S., 305. And this doctrine is held in the very case under which, apparently, the consolidation was attempted to be made, the court there distinctly holding that it was a question not of corporate, but of legislative, intention, and that the statute, by its terms, preserved the identity of the consolidating companies. *Central R. R. Co.* v. *Georgia,* 92 U. S., 665. And the court observe, in a later case, that of the *Central Railroad* v. *Georgia,* it was the railroad company which had an exemption which was preserved intact, and that the one merged into it had no exemption. It is evident the court, in the

Keokuk case, would not have approved any other rule. Their whole reasoning is against it. They quote all other cases, but refuse to notice the *S. W. R. R. Co.* v. *Georgia,* following the *Central R. R. Co.* v. *Georgia,* supra. *Keokuk* v. *Missouri,* 152 U. S., 307.

Now the L., N. O. & T. Ry. Co. had no original power of its own to consolidate at all. It derives that power, if at all, under the first section of its charter, which gave it "the rights, ways, privileges, franchises, property, grants, and immunities, which are now possessed by the companies which may enter into such consolidation," and for that purpose their charters ·were expressly made part of the act. Acts of 1882, pp. 1011, 1012. What were those rights and franchises? The N. O., B. R., V. & M. R. R. Co. had no exemption and was authorized "to consolidate the company with any other company under the name of one, or both, and when such consolidation is effected, the said company shall be entitled to all the benefits, rights, franchises, lands, and property belonging to the roads so consolidated." Acts of 1882, sec. 25, p. 932; same as *St. Louis* v. *Berry,* 113 U. S., sec. 43, p. 467. There was no intention to pass an exemption here, whatever words had been used, for there was none to pass. Under the charter of the M. & V. R. R. Co. it could consolidate by consolidating the "stock, property, and franchises" of the road with those of the other road, "upon such terms as are consistent with the powers herein granted." Acts of 1870, sec. 16, p. 326. Now, a consolidation of stock universally means the formation of a new corporation. Green's Brice's Ultra Vires, p. 538, note; *R. R. Co.* v. *Georgia,* 98 U. S., 360, 361, 363, 364; *Clearwater v. Meredith,* 1 Wall., 25; *Ridgeway* v. *Griswold,* 1 McCrary, 151; *Atlantic* v. *State,* 63 Ga., 486; *St. Louis* v. *Berry,* 113 U. S., 466, 473; *Keokuk* v. *Missouri,* 152 U. S., 308. And an exemption would not pass under this charter for two reasons: First, it provides that the company may consolidate "the stock, property, and franchises" of the road with those of any

other road, but does not say a word about what rights the consolidated company shall get, and both the weight of authority and the better opinion now is that such expressions only pass the ordinary right to exist as a corporation, have stock, and run the railroad, and that unless it is expressly provided that the consolidated company shall have the "immunities" of the consolidating companies, or an intention to pass an exemption from taxation is clearly manifested by other parts of the statute, it will not pass. *Phenix Ins. Co.* v. *State,* 161 U. S., 176, 182; *Covington* v. *Sanford,* 164 U. S., 586, 587; *Norfolk, etc.,* v. *Pendleton,* 156 U. S., 672, 673; *Pickard* v. *E. T., V. & G. R. R. Co.,* 130 U. S., 640; *L., N. O. & T. Ry.,* v. *Palmes,* 109 U. S., 251, 252; *Home Ins. Co.* v. *State,* 161 U. S., 198-200; *Atlantic, etc.,* v. *State,* 63 Ga., 484-486; *Keokuk* v. *Missouri,* 152 U. S., 304-312. This is now established "by the weight of authority and the better opinion." *Phenix, etc.,* v. *Tennessee,* 161 U. S., 183.

Mr. Mayes puts great stress upon the provision in the first section of the act of March 3, 1882—the L., N. O. & T. charter—that "the charters of said consolidating companies shall be taken and held to be part of this act." We meet him upon this ground, and ask for literal enforcement of this provision, as contended for by him.

(1) This necessarily excludes the Baton Rouge company from the consolidation, because it was impossible to treat that charter, which was not enacted until March 9, 1882, as copied into the act of March 3, 1882. How could it be so copied before it came into existence?

(2) Even if these charters were copied into the charter of the consolidated company, this would give it no more strength than a mere transfer of the powers, etc., of the constituent companies by reference to their charters. 66 Maine, 514.

(3) If each charter were thus copied bodily into the charter of the L., N. O. & T., each charter, so copied, by its

very terms, would, of necessity, be limited to that part of the road to which it applied before the consolidation. The M. & V. charter, if so copied, would be limited to that part of the road north of Vicksburg, if any part of the road was built under that charter. The Baton Rouge charter, if so copied, would be limited to that part of the road south of Vicksburg, if the other part was built under the M. & V. charter, and would apply to the whole road if all of it was built under the Baton Rouge charter. The Baton Rouge charter could bring no exemption into the consolidation, because that charter gave no exemption. The M. & V. charter could bring no exemption, even to that part of the road north of Vicksburg, (1) because its original charter brought no exemption; (2) because, if copying the whole charter carries the exemption in the amendment to the charter (Laws of 1870, p. 327), that exemption was repealed by that provision of the code of 1880 subjecting all railroads to taxation, as shown in the Lambert case; (3) because section 16 of the charter of the M. & V. Co., which gave it the right to consolidate, gave no power to pass any exemption to the consolidated company.

As above shown by us, it is necessary for the section of the law providing for the consolidation to use the word "immunities," or words equivalent thereto, in order to pass an exemption from taxation; and our position is strengthened on this point when we consider the charters of the consolidating companies, as copied into the L., N. O. & T. charter, as contended for by Mr. Mayes. Treat the Baton Rouge and M. & V. charters as part of the L., N. O. & T. charter, or as copied therein. Then, in this consolidated charter we find the word "immunities in the first section of the act of March 3, 1882. In the fifth section of the same act, exemption from taxation is given to the consolidated company, but sec. 16 of the Baton Rouge charter and sec. 25 of the M. & V. charter, the only provisions claimed for right of future consolidation, omit the word "immunities," and contain no words equivalent thereto.

All of these sections, being thus put in the same charter, demonstrate that it was the purpose of the legislature to pass the exemption into the L., N. O. & T., under the word "immunities," but to withhold it from any future consolidation by omitting the word "immunities" in said secs. 16 and 25, and by using therein no words to indicate the intention of passing an exemption to any future consolidation; and, in this connection, the court will bear in mind that the act of 1890, as to the sale of the N. J. & C. R. R., on which the Lambert case is based, used the word "immunities," as elsewhere shown. When the legislature passed the act of March 3, 1882—the L., N. O. & T. charter—it necessarily had in mind the provisions of the charters of the M. & V. Co. and the Mississippi Valley & Ship Island Co., because both of these companies are mentioned in the very beginning of the act, and it was passed for their express benefit; and the legislature made these charters necessary parts of the act, because, by its terms, it could not be made effectual without "the charters of said consolidating companies be taken and held to be a part of this act." Said M. V. & S. I. R. R. Co. was incorporated in 1871 (Acts of 1871, p. 237), as the Vicksburg, Pensacola & S. I. R. R. Co. In 1873 its name was changed to M. V. & S. I. R. R. Co. (Acts of 1873, p. 562). The fifteenth section of the original charter of this company gave the power of consolidation (Acts of 1871, p. 247), but omits the word "immunities," and gives no power to vest in the consolidated company the exemption from taxation contained in the twenty-first section of the charter. Besides, the amendatory act of 1873, which vested this exemption from taxation in the charter as amended, uses the word "immunities" in sec. 1, p. 562, acts of 1873. All these things were in the minds of the legislature as parts of said act of March 3, 1882, and show they used the word "immunities" advisedly, and did not intend any exemption should pass into any future consolidation after the formation of the L., N. O. & T., and this sec. 15 of the M. V. & Ship Island R. R. Co.

expressly provided that any consolidation should form one company and have a joint and common stock. Neither could there be a merger. It must be a consolidation, which means the formation of a new company. There is no authority in any of the charters involved in this case to merge one company into another without forming a new company. Every provision of the statutes to which the opposing counsel can appeal provides for a consolidation. Acts of 1870, p. 326, sec. 16 (M. & V. charter); acts of 1882, p. 932, sec. 25 (Baton Rouge charter); acts of 1882, pp. 842, 843, sec. 5 (Y. & M. V. charter).

The three leading cases relied upon by Mr. Mayes as authority for merger in this case are wholly unlike the case at bar, for each of said three cases not only provides for a merger pure and simple, but expressly excludes the power to consolidate: (1) *Tomlinson* v. *Branch,* 15 Wall., 460, was decided upon a statute providing in express terms for a merger; (2) *The Central* v. *Georgia,* 92 U. S., 666, 671, and (3) *Meyer* v. *Johnson,* 53 Ala., 313, are both decided upon statutes which provide for what is called consolidation, but these are misnomers, for the statute in each case provides for a strictly technical merger, but not a consolidation. In each of these three cases the statute provided that one company should merge or pass into the other, leaving the charter of the latter company and the company itself intact, without any change of its officers, organization, or stock, while in the case now under discussion before this court:

1. There is a consolidation of stock.

2. There is a new organization, and the selection of officers for a new company in the deed.

3. A conveyance of all rights and property of both constituent companies to the consolidated company.

4. The articles of consolidation express a doubt as to what it is, and expressly provide that the agreement shall stand whether it be a consolidation or merger.

5. At any rate it forms a new company as to the L., N. O.

& T., and its exemption is thus cut off by sec. 180 of the constitution.

Mr. Mayes cites many authorities to establish the claim that there may be a merger without the loss of the exemption of the company merged. This position we have never disputed, but in case of such merger the exemption never passes unless the legislature expressly so directs. The passing of such exemption is not provided for in this case, and the legal presumption in every case is that it does not pass unless the contrary is clearly shown. "It is incapable of transfer without statutory direction." *Morgan* v. *Louisiana,* 93 U. S., 223; *Chesapeake & O. Ry. Co.* v. *Miller,* 114 U. S., 186.

And even if the statutes provided for the transfer of the exemption of the L., N. O. & T. to the Y. & M. V., the same would be cut off by sec. 180 of the constitution. *Keokuk* v. *Missouri,* 152 U. S., 311, 312; *L. & N. R. R. Co.* v. *Kentucky,* 161 U. S., 695; *Pearsall* v. *G. N. Ry. Co.,* 161 U. S., 667.

Opposite counsel contend that the testimony of Welling shows the stock had never been exchanged. But he is mistaken. Maj. Welling did say that, but after reflection, added: "I do not know as to that question. I do not recall the fact just what was done." (Rec., p. 339.)

The notice for a meeting for August 1, 1893, is for a meeting of the stockholders of the Y. & M. V. R. R. Co. The minutes of that meeting recites that it is a meeting of the stockholders of the Y. & M. V. R. R. Co., and gives the number of shares and names of the holders, and the same is true of the meeting of October 4, 1893. (Rec., pp. 278, 279, 283, 285.)

On August 1, 1893, a resolution was passed that "the stock, property, and franchises of said two corporations had been merged or united in one single corporation under the corporate name of the Y. & M. R. R. Co." We suppose authority for this would be claimed under the charter of the N. O., B. R., V. & M. R. R. Co., which authorized the consolidation to be "under the name of one or both," not "under the name and charter of one

or both," as in *C. R. R.* v. *Georgia,* 92 U. S. (Rec., pp. 285, 286.)

And they also passed a resolution reciting that the Y. & M. V. R. R. Co., the defendant in this case, was "the successor or assignee of the L., N. O. & T. Ry. Co." (Rec., p. 286, and *Keokuk* v. *Missouri,* 152 U. S., 309–312.)

It makes no difference whether the stock has been actually exchanged or not. It is fixed at ten millions of dollars, and a method of exchange is provided for, and a power to exchange. In fact, each share of stock is given the right of a vote in the "consolidated company." There are no old companies to vote in.

Opposite counsel contend that their rights are preserved by sec. 279 of the schedule to the constitution, which, among other things, provides that "the rights of bodies corporate and charters of incorporation shall continue."

To this there are three answers:

1. The power to consolidate is not a right till exercised, but a mere license.

2. As we have shown, under the words or wording of the charters, no exemption would have passed if there had been no constitution. In the Keokuk case, after showing that an exemption would have been cut off by the new constitution, the court, in response to the very point urged here, said it was true sec. 3, art. 11, preserved all existing rights, but that as a matter of law "the exemption ceased not by the operation of the constitution, but by the dissolution of the original companies to which it had attached," and they went on to show that the new constitution simply prevented its revivor in the consolidated company. It extinguished no right but simply prevented its extension to another company. 152 U. S., 311, 312.

3. Shall continue. Continue how long? Forever? Could not the legislature change it? Could not the corporation forfeit or surrender its charter? The plain purpose of sec. 279

was to prevent chaos, to preserve things as they were until changed by the act of the legislature or of the corporation. Any other construction would entirely nullify secs. 180, 181, 197, and many other parts of the constitution. In the deed of consolidation all the property, rights, and franchises of the two companies are transferred to the "consolidated company, without any further act or deed."

Then, where are the other companies?

The same language was held to create a new company in *St. Louis* v. *Berry,* 113 U. S., 475; *Keokuk* v. *Missouri,* 152 U. S., 308.

To still further strengthen this view, it must be observed that the stock was in the entire L., N. O. & T. Ry. Co., a part of which was in Tennessee and a part in Louisiana. The statutes in those states were similar at the time of this consolidation to the Ohio and Missouri statutes in the Keokuk case. 152 U. S., 308-310; Code of Tennessee (1884), secs. 1263-1269; *Board* v. *Gaslight Co.,* 40 La. Ann., 384-387.

Now, the Tennessee and Louisiana ends are a part of this new Y. & M. V. R. R. Co. It is, necessarily, a new corporation as to these ends. It is an entire corporation, and we cannot see how it can get along and do business as a Dr. Jekyll and Mr. Hyde—at one time and place single, and at another time and place double; single stock as to Tennessee and Louisiana, and double stock as to Mississippi, and all created out of the same $5,000,000 stock. Which part of the $5,000,000 is single, and which part is double? Which is Louisiana stock, which is Mississippi stock, and which is Tennessee stock?

There is no creed which requires us to believe that Jonah swallowed the whale, and it is a physical and metaphysical impossibility for a corporation with 6,000 shares of stock to absorb one with 50,000 shares, and allow one vote to each share. The voting power of the latter is more than eight times that of the former, and it could absorb the former and seven more like it, and no legislative declaration or judicial dictum

could alter this fact, for it is founded in the nature of things.

It is admitted that in the act of consolidation the L., N. O. & T. Ry. Co. was dissolved, and is extinct. We have shown that it could not be absorbed by the Y. & M. V. R. R. Co. and leave the voting power of the shares equal. The deed of consolidation provides for the contingency, and says "whatever the effect, the consolidation shall stand and be effective." What is, then, the effect? If the L., N. O. & T. Ry. Co. is extinct, and the voting power of each share of stock is equal, and extends equally all over the property, rights, operations and franchises of the consolidated company, you may put it in what name or call it what you may, but the actual result is a complete and prefect consolidation with the combined voting power of both. One cannot absorb $8\frac{1}{3}$, but 1 and $8\frac{1}{3}$ can make $9\frac{1}{3}$, a new number.

*Eighth.*—The power to consolidate is "the grant of a corporate franchise," and as the consolidation did not take place till after November 1, 1890, any claim of exemption would be cut off.

While the framers of the constitution took care to preserve and protect all those existing rights of corporations which are ordinarily classed under the head of contract or vested rights, yet it was clearly their intention not to extend any unusual privileges beyond that, nor to continue them in any case where it was not required by good faith based on some consideration. Const., sec. 180.

This is made plain by the whole article on corporations, and especially by sec. 180, which is as follows: "All existing charters or grants of corporate franchise under which organizations have not taken place in good faith at the adoption of this constitution, shall be subject to the provisions of this article," etc.

If no organization had been effected under a charter or grant of corporate franchise, there could be no right or obligation to be impaired, and there could be no more reason for continuing exemptions in the one case than in the other, nor than in case of the grant of a new charter. They are all on the same legal

footing, and all take water through the same quill. The power to consolidate is "the grant of a corporate franchise," and called by that expression. 2 Morawetz Priv. Corp., sec. 945, p. 903; *Ashley* v. *Ryan,* 153 U. S. 436, 445. It is not a right but a mere license. *Pearsall* v. *G. N. Ry. Co.,* 161 U. S., 667. And takes effect, not as of the date of charter, but as of the date of the consolidation or exercise of the power. *Keokuk* v. *Missouri,* 152 U. S., 308, 310. And a corporation can have no status or existence till organized. 1 Morawetz Priv. Corp., sec., 288. Hence, unless it had been consummated and organized at the adoption of the constitution, it could not possibly have been legally, or in any other way, entitled to an exemption at that time. *Planters' Fire* v. *State,* 161 U. S., 193.

What is meant by the word franchise, as used in the constitution?

(1) A corporate franchise is the right to exist as a corporation. This franchise is vested in the individual stockholders before the corporation is organized, authorizing them to form such corporation by organization. This is the corporate franchise spoken of in sec. 180 of the constitution.

(2) The right to build and operate a railroad after the corporation is organized is also a franchise, but this franchise belongs to the corporation as an artificial person, and not to the stockholders. This is not the franchise spoken of in sec. 180 of the constitution, because that section treats only of franchises under which no organizations have taken place. Anderson's Law Dic., p. 473; *Pierce* v. *Emery,* 32 N. H., 507; *R. R. Co.* v. *Commissioners,* 112 U. S., 619.

(3) The right to consolidate is a corporate franchise, and may be vested in two or more corporations, giving them the power to exist as one united corporation. This franchise belongs to the constituent corporations just as the franchise first above mentioned belongs to the individual stockholders. These constituent corporations, as artificial persons, may unite under this franchise, organizing themselves into a single new corpo-

ration, which is consolidation. This franchise, therefore, like the first mentioned above, is embraced in the provisions of sec. 180 of the constitution, and, hence, a failure to so "organize" under this franchise as to form the consolidation prior to the adoption of the constitution, forfeited all exemptions when made.

(4) This consolidated corporation, when so organized, may likewise have the right to build and operate a railroad. This is a franchise the same as the one second above mentioned.

There is a perfect analogy between the franchise vested in individuals as natural persons, authorizing them to organize themselves into a corporation, and the franchise vested in constituent corporations as artificial persons, authorizing them to organize themselves into a consolidated corporation, and in neither case can the franchise become effectual without the "organization" of a new company.

The exception in sec. 181 of the constitution, by which exemptions from taxation are continued in force, can only apply to corporations organized before the constitution was adopted, otherwise this exception would nullify that part of sec. 180 as to "existing charters or grants of corporate franchise under which organizations have not, in good faith, taken place." We have shown that this previous "organization" was as necessary in case of the formation of a consolidation by the union of constituent corporations as in case of the formation of an original corporation by the union of individuals. The exemption in sec. 181 applies to "corporations," not to charters. A corporation has no existence until it is organized, and a consolidated corporation has no existence until the consolidation is actually made, and this exception applies alone to corporations as they existed when the constitution took effect, but was never intended to save dormant rights in charters or upon the statutes. If the L., N. O. & T. Co. had any exemption, the same was protected as long as it had a corporate existence, but when it ceased to be a corporation its exemption ceased, for there could

be no exemption to a thing or person that had no existence. The new corporation formed by the consolidation did not exist when the constitution was adopted, and, hence, it is not within the terms of the exception. There is nothing in sec. 181, or in any part of the constitution which justifies the assumption that the constitutional convention intended to allow these exemptions to be transferred from one company to another, by consolidation or otherwise, even in cases where such thing was allowed by their charters. The presumption is that such was not their intention. *Morgan* v. *Louisiana,* 93 U. S., 223; *C. & O. Ry. Co.* v. *Miller,* 114 U. S., 186.

The exception, by its express terms, applies alone to "corporations," and there can be no corporation till the individuals have accepted and organized under the charter, or the constituent companies have accepted and organized under the power to consolidate.

*Ninth.*—The stock was fictitious and not entitled to any dividends as against the state. The railroad companies and the Financial Improvement Company, which built the road, were all owned by the same parties, C. P. Huntington and associates, and R. T. Wilson & Co., in the proportion, respectively, of sixty to forty per centum of the stock. Under such circumstances they were required to deal fairly with the state. *M. & O. R. R. Co.* v. *Tennessee,* 153 U. S., 506, 507.

The amount of the bonds was largely in excess of the cost of the road, and the stock was a mere gratuity, issued as a bonus with the bonds, and issued by themselves to themselves. There was no authority for this. 2 Thompson's Comm. Law Priv. Corp., secs. 1562–1564, 1586; 1 Morawetz Priv. Corp., secs. 286 and 289.

*Tenth.*—The affidavit of Willis Chiles, and the fact that four cases were tried together, and that the jury returned a verdict in favor of the plaintiff in one of the cases, and in favor of the defendants in the other three, on the same evidence, show plainly that it was a compromise verdict, and in such cases the

courts will not hesitate to set it aside. 2 Thompson on Trials, sec. 2606.

*J. A. P. Campbell,* on the same side.

Any immunity from payment of taxes had by the L., N. O. & T. R. R. Co. was lost by its consolidation with the Y. & M. V. R. R. Co., November 24, 1892, first, by virtue of the provisions of the charter of the latter company, which alone authorized the union; secondly, because of secs. 180 and 181 of the constitution of Mississippi, adopted in 1890.

(The first proposition was fully argued with reference to the several charters involved, but as the court gave no expression of its views on this, the argument of counsel on it is not given.)

By sec. 180 of the constitution of 1890, it is declared that all existing charters, or grants of corporate franchises, under which organizations have not, in good faith, taken place at the adoption of this constitution, shall be subject to the provisions of this article, among which is sec. 181, declaring that "the property of all private corporations for pecuniary gain shall be taxed," etc., existing exemptions to continue in force unless sooner repealed. The power to consolidate is a corporate franchise, and where it was not exercised so as to effect organization before the adoption of the constitution, its subsequent exercise was subject to the provision for the taxation of all the property of private corporations for pecuniary gain, in view of which there cannot be an exemption of the property of such corporation, except when like exemption is extended to individuals. Thompson Corp., sec. 365; 112 U. S., 609; 113 *Id.,* 465; 109 *Id.,* 244; 152 *Id.,* 301; 18 Wall., 391; 119 U. S., 191; 32 N. H., 507; Angell & A., 3.

The constitution preserved the *status quo* of existing exemptions, but does not apply to exemption in a new organization effected by the exercise of a corporate franchise after the adoption of the constitution. The purpose of the constitution was to leave existing exemptions to be dealt with by the legislature.

and, if the L., N. O. & T. Co. had continued in being, and the exercise of its rights, the exemption would have been unaffected, but as it was consolidated with the Y. & M. V. Co., and surrendered its existence, in pursuance of a corporate franchise, the organization resulting was subject to the provision that the property shall be taxed. *Keokuk* v. *Missouri*, 152 U. S., 301.

Sec. 279 of the constitution can have no influence in this case. It was wholly unnecessary, is a mere platitude, and could not serve any purpose, except as declarative of what was true without it, viz.: that the adoption of the constitution did not affect the status of existing claims as mentioned. It means this and no more: that the substitution of the new for the old constitution shall not *ipso facto* disturb the *status quo* under the old. It did not, in any way, abrogate or qualify any of the specific provisions of the new constitution.

The case of *Lambert* v. *R. R. Co.,* 70 Miss., 779, so far from being an adjudication of any question here involved, can have no influence on this case. It must be considered with reference to its facts. It was about taxes claimed for years preceding the consolidation here involved, and the transfer by the N. J. & C. R. R. was in March, 1890. The case did not present any of the questions here presented, and whatever was argued by counsel or said by the court in deciding that case, has no relation to this. The effect of the consolidation of the L., N. O. & T. with the Y. & M. V. Co., except as to the right to pay taxes accrued before the consolidation on the N. J. & C. road, was not involved or decided, and could not have been properly remarked upon. There was a careful avoidance of any expression of opinion, even, as to the effect of the consolidation of the L., N. O. & T. Co. with the Y. & M. V. Co., as to anything except the matter before the court. 94 U. S., 351; 152 U. S., 301. In the Lambert case no distinction was made by counsel or court between the taxes of 1891 and 1892. Both were treated as resting on the same proposition. It did not involve anything except the taxes of 1891 and 1892 on the N.

J. & C. R. R. Co. The effect of consolidation between the L., N. O. & T. and the Y. & M. V. Co. was not before the court or considered, except as to the single thing—the right to pay for 1891 and 1892 on the N. J. & C. R. R. Co.

The effect of the constitution upon a new organization, in whatever form, resulting from the exercise of a corporate franchise after November 1, 1890, was not involved in that case, for the sale of the N. J. & C. road was made in March, 1890, and the answer which might, and perhaps should, have been made was that the effect of the constitution was not involved. But what was said is correct, although said unnecessarily, and in no manner affects this case. It was said in response to the arguments of counsel. The exercise, after November 1, 1890, of a corporate franchise could not transfer a pre-existing immunity from taxation as to property of a private corporation for pecuniary gain. The Y. & M. V. Co. cannot claim it, and the L., N. O. & T. Co. is defunct.

To constitute *res adjudicata,* the very matter involved in the second suit must have been decided in the first, and this must not be left to inference or be matter of argument. The very same question must have been involved and decided. If the cause of action in the latter suit may co-exist with that determined in the former suit, the judgment in the former is not conclusive. *Duchess of Kingston case;* Herman on Estoppel, 279; Freeman on Judgments, secs. 256-462, 257, 258. The test is whether the same evidence will support both issues. Freeman on Judgments, sec. 259.

Right or wrong, the decision in the Lambert case related solely to the right of the Y. & M. V. R. R. Co. to pay for 1891 and 1892 on N. J. & C. R. R., and even if it be held to have settled forever the right to pay on that for future years, it cannot be stretched to cover anything else. Because the court held in the Lambert case that the right to pay by affidavit on the N. J. & C. road was not lost by the consolidation, it is now claimed that this adjudicated the right to pay on the L., N.

O. & T. road, a totally different road, when the ground of the decision plainly is the act of 1890, relating alone to the N. J. & C. road. The claim is preposterous. If the court erred in holding that the immunity continued as to the N. J. & C. road, it must be confined to that road, and not extended to another no part of it, and not even consolidated with it legally, though it was practically, and so spoken of by the court.

Why did not the defendants plead the *res adjudicata?* Test it by special pleading, and the claim becomes ludicrous. Let the court draw the plea and consider the effect of a demurrer to it, if the facts are all stated, or a replication, if not.

It should not be forgotten that in the Lambert case the N. J. & C. Co. was complainant, and the Y. & M. V. R. R. Co. was co-complainant, because of its interest as assignee. The N. J. & C. Co. was, and perhaps still is, an existent corporation, never having been consolidated, but alive to claim the immunity secured to it and successors in ownership so solicitously by the act of 1890. It is manifest that the act of 1890, and that alone, carried the court to its conclusion in the Lambert case. Perhaps it gave undue effect to the act of 1890, as insisted by opposing counsel, but it is settled forever. *Res adjudicata* is applicable to that, and to that alone.

As to the matter in issue, Wells on Res Judicata, sec. 200; directness of issue, *Id.,* sec. 203, *et seq.;* certainty of issue, *Id.,* secs. 223, 224; materiality of issue, *Id.,* p. 193, *et seq.;* identity of issues, *Id.* p. 240, *et seq.*

*Calhoon & Green,* on the same side.

Commencing with the code of 1880, we will trace the legislation cognate to the existence of an exemption from taxation, or not, of railroad property under the code of 1892. In the Lambert case (70 Miss., 787) it was held that each railroad in the state was subjected to taxation by the code of 1880, and, hence, all exemptions were thereby repealed. That case also held, without the act being pleaded as an exemption, that the

act of 1884, p. 29, restored the exemption to the Natchez, Jackson & Columbus R. R. Co. This declaration is not sup-ported either by the language of the act itself or by its re-lation to the legislation it amends. Every presumption is against the grant. The code of 1880, §§ 597-606, imposed *ad valoren* taxes. This general law repealed all the special charters in this regard. The Natchez railroad charter had passed under general laws by the acts of 1875, p. 66; 1878, pp. —, in respect to taxation. Privilege taxes were imposed in lieu of *ad valorem* taxes by the acts of 1875 and 1878. The code of 1880 imposed *ad valorem* taxes primarily, but by §§ 607, 608, railroad companies which accept the provisions of the code, in writing, may pay privilege taxes in lieu of *ad valorem* taxes, except municipal taxes. Sec. 606. The policy inaugurated by the code of 1880 continued through all legislation (Acts of 1884, p. 29; 1886, p. 23; 1890, p. 12) to the constitution of 1890 and to the code of 1892. There is no averment in the bill in Lambert's case that the Natchez, Jackson & Columbus R. R. Co. ever accepted, in writing, the provisions of the code of 1880, or of the acts of 1884, or 1886, or 1890. Under these acts there was no exemption from taxa-tion, but only the privilege of substituting privilege for *ad valorem* taxation. The act of 1884 amended only §§ 607, 608, of the code of 1880, as to privilege taxes. It left intact §§ 597-606, imposing *ad valorem* taxes. All of these acts are general revenue laws. As such, the subject of taxation passed out of the domain of special charters.

The act of 1884 was amended by the acts of 1886, pp. 12, 23, and whereby the privilege tax chapter of the code of 1880 was amended so as to require that "hereafter said railroad companies shall pay privilege taxes, respectively, 25 per cent. greater per mile than as fixed in said act" of 1884. This is clearly a repeal of the restoration, if any, of the exemption by the act of 1884. This act of 1886 escaped the attention of both court and counsel in Lambert's case.

The privilege tax sections of the code of 1880 were again amended by the act of 1890, p. 12, and whereby secs. 1 and 2 of said act of 1884 were re-enacted as amended, but the *ad valorem* clauses of the code of 1880 remained intact. Lambert's case held that this act of 1890 continued the "exemption of railroads entitled to it" (p. 787), but it did not hold that it had been repealed by the act of 1886 and re-enacted The proviso is that no railroad shall be subjected to taxation while exempt by its charter. This, under well-established rules, would not create an exemption. This act is a general revenue law.

When the constitution of 1890 was ordained, the Natchez road was not entitled to any exemption from taxation. Lambert's case declared that sec. 181 of the constitution of 1890 has no effect as to the exemption claimed. It left the matter as if the constitution had not been adopted. It let it alone, to rest upon legislation, unaffected by the fundamental law (p. 790).

The code of 1892 contains a revision of all the privilege and *ad valorem* tax laws, and, by § 3379, a privilege tax of a very small amount as compared with the previous tax in lieu of *ad valorem* taxes, is imposed on all railroads. All of the limiting provisions of the acts of 1884 and 1890 are omitted, and privilege taxes, as such, are imposed. This is a plain repeal of the previous legislation permitting privilege taxes to be paid in lieu of *ad valorem* taxes. This repeal left the policy of *ad valorem* taxation in full force. This policy is executed in the code of 1892. Section 3744 declares what property shall be exempt from taxation, and railroads are not mentioned; and this under the spirit of sec. 90 (*h*) const., 1890. Then, by § 3875, *ad valorem* taxes are imposed. To ascertain the taxable value of railroad property, § 3875 requires a return of all of the property of railroads, within and without this state, with its value, so that the value may be ascertained. The property without the state adds value, relatively,

to the property within the state. Dealing with all of the property, wheresoever situated, that section requires that "all of its property, real or personal, taxable and nontaxable," etc., shall be included. By "taxable and nontaxable" property, exemption from taxation was not created or recognized. "Nontaxable" property is not exempt property. Exemption from taxation implies that the property is taxable, but is relieved from payment. Nontaxable property is that upon which no taxes can be imposed. United States bonds are nontaxable property; farm products, if raised in this state, are exempt property. That this language did not mean exempt property is evidenced by the concluding clause: "If any of said property is claimed to be' exempt from taxation, it shall be separately stated, and the law cited under which the claim is made." All property within and without the state must be returned. "If any of said property," within or without the state, is claimed to be exempt, it shall be separately stated, and the law cited, etc. This last clause did not create or recognize any exemption. The assessors were to "assess all railroads . . . and express company property liable to taxation in the state, affixing its true value" (§ 3877), and if there was a "claim" of exemption, it was to be made to the railroad commission, so that it might be adjudged by its order in making the assessment. There is a broad distinction between a provision for propounding a "claim" to an exemption and a legislative declaration of the existence of the exemption. This provision could not impair § 3744: "The following property, and no other, shall be exempt from taxation."

The policy of the constitution of 1890 was to compel corporations for pecuniary gain to bear their equal proportion of taxation. This policy is executed in the code of 1892, wherein, in revision, every provision that squinted at exemption from taxation was omitted and abrogated.

Section 606, code of 1880, was not affected by the privilege tax clauses of the code of 1880, acts of 1884, 1886, and 1890,

and, hence, *ad valorem* municipal taxes have remained intact.

Therefore there was no exemption of any railroad property from taxation under the code of 1892, and especially not that of the Natchez, Jackson & Columbus R. R. Co.

*Mayes & Harris*, for appellee and cross appellant.

The consolidation effected between the Yazoo & Mississippi Valley Railroad Company and the Louisville, New Orleans & Texas Railway Company on the 24th day of October, 1892, was not a waiver of the privilege conferred by sec. 5 of the act of March 3, 1882, incorporating sec. 21 of the charter of the Mobile & Northwestern Railroad Company. On the contrary, notwithstanding such consolidation, the privilege remained to the company, whether we consider the common law applicable to consolidation, or whether we consider the effect of the constitution of 1890.

We submit, however, that this question is not open in this case. It is conclusively settled by *Railroad Company* v. *Lambert,* 70 Miss., 779, and is *res adjudicata* in favor of the company.

In that case the state was represented by its authorized agent to collect taxes by suit, the sheriff of Adams county, just as herein it is represented by the state revenue agent, and the difference in agent is immaterial, the principle being the same; and in that case the Yazoo & Mississippi Valley Railroad Company, the appellant here primarily liable, was also a party to the record. The pleadings in that case, on their face, set forth the identical consolidation which is relied on by the state revenue agent here. The state was represented in the supreme court by the attorney-general; and the record, especially the attorney-general's brief on file therein, shows that two principal propositions were relied on, the second of which was that, so far as the taxes of 1892 (which constituted part of the demand in controversy therein) were concerned, the privilege claimed by the company was waived by the consoli-

dation of October, 1892, and the constitution of 1890 was expressly invoked.

The court held that the consolidation was not a waiver; and in so holding it did not merely settle the question involved, so as to constitute *stare decisis,* but also, as to this litigation, the effect of the consolidation of 1892 becomes *res adjudicata.* It is *res adjudicata* because the state was a party to the cause, and the railroad company was also a party to the same, and the same question was involved and was actually decided, although the controversy was over a different year's taxes, and taxes on a different property. The fact that two suits are for different taxes does not prevent the operation of the doctrine of *res adjudicata.* The principle is that where the second action is on a different claim or demand, and is between the same parties, the former judgment is, it is true, conclusive only as to those matters in issue, or points controverted, upon the determination of which the finding or verdict was actually based; but it is conclusive as to them. 1 Greenleaf' Evidence, secs. 523, 534, 535, note 9; 21 Am. & Eng. Enc. L., 200*b*; *Lovejoy* v. *Murphy,* 70 U. S., 1, 19; *Robins* v. *Chicago,* 71 U. S., 657, 673; *Butterfield* v. *Smith,* 101 U. S., 570; *Brooklyn, etc.,* v. *Bank,* 102 U. S., 14, 22; *Hale* v. *Finch,* 104 U. S., 261, 265; *Plumb* v. *Crane,* 123 U. S., 560; *Keokuk* v. *Missouri,* 152 U. S., 301; *Nesbit* v. *Riverside Dist.,* 144 U. S., 610; *Wilmington, etc., R. R.* v. *Alsbrook,* 146 U. S., 279.

Coming now to the merits of the question, we maintain that the consolidation of 1892 was not a waiver of the privilege of sec. 21, so corporated into the act of March 3, 1882; and, first, that it was not such a waiver, whether the effect of that consolidation is considered and decided under and by the general principles of the law of consolidations as declared by the courts; and, secondly, that it was not such a waiver, even under the altered condition of the law as established by the adoption of our new constitution of 1890.

1. It was not a waiver when considered under the general

principles of the law without reference to the constitution of 1890. Under such general law, a privilege like this passed to the consolidated company whether the statutes authorizing the consolidation do or do not so provide, and it so passed whether the consolidation does or does not create a new company in the legal sense. We state the law as it is, not as we need it to be; for the law is wider than our necessity. Our statutes do provide, in effect, that the privilege shall pass by the consolidation; and our consolidation did not create a new company in the legal sense, but the existence of the Y. & M. V. continued unbroken; the consolidation made operated only as a merger of the L., N. O. & T. into the Y. & M. V. *Philadelphia, etc., R. R. v. Maryland,* 10 How., 276; *Tomlinson v. Branch,* 15 Wall., 460; *Charleston v. Branch, Id.,* 677; *Delaware Railroad Tax cases,* 18 Wall., 206; *Central Railroad v. Georgia,* 92 U. S., 665; *Southwestern Railroad v. Georgia, Id.,* 676; *Chesapeake, etc., v. Virginia,* 94 U. S., 718; *Greene County v. Conness,* 109 U. S., 104; *Tennessee v. Whitworth,* 117 U. S., 139; *Wilmington, etc., R. R. v. Alsbrook,* 146 U. S., 279. See also analogous questions, *Scotland v. Thomas,* 94 U. S., 682; *Schuyler Co. v. Thomas,* 98 U. S., 169; *Wilson v. Salamanco,* 99 U. S., 499; *Empire v. Darlington,* 101 U. S., 87; *Menasha v. Hazard,* 102 U. S., 81; *New Buffalo v. Cambria Iron Co.,* 105 U. S., 73; *Citizens' Street Railway v. Memphis,* 53 Fed. Rep., 715; *People v. L. & N. R. R. Co.,* 120 Ill., 48, 61; *O. & M. Ry. Co. v. People,* 123 Ill., 467, 483; *State v. Keokuk, etc., Ry. Co.,* 99 Mo., 31, 36.

2. The consolidation of 1892 was not a waiver of the company's privilege, even when considered in relation to the new constitution of 1890. That consolidation did not form a new company. It operated only as a merger of the L., N. O. & T. into the Y. & M. V., and the existence of the latter dates back to its original charter, in 1882, with its autonomy unbroken.

The continuity and unity of the Y. & M. V. is not broken because of the fact that it has absorbed the L., N. O. & T.,

nor by the further fact that, in absorbing it, new rights were acquired, new property obtained, and a further issuance of stock possibly entailed. That consolidation was made under sec. 16 of the original charter of the Memphis & Vicksburg Company and under sec. 25 of the original charter of the Baton Rouge Company (both of which had been incorporated into the charter of the L., N. O. & T. by sec. 1 of the act of March 3, 1882), and also under sec. 5 of the charter of the Y. & M. V. Company. These charters authorized a consolidation to be made upon such terms as the consolidating companies should agree on, and the articles of consolidation expressly stipulated that the consolidation, when made, should not disturb the corporate existence of the Y. & M. V. Company, or form any new and distinct corporation. *Railroad Company* v. *Howard,* 13 How., 332, 333; *Pullman Car Co.* v. *Missouri Pacific Co.,* 115 U. S., 587, 594; *Central Railroad* v. *Georgia,* 92 U. S., 665; *Southwestern Railroad* v. *Georgia, Id.,* 676; *Greene County* v. *Conness,* 109 U. S., 104; *Citizens' Street Railway* v. *Memphis,* 53 Fed. Rep., 715; *Meyer* v. *Johnston,* 53 Ala., 237, 313.

The cases which hold that the consolidations under consideration therein created new companies are distinguishable from the one at bar. In them, new companies were created because of the absence of enabling terms in their charters, and because when the consolidation was effected there was a rule of local state law, affirmatively expressed in the statutes, that such consolidation must, and did, form a new company independent of and against the expressed will and written contract of the contracting parties. See *Shields* v. *Ohio,* 95 U. S., 319; *Railroad Company* v. *Maine,* 96 U. S., 499; *Railroad Company* v. *Georgia,* 98 U. S., 359; *Railway Company* v. *Berry,* 113 U. S., 465; *Wabash* v. *Railway Company,* 114 U. S., 587, 595; *Pullman Car Co.* v. *Pacific Co.,* 115 U. S., 587, 594; *Wilmington R. R. Co.* v. *Alsbrook,* 146 U. S., 279; *Keokuk* v. *Missouri,* 152 U. S., 301; *Railway Company* v. *People,* 123 Ill., 467,

483; *Insurance Company* v. *Railway Company,* 149 Mass., 214, 220; *Day* v. *Railroad Company,* 151 Mass., 302, 307; *Railroad Company* v. *Jones,* 29 Ind., 465; *Paine* v. *Railroad Company,* 31 Ind., 349; *Railroad Company* v. *Powell's admr.,* 40 Ind., 89; *Railroad Company* v. *Hendricks,* 41 Ind., 60; *Railroad Company* v. *Boney,* 117 Ind., 501; *Berry* v. *Railroad Company,* 52 Kas., 774; *Langhorne* v. *Railroad Company,* 91 Va., 369; *Cumberland Railroad* v. *Railroad Companies,* 177 Pa., 519.

Furthermore, the bare fact that by a consolidation a new company is formed does not cause a lapse or forfeiture or waiver of any privilege, even of exemption from taxation, previously enjoyed by one of the consolidating companies. On this point the counsel for appellant, in their argument, beg a great part of the question. In order that such a lapse or waiver shall occur, there is needed a double event: First, the creation of a new company by the consolidation; and, secondly, the creation of that new company at such time and under such conditions that for it to acquire the controverted privilege at the time of the consolidation would be to violate some expressed will of the state, expressed either by statute or by constitution. The lapse or waiver does not occur if either no new company was created or there is no such expressed will to be violated. This is clearly shown in *Tennessee* v. *Whitworth,* 117 U. S., 138, and is expressly admitted even in *Keokuk, etc., Railroad Co.* v. *Missouri,* 152 U. S., 301.

There is no such prohibition expressed in the constitution of 1890. That constitution was a movement to establish, and reestablish and maintain, legislative power. The question of exemption from taxation was not at that time a question of legislative power, because the constitution of 1869 had already secured that point. The harm against which sec. 180 of the constitution was directed was this: To subject charters theretofore granted, but not accepted because not organized under, to the new rules of the constitution, they being as yet mere

offers of franchises by the state, and not closed contracts. The provision had no relation to a mere consolidation of two old companies long since organized and in active business under their charters. *People* v. *Stanford,* 77 Cal., 371; *Santa Ana Co.* v. *San Buenaventura,* 56 Fed. Rep., 339, 351.

Furthermore, suppose, on the other hand, that sec. 180 did include such a transaction as this consolidation, and suppose that by the consolidation a new corporation was formed, still the privilege was not lost by operation of the constitution. Sec. 180, by its own terms, clearly fixes the consequence when any corporation shall be organized under its dominance. That consequence was that such corporation should "be subject to the provisions of this article;" that is to say, it would become subject to the new rule of legislative power to amend, repeal, or alter, laid down in sec. 178, and to the ninety-nine-year rule as to duration. So, also, of sec. 178, etc. But just so clearly as those new rules are laid down in art. 7, quite as clearly does the same article in sec. 181 declare that "exemptions from taxation, to which corporations are legally entitled at the adoption of this constitution, shall remain in full force and effect for the time of such exemption as expressed in their respective charters, or by general law, unless sooner repealed by the legislature."

Here, then, in the very article to which they "become subject," is a specific and clear direction that the privilege should remain until repealed by the legislature. It is manifest that the convention did not intend to embrace, as a condition to the exercise of any powers contained in charters already granted and organized under and put into operation, the requirement that the companies should come under any new and different law as made by the constitution itself. *County of Scotland* v. *Thomas,* 94 U. S., 682, 688; *Supervisors* v. *Galbraith,* 99 U. S., 214, 220; *Pretty* v. *Solly,* 26 Beav., 606; Endlich on Interpretation of Statutes, sec. 216.

This view is strongly reinforced, indeed made conclusive,

by sec. 279 of the constitution. That section declares that all rights, etc., rights of individuals and bodies corporate, and of the state and charters of incorporation, shall continue, etc.

Nor does this position at all conflict with the case of *Louisville R. R. Co.* v. *Kentucky,* 161 U. S., for here it is only a question as to what is the true intent of the constitution itself, while there it was a question of power in the constitution to control the effect of a consolidation.

The brief of Messrs. Mayes & Harris on the appeal of the revenue agent, and on the cross appeal of the company, was very voluminous, being 367 printed pages; but the residue of it was devoted to a consideration of points of error (of which seventy-one were assigned) not passed upon by the court in its decision.

Argued orally by *R. C. Beckett, Frank A. Critz, J. A. P. Campbell,* and *Marcellus Green,* for the appellant and· cross appellee, and by *Edward Mayes,* for the appellee and cross appellant.

WHITFIELD, J., delivered the opinion of the court.

The question which lies at the foundation of this case is this: Conceding for argument's sake that the L., N. O. & T. R. R. Co. had an exemption from taxation, did the consolidation of that railroad with the Yazoo & Mississippi Valley Railroad Company on October 24, 1892, create a new corporation, as of that date, and thus result in the cutting off of said exemption by sec. 180 of the constitution of 1890? If this question be answered in the affirmative, then, obviously, the contention of the state must prevail throughout, without regard to any other questions in the case. The power to consolidate must be granted by the state, and permission to consolidate, so granted, is not a contract, but a mere license. 6 Am. & Eng. Enc. L. (2d ed.), p. 802; *Pearsall* v. *G. N. Ry. Co.,* 161 U. S., 667; *Louisville, etc., Railroad Co.* v. *Kentucky,* 161 U. S., 695; *Keokuk, etc., Railroad Co.* v. *Missouri,* 152 U. S., 312.

These railroad companies were perfectly free to consolidate or not. The L., N. O. & T. R. R. Co., if it had a legal exemption, could have retained it by simply retaining the precise corporate existence it then had. Sec. 181 of const. of 1890. Consolidation was voluntary on their part, and effected subject to the law and constitution then in force. What the effect of consolidation is depends upon the will and purpose, not of the corporation, but of the state speaking through the legislature.

Great stress has been laid upon the provisions of sec. 5, acts of 1882, p. 843, to the effect that the Y. & M. V. R. R. Co. might consolidate with other railroad companies "upon such terms as they may agree upon." But this simply meant "such terms as they, the companies, might agree upon," consistent with the law as announced in their charters, and otherwise. The charter of the Memphis & Vicksburg Railroad Company, one of the constituents of the L., N. O. & T. R. R. Co., expressly stipulates any consolidation shall be "on such terms as may be consistent with the powers conferred on said company." Substantially identical language with the language of sec. 5, supra, occurred in the charters under consideration in *Keokuk, etc., Railroad Co.* v. *Missouri,* 152 U. S., at p. 309, top of the page, and *Railroad Co.* v. *Georgia,* 98 U. S., at p. 361, and in many other cases. These words, "upon such terms as they may agree upon," are not new. They perhaps appear substantially in all grants of power to consolidate railroad or other corporations—as, for example, in the *Atlanta, etc., Railroad Co.* v. *State,* 63 Ga., at p. 486. They have no magic in them. They are plain, everyday phrases, and relate alone to the mere administrative details attending the consolidation of corporations, which must, of course, be left to the officers of such corporations, and with which the legislature cannot be burdened; and they convey no substantive powers or rights. These must be found, if anywhere, expressly set forth by the legislature in the charters in the first instance,

and not delegated to the corporations, to be worked out under the gloss of these mere administrative phrases. Whether, therefore, the union of these two corporations resulted in consolidation and the creation of a new corporation, or in mere merger of the L., N. O. & T. R. R. Co. with the Y. & M. V. R. R. Co. is to be found, not in this phrase so much relied on, but in the clear purpose of the legislature. The articles of consolidation are to be carefully looked to, of course, but they must conform in what they do, if valid, to the purpose of the legislature as to what the effect of the consolidation shall be. *Keokuk, etc., Railroad Co.* v. *Missouri,* 152 U. S., 305; *Central Railroad Co.* v. *Louisiana,* 92 U. S., 660.

Let us inquire, then, what the effect of this consolidation was; and, first, What railroads entered into this consolidation? The L., N. O. & T. R. R. Co. and the Y. & M. V. R. R. Co. What was the L., N. O. & T. R. R. Co.? It is described in the "Articles of Consolidation" as "The Louisville, New Orleans & Texas Railway Company, a corporation of the states of Tennessee, Mississippi, and Louisiana of the first part;" and it is further expressly declared in said articles that the consolidation is effected "under and by virtue of the charters of the respective states of Tennessee, Mississippi, and Louisiana, in such case made and provided," etc. The two ends of this railroad are in Louisiana and Tennessee. Now, what are the laws touching consolidation in these states, "in such case made and provided?" Of course we deal here exclusively with the Mississippi corporation under our laws; but the laws of Louisiana and Tennessee are expressly referred to as having been held in mind in effecting this consolidation, and they will materially aid us in solving this question. The road, with all its property, was a unit in the three states. If the effect of the consolidation in Tennessee and Louisiana was known necessarily to be the creation of a new corporation, it hardly comports with reason to suppose that any different consolidation would have been sought at the hands of the Mississippi legis-

ture or granted by it, if sought; and so we shall find it to be. The act No. 157 of 1874 of Louisiana, set forth in 40 La. Ann., p. 385, a general law, expressly provides that "any two business [companies] may consolidate said corporations and form one consolidated company, holding, etc., all property, etc., belonging to each, and under such corporate name as they may agree upon; and a certificate of the fact of such consolidation, with the name of the consolidated company, shall be filed and recorded in the office of the secretary of state." This is like the Ohio and Missouri statutes, referred to in *Keokuk, etc., Railroad Co.* v. *Missouri,* 152 U. S., 308-310, and they were all held to provide for a consolidation resulting in a new corporation. *Board* v. *Gaslight Company,* 40 La. Ann., 384. The provisions of the Tennessee code (Mill. & V.), 1884, §§ 1263-1270, are stronger and more explicit still in necessitating the creation of a new corporation, § 1270 expressly declaring that no exemption from taxation of any constituent company should pass to the consolidated company. The Tennessee and Louisiana ends of the L., N. O. & T. R. R. are integral parts now of the present Y. & M. V. R. R. As to these ends, under Louisiana and Tennessee law, the present Y. & M. V. R. R. is undoubtedly a new corporation. How, then, can this corporation—the present Y. & M. V., an entire corporation—be one new corporation, with stock of but one corporation, the new one, in Louisiana and Tennessee; and, in Mississippi, not one new corporation, and having double stock of both constituent roads? As counsel very pertinently asks: "Which is Tennessee stock, which is Louisiana stock, and which is Mississippi stock?"

What, now, are the provisions of Mississippi law as to this consolidation? The L., N. O. & T. had itself no power to consolidate, and it is conceded that this consolidation of the L., N. O. & T. with the Y. & M. V. did not take place under sec. 1 of the act of 1882—the charter of the L., N. O. & T.—but that the power of consolidation authorized by that section

was exhausted in the consolidation of the Baton Rouge Railroad with the M. & V. R. R., forming the L., N. O. & T. R. R. The provisions of law we look to, then, as authorizing the consolidation under consideration are sec. 16 of the acts of 1870, p. 326, the charter of the Memphis & Vicksburg Railroad Company; sec. 25 of the acts of 1882, p. 932, the charter of the N. O., B. R., V. & M. R. R. Co., the Baton Rouge charter; and sec 5 of the acts of 1882, pp. 842, 843, the Yazoo & Mississippi Valley Railroad charter. The language of said section 16 is as follows: "That said company shall have the right and power to consolidate the stock, property, and franchises of the road with any other road or roads, in or out of this state, at any time that the president and directors of the road may deem proper, and upon such terms as may be consistent with the powers conferred upon said company." We understand the well-settled rule of law, as declared by the supreme court of the United States to be that a consolidation of stock results uniformly and necessarily in the creation of a new corporation. *Clearwater* v. *Meredith,* 1 Wall., 25; *Savannah, etc., Railroad Co.* v. *Georgia,* 98 U. S., 361, 363, 364; *Keokuk, etc., Railroad Co.* v. *Missouri,* 152 U. S., 308; *St. Louis, etc., Railway Co.* v. *Berry,* 113 U. S., 466–473; Green's Brice's Ultra Vires, note at p. 538.

In 98 U. S., supra, at pp. 363, 364, the court says "that generally, the effect of consolidation, as distinguished from a union by merger of one company into another, is to work a dissolution of the companies consolidating, and to create a new corporation out of the elements of the former, is asserted in many cases, and it seems to be a necessary result. In *McMahan* v. *Morrison,* 16 Ind., 172, the effect of a consolidation was said to be a dissolution of the corporations previously existing, and at the same instant the creation of a new corporation, with property, liabilities, and stockholders derived from those passing out of existence. So in *Lauman* v. *Lebanon, etc., Railroad Co.,* 30 Pa. St., 42, the court said: 'Consoli-

77 Miss.—16

dation is a surrender of the old charter by the companies, the acceptance thereof by the legislature, and the formation of a new company out of such portions of the old as enter into the new.' This court, in *Clearwater* v. *Meredith*, 1 Wall., 40, expressed its approval of what was said in the former of these cases. It is true these expressions have not all the weight of authority, for they were not necessary to the decisions made, but they are worthy of consideration, and they are in accordance with what seems to be sound reason." Justice Strong, who delivered this opinion, also delivered the opinion in 92 U. S., where, at p. 671, he referred, in the spirit of criticism, to these cases. It is, therefore, noteworthy that three years later, after fuller consideration, he says, speaking for a unanimous court: "They are in accordance with sound reason." The authority in 98 U. S., 361, was to "consolidate their stocks upon such terms as might be agreed upon by the directors and ratified by a majority of the stockholders," and it was unanimously held that it was not merger, as in 92 U. S., 665, nor alliance or confederation, but consolidation, resulting in the formation of a new company. Said the court, at p. 364: "When, as in this case, the stock of two companies is consolidated, the stockholders become partners, or quasi partners, in a new concern. Each set of stockholders is shorn of the power which, as a separate body, it had before. Its action is controlled by a power outside of itself. To illustrate: The stockholders of the Savannah & Albany Railroad Company could not, after consolidation, have exercised any of the powers or franchises they had prior to their consolidation with the stockholders of the Atlantic & Gulf Railroad Company. They could not have built their road or controlled its management. They could not, therefore, have performed the duties which, by their original charter, were imposed upon them; those duties could only have been performed by another organization, composed partly of themselves and partly of others. Their powers, their franchises, and their privileges were therefore gone, no longer

capable of exercise or enjoyment. Gone where? Into the new organization, the consolidated company, which exists alone by virtue of the legislative grant and which has all its powers, facilities, and privileges by virtue of the consolidation act. What, then, was left of the old companies? Apparently nothing. They must have passed out of existence, and the new company must have succeeded to their rights and their duties; but the new company comes into existence under a fresh grant. Not only its being, but its powers, franchises, and immunities, are grants of the legislature which gave it its existence." Since, then, a consolidation of the stock of two corporations means the creation of a new corporation, it necessarily follows that the power to consolidate given by this sec. 16, supra, did not authorize a merger or any consolidation except such as resulted in the formation of a new company. The next source of power to consolidate is sec. 25, acts of 1882, p. 932, supra. That provides "that the company shall have power and authority to . . . consolidate the company with any other company, under the name [not under the name and 'charter, as in 92 U. S., 667] of one or both; but when such . . . consolidation is effected, the said company shall be entitled to all the benefits, rights, franchises, lands, and property of every description belonging to said road or roads so consolidated." The language here sharply distinguishes between the old companies and the new, in a way that makes it perfectly clear the legislature meant the consolidation to result in the creation of a new corporation. Said company, that is the new consolidated company, may be under the name of one, but not the charter of one; on the contrary, it, said company, shall be entitled to all the benefits, etc., belonging to said roads— all of them so consolidated. Manifestly the legislative purpose here was the consolidation of two or more companies into one new company. No power can be found here for merger. The next source of power to consolidate is sec. 5 of the acts of 1882, p. 843, which provides: "Said company may con-

solidate with any other railroad company in or out of the State of Mississippi, upon such terms as the consolidated company may agree upon; and upon any such consolidation the consolidated company shall have and enjoy all the property, rights, privileges, powers, liberties, and immunities and franchises herein granted; but such consolidation shall not have the effect of exempting from taxation the railroad or property owned by such other consolidated company prior to its consolidation with the company hereby chartered, nor of exempting from taxation any property which the consolidated company may, after such consolidation, acquire under the provisions of the charter of such other consolidating company." Clearly here, also, it is consolidation and not merger which is provided for, and such consolidation as should result in a new company, a "consolidated company which should" enjoy all the property, etc., of its previously existing constituent companies. It will not fail to be noted that in none of these acts is the word "merger" ever used. Always and everywhere it is "consolidation" alone that is authorized. If merger merely was intended, what was easier than to have used the words appropriate to manifest that intention? Why this careful and exclusive use of the word "consolidation?" And not of this word only, but of other terms indicating a clear intention to create a new consolidated company? We conclude, therefore, on a review of the statutes authorizing the consolidation under review that, so far as the purpose of the legislature was concerned, it was its clear purpose that consolidation, and not merger, should occur, and such consolidation as should result in the creation of a new corporation.

Counsel for the railroad company relies on three authorities especially to show that what the legislature here intended was merger: *Tomlinson* v. *Branch,* 15 Wall., 460; *Central Railroad Co.* v. *Georgia,* 92 U. S., 666; and *Meyer* v. *Johnson,* 53 Ala., 313. But in *Tomlinson* v. *Branch,* Mr. Justice Bradley properly characterized what was done as

"amalgamation," which is merger, and not consolidation (15 Wall., 463), and the act of the legislature expressly provided for merger. It provided (p. 463) that "the said South Carolina Canal & Railroad Company shall be merged in the said South Carolina Railroad Company," and provided expressly that the South Carolina Railroad Company should retain its autonomy and previous existence. There was no room for construction in this case, and it was conceded on all hands that what occurred was merger. So in *Central Railroad Co.* v. *Georgia,* it was expressly provided (92 U. S., 671) that the union should take place under "the name and charter of the Central Railroad & Banking Company." Merger was clearly provided for (pp 671-3); and in *Meyer* v. *Johnson,* 53 Ala., the court lay stress upon the word "unite" (p. 318)—"were united with those of the Alabama Company and vested in it, so as to enable it [called in the contract the consolidated company, because their franchises were consolidated with it]," etc.—a case, again, of merger. The authorities are wholly inapplicable to a case like this, where the statutes all sedulously avoid the word "merger," exclusively use the word "consolidate," and accompany that word, definite enough in itself, with other provisions, which leave no doubt that consolidation, resulting in the creation of a new corporation, was intended. Turning now from the legislative purpose, let us see what was actually done in pursuance of this power to consolidate.

1. The stock of the two companies was consolidated. Learned counsel for the railroad insists that the testimony of Welling shows that the stock was never exchanged. He is mistaken in this. Welling does so state, but on cross-examination expressly declares on this very point, "I do not know as to that question, I do not recall the fact just what was done;" and he is a witness for the railroads. This falls far short of showing that the stock was not exchanged; the other testimony shows it was.

2. The deed of consolidation, on its face, provides for and

creates a new organization and new officers. See articles 4, 5, 6, 7, and 8.

3. The fifth article of consolidation conveys all the "rights . . . . ' property, etc., of every kind belonging to either of the parties . . . to the consolidated company, without any further act, deed, or conveyance," distinguishing clearly between the two previous companies—"either of the parties"— and the new company, the grantee, the "consolidated company."

4. The articles of incorporation themselves on their face declare that doubt exists as to the effect of what has been done, and conclude most significantly: "But whatever may be the legal consequence of the consolidation herein provided for, this agreement is to stand and be effective." This is pregnant with meaning. The railroad companies knew that the only power the legislature ·had given was to so consolidate as to create a new corporation, and that under sec. 180 of the constitution of 1890 the exemption, if any existed, would be cut off. They knew the only word used was "consolidate" in all the legislative acts, and that merger and consolidation are very distinct and different things; and yet, not conforming to the power, but seeking to carry the exemption in spite of it, they used the words "unite, merge, and consolidate," and say that "such consolidation shall be effected by uniting or merging the stock, property, and franchises of the L., N. O. & T. R. R. Co. with and into the stock, property, and franchise of the said Yazoo & Mississippi Valley Railroad Co. without disturbing the corporate existence of the last named company, or the formation of any new, distinct corporation, unless such result shall be necessary to give legal effect to this agreement; but whatever may be the legal consequence of the consolidation herein provided for, this agreement is to stand and be effective." Doubtless they desired to merge; but the legislature had only authorized consolidation, and such consolidation as necessarily resulted in the creation of a new corporation, and they could only lawfully do what the legislature in fact

authorized, not what they might wish to do; and the words "consolidate upon such terms as they might agree upon" mean that the thing done must be consolidation, but the mere administrative details of uniting the two into one new corporation were left to the companies. Names count for nothing; it is substance courts look to. Consolidation resulting in the creation of a new corporation is what the legislature authorized, is what the articles of consolidation actually effected, and it is utterly beyond the power of the railroad companies to change the essential nature of what was done by calling it "merger."

We have not adverted to all the considerations sustaining this view. The closer the analysis of the articles of consolidation and of the action of the authorities of the two companies, the more indisputably it appears that such consolidation as resulted in the creation of a new corporation was precisely what was effected. The notice for a meeting of the stockholders called for August 1, 1893, is a meeting of the stockholders of the Y. & M. V. R. R. Co. The minutes recite that it was a meeting of the stockholders of the Y. & M. V. R. R. Co., and gives the number of shares and names of the holders; and all this is true also of the meeting of stockholders of October 4, 1893. Again, on August 1, 1893, a resolution was passed "that the stock, property, and franchises of said two corporations had been merged or united in one single corporation under the corporate name of the Y. & M. V. R. R. Co." Another resolution was passed, reciting that the Y. & M. V. R. R. Co. was the "successor" or assignee of the L., N. O. & T. R. R. Co. Of course the mere name—Y. & M. V. R. R. Co.—is utterly immaterial in determining whether it is attached to the same old company, known as the Y. & M. V. R. R. Co., or to the consolidated company, the new company, and this action of the stockholders, as well as the articles of consolidation, pointed clearly to the same result—consolidation, and not merger. The new company was the successor or assignee

of the two old companies, and the language of Mr. Justice Brown, of the supreme court of the United States, in *Keokuk, etc., Railroad Co.* v. *Missouri*, 152 U. S., 309, fits in here as if uttered for this case: "It is impossible to conceive of a corporation existing without stock or certificates representing the interests of the corporators in the organization. Now, if the act provides [the deed in the case at bar] that these certificates shall be surrendered and certificates in another company issued in their place, what becomes of the prior companies? Who are their stockholders? Who their officers? [The deed in this case appoints an entirely new set of officers. See charter book, pp. 731, 732.] If the stock in the new company is sold, what interest in the prior company passes by the sale? There can be but one answer to these questions. The property and franchises of the prior companies are gone, as much as if they had surrendered their charters. The new company doubtless received by transmission from its constituent companies their property, rights, privileges, and franchises, including any immunity from taxation; but it receives them as an heir receives the estate of his ancestor, or as a grantee receives the estate of a grantor—by inheritance, succession, or purchase. The result is not a mere union or partnership of two companies, nor the merger of franchises of one in another, but the extinguishment of one and the creation of another in its place. It follows from this that when the new corporation came into existence, it came precisely as if it had been organized under a charter granted at the date of the consolidation and subject to the constitutional provisions then existing." To the same effect, also, is *St. Louis, etc., Railway Co.* v. *Berry*, 113 U. S., 469-475.

Art. 2 of the articles of consolidation is as follows: "The corporate name of the said consolidated company shall be the Yazoo & Mississippi Valley Company." Articles 4 to 8, inclusive, are as follows:

"Art. 4. Every holder of the stock of either of the said companies now outstanding shall be entitled to cast one vote

for each share of stock held by him in the stockholders' meetings of the consolidated company, which vote may be cast either in person or by proxy, and shall have all the rights of a stockholder of the consolidated company as fully as if new shares of the consolidated company had been issued and exchanged therefor; and in case the consolidated company shall determine to issue new shares, such shares shall be exchangeable at par for the now outstanding shares of each of the constituent companies; and the remainder of the capital stock of the consolidated company shall be issued from time to time, and upon such terms and conditions as may be prescribed by the board of directors of said company.

"Art. 5. All and singular the rights, powers, privileges, immunities, and franchises, and all the railroads, real and personal estate, easements, fixtures, equipments, choses in action, and property and assets of every kind, nature, or description belonging to either of the parties hereto, shall be vested in and become the property of the said consolidated company, without any further act, deed, conveyance, or assurance being required in the premises.

"Art. 6. The affairs of the consolidated company shall be managed by a board of directors, which shall consist of such a number of members, not less than five, as the company may determine from time to time, each of whom shall be a stockholder, and one of them a resident of the State of Mississippi, one of Tennessee, and one of Louisiana. The members shall be divided into three equal classes, as nearly as practicable. Successors, for the term of three years, shall be chosen for those belonging to the first class at the first annual meeting of the stockholders held after this consolidation shall have been effected; for those who belong to the second class, at the next annual meeting, and for those belonging to the third class, at the next succeeding annual meeting of the stockholders. Each director successively chosen shall continue in office until his successor is elected. Vacancies in the board, caused otherwise

than by expiration of term for which the retiring director was chosen, may be filled by a vote of a majority of the directors remaining, such appointee to continue in office until the next regular election of directors by the stockholders. The first board of directors shall be composed of the following members, divided into three classes, as follows: First class, Stuyvesant Fish, Adolph Schreiber, W. C. Craig, Chas. A. Peabody, Jr.; second class, John W. Auchinloss, Walther Luttgen, Edward H. Harriman, J. T. Harahan; third class, S. V. R. Cruger, R. P. Neely, R. C. Shepherd, John C. Welling.

"Art. 7. The board of directors of said consolidated company shall choose one of their number president, whose term of office shall be one year, or until his successor shall be chosen or qualified. They may also appoint such other officers and agents as they may deem necessary from time to time, and prescribe their duties and compensation; and may provide, by the by-laws to be adopted, such rules and regulations relating to the affairs and business of said company as may be necessary or proper. The said board shall also have power to appoint an executive committee, of whom the president shall be one *ex officio,* who shall possess and exercise all the powers and duties of the board of directors when the board is not in session. Until otherwise ordered, the corporate seal of the said consolidated company shall be that of the Yazoo & Mississippi Valley Railroad Company.

"Art. 8. The said consolidated company shall be, and the same is hereby, authorized and empowered in such a manner and upon such conditions as are permitted by law, to issue its bonds and secure the same, as well as all bonds heretofore issued by either of the constituent companies, or that have been heretofore or may be hereafter issued by any other railroad company, by mortgage or deed of trust, upon all or any of its railroads, rights, franchises, and property, real and personal, wherever the same may be situated, and whether the same may be owned by said company at the time this consolidation is

effected or may be hereafter acquired; and may also exercise any and every other corporate right or power now vested in or which might have been heretofore lawfully exercised by either of said constituent companies."

It will be seen that said art. 5 itself conveys all the property, rights, and franchises, etc., belonging to either constituent to the consolidated company, without any further act, "deed, conveyance, or assurance being required in the premises," and in this regard is substantially identical with the provisions in *St. Louis, etc., Railway Co.* v. *Berry,* 113 U. S., 475, and *Keokuk, etc., Railroad Co.* v. *Missouri,* 152 U. S., 308, both of which cases hold that a new corporation was created.   It will be noticed also that art. 6 creates a new organization, and actually names a new set of directors for the consolidated company, who are, under art. 7, to elect officers for the consolidated company.   It will be noticed that art. 8 authorizes the new consolidated company to "issue its bonds and secure the same, as well as all bonds heretofore issued by either of the constituent companies," and further provides "that the consolidated company shall exercise any and every other corporate right or power now vested in, or which might have been heretofore lawfully exercised by, either of said constituent companies," clearly drawing the distinction between the two previous constituent companies and the new consolidated company; and it will further be specially noticed, and to this we direct the closest attention, that art. 4 provides "that every holder of the stock of either of the said companies now outstanding shall be entitled to cast one vote for each share of stock held by him, in stockholders' meetings of the consolidated company, and shall have all the rights of a stockholder of the consolidated company as fully as if new shares of the consolidated company had been issued and exchanged therefor." Now, it is clearly admitted by both sides that the L., N. O. & T. Railroad Company was dissolved and became extinct.   The L., N. O. & T. Railroad Company had 50,000 shares of stock;

the Y. & M. V. had 6,000 shares of stock, and if anything is certain, it is undoubted that it is a metaphysical and legal impossibility that a corporation with 6,000 shares of stock could absorb one with 50,000 shares, and allow one vote to each share. It is well said by counsel for the revenue agent: "The voting power of the latter is more than eight times that of the former, and it could absorb the former and seven more like it, and no legislative declaration or judicial dictum could alter this fact, for it is founded in the nature of things. The deed of consolidation provides for the contingency, and says whatever the effect, that consolidation shall stand and be effective. What is then effected? If the L., N. O. & T. Railroad Company is extinguished and the voting power of each share of stock is equal, and extends equally over all the property, rights, operations, and franchises of the consolidated company, you may put in what name, or call it what you may, but the actual result is a complete and perfect consolidation with the combined voting power of both. One cannot absorb $8\frac{1}{3}$, but one and $8\frac{1}{3}$ can make $9\frac{1}{3}$, a new number."

We have thus far been discussing two things: the purpose of the legislature in authorizing the consolidation, and what was actually done in pursuance of that authority, and it is perfectly clear that what the legislature authorized, and what was actually created in fact in pursuance of that authorization, was consolidation of such character as resulted in the creation of a new company under the name of the Y. & M. V. Railroad Company; that the Y. & M. V. Railroad Company with which we now deal is not the old Y. & M. V. Railroad Company—one of the constituent members—but is the new Y. & M. V. Railroad Company, a new consolidated company, taking its grant of corporate rights from date of said consolidation, October 24, 1892, some two years after the constitution of 1890 went into effect. This leaves for. solution on this branch of the case a single inquiry, Did sec. 180 of the constitution of 1890 cut off the exemption claimed by. the L., N. O. & T.

Railroad Company, conceding now for the purpose of argument that it ever had any such exemption? That section is in the words following:

"Section 180. All existing charters or grants of corporate franchise under which organizations have not, in good faith, taken place at the adoption of this constitution, shall be subject to the provisions of this article, and all such charters under which organization shall not take place in good faith, and business be commenced within one year from the adoption of this constitution, shall thereafter have no validity, and every charter or grant of corporate franchise hereafter made shall have no validity unless an organization shall take place thereunder, and business be commenced within two years from the date of such charter or grant."

It is too clear for argument that the "power to consolidate is the grant of a corporate franchise." 2 Morawetz Priv. Cor., sec. 954, p. 903; *Ashley* v. *Ryan,* 153 U. S., 436--463. It is not a right but a mere license, as heretofore shown. It takes effect not as of the date of the charter, but as of the date of the deed of consolidation. *Keokuk, etc., Railroad Co.* v. *Missouri,* 152 U. S., 308. A corporation can have no status or existence until organized. 1 Morawetz Priv. Corp., 288. Unless, therefore, the present Y. & M. V. R. R. Co. had been organized at the date of the adoption of the constitution, it is settled that it could not possibly have been legally entitled to an exemption at that time. *Planters' Ins. Co., etc.,* v. *Tennessee.* 161 U. S., 193. A corporate franchise is the right to exist as a corporation. It is the franchise invested in the individual stockholders before a corporation is authorized, authorizing them to form such corporation by organization. This is the precise corporate franchise meant by sec. 180 of the constitution. There is an exact analogy between this corporate franchise authorizing individuals to organize themselves into a corporation, and the franchise authorizing constituent corporations and artificial persons to organize them-

selves into a consolidated company, and in the one case as in the other, the result of the organization must be a new company. There are various other franchises which may belong to corporations, such as the right to be and operate a railroad after the corporation is organized, receive tolls, etc., but this belongs to the corporation as an artificial person. It is clear, therefore, that the corporate franchise referred to in sec. 180 is the right to exist as a corporation. It is thoroughly settled by the United States supreme court that the effect of sec. 180 of the constitution of 1890 was to cut off any exemption claimed, if it ever existed. *St. Louis, etc., Railway Co.* v. *Berry,* 113 U. S., 475; *Keokuk, etc., Railroad Co.* v. *Missouri,* 152 U. S., 308.

Learned counsel for the railroad companies insist that under sec. 181 of the constitution, and sec. 279, in the schedule of the constitution, this exemption was continued. These sections are in these words:

"Sec. 181. The property of all private corporations for pecuniary gain shall be taxed in the same way, and to the same extent as the property of individuals, but the legislature may provide for the taxation of banks and banking capital by taxing the shares according to the value thereof (augmented by the accumulations, surplus, and unpaid dividends), exclusive of real estate, which shall be taxed as other real estate. Exemptions from taxation to which corporations are legally entitled at the adoption of this constitution, shall remain in full force and effect for the time of such exemptions, as expressed in their respective charters, or by general laws, unless sooner repealed by the legislature."

Section 279 is as follows:

"Sec. 279. All writs, actions, causes of actions, proceedings, prosecutions, and rights of individuals and bodies corporate, and of the state, and charters of incorporation shall continue, and all indictments which shall have been found, or which shall hereafter be found, and all prosecutions begun, or that may be begun, for any crime or offense committed before

the adoption of this constitution, may be proceeded with and upon as if no change had taken place."

This is a wholly mistaken view of these provisions of the constitution: Sec. 181 preserves only such exemptions as corporations fully organized prior to the constitution were legally entitled to at the adoption of the constitution. Its meaning plainly was that if corporations organized and existing at the date of the adoption of the constitution should retain the precise corporate existence they then had, such exemptions as they legally had should continue whilst their corporate organizations remained as they were. It has nothing to do with the preservation of exemption to any corporation existing at the date of the adoption of the constitution which ceased to retain its said precise corporate existence, and became consolidated with another corporation, thereby ceasing to exist. Sec. 279 meant the same thing, to wit: that charters of incorporation belonging to corporations at the date of the adoption of the constitution were not, in any way, to be infringed by the constitution so long as such corporations retained their precise previous corporate organization. This, and this only, is the whole scope of the two sections. Their plain meaning is in harmony with the whole spirit of the chapter on corporations in the constitution, and cannot be frittered or pared away by ingenuity or refinement.

It was well said by Mr. Justice Brown, in *Keokuk, etc., Railroad Co.* v. *Missouri,* 152 U. S., 312: "But the decisive answer to this objection is that the legislature had no power, in 1869, to extend to a new corporation created by the consolidation an exemption contained in an act passed in 1857, before the constitution was adopted, and, hence, under the terms of this act, we cannot hold that immunity from taxation passed as a franchise or privilege to the consolidated corporation. The construction claimed by the defendant would be directly in the teeth of the constitutional provision that no property shall be exempted from taxation. While, as heretofore observed, an exemption

from taxation contained in a charter previously granted could not be taken away by this constitutional provision without the impairment of the obligation of a contract, it doubtless applies to all corporations thereafter formed either by original charter or by the consolidation of prior corporations under the act of 1869."

It is further clear that if the different charters relied upon had expressly provided by the use of the word "immunity," or by direct declaration to that effect, that the alleged exemption of the L., N. O. & T. should pass into the consolidated company, sec. 180 of the constitution of 1890 still cut off the exemption, since the constitution is the paramount law of the land, the consolidation have taken place some two years after its adoption. It is so expressly held in the *Louisville, etc., Railroad Co.* v. *Kentucky,* 161 U. S., 695, and *Pearsall* v. *G. N. Railroad Co.,* 161 U. S., 667. And, in this view, it, of course, becomes immaterial whether the position of learned counsel for the railroad, that the exemption passes by general law into the consolidated company without express declaration, is correct or incorrect, though we understand the supreme court of the United States to have distinctly held that the sovereign right of taxation does not so pass unless there be either express declaration to that effect, or the use in statutes authorizing the consolidation of the word "immunity." And that court has distinctly held as "the later and best considered view, sustained by the weight of authority," that the use of the word franchise, or privilege, or any other word than the word immunity, is not sufficient to embrace an exemption from taxation. *Phoenix Ins. Co.* v. *Tennessee,* 161 U. S., 176; *Keokuk, etc., Railroad Co.* v. *Missouri,* 152 U. S., 304; *Covington Turnpike, etc., Co.* v. *Sanford,* 164 U. S., 586; *Norfolk, etc., Railroad Co.* v. *Pendleton,* 156 U. S., 172; *Pickard* v. *Tennessee, etc., Railroad Co.,* 130 U. S., 640; *Railroad Co.* v. *Palmes,* 109 U. S., 244; *Home Ins. Co.* v. *Tennessee,* 161 U S., 198.

On this very point Mr. Justice Peckham, in *Phoenix Ins. Co.* v. *Tennessee,* 161 U. S., p. 178, says: "The inference

is sought to be drawn in favor of exemption if the legislature did not affirmatively grant the right to tax. We cannot assent to any such view, and we could come to no such conclusion from an examination of the general statutes cited by counsel. It is a complete overturning of the universal rule in regard to taxation. The power and the right to tax are always presumed, and the exemption is to be clearly granted. Mere silence is the same as a denial of exemption." Nothing certainly can be clearer than this. Indeed, the opinion of Mr. Justice Peckham in this case is so clear and forcible that we quote from it to adopt the following passages on this particular proposition:

"In *Wilson* v. *Gaines,* 9 Bax., 546, it was held by the supreme court of Tennessee that as the state, in its constitution (art. 11, sec. 7, const. 1834) used in the same connection all the words 'rights,' 'privileges,' 'immunities,' and 'exemptions,' each of these words was to be given, in interpretation, a meaning so limited as not to include anything expressed by the others, and that when any one of them is found in a statute, the legislature must be conclusively presumed to have used it in its restricted sense. This decision of the Tennessee court tends very strongly to the idea that the words 'immunity' or 'exemption' would have been required to secure the exemption to a company in a case like this. It is true that this view was not assented to by this court as being the correct one, in *Tennessee* v. *Whitworth,* 117 U. S., 139, 146, and it is simply cited for the purpose of showing what the Tennessee court did decide in regard to the meaning of its own constitution in reference to this subject.

"That the legislature was, about the time, freely incorporating various companies and granting them exemption from taxation with considerable liberality, is not a sufficient reason to induce this court to depart from the universal and well-established rule making a claim for exemption a matter to be proved beyond all doubt. The circumstance which we regard as very significant, and which has already been alluded to, consists in

the omission of the word 'immunities' in the grant to plaintiff in error.    That omission we attach great weight to, and the least that can be said of it is that it involves the question in doubt.

"It cannot be denied that the decisions of this court are somewhat involved in relation to this question of exemption.    It is difficult in some cases to distinguish the language used in each so far that the different results arrived at by the court can be seen to be founded upon a real difference in the real meaning of such language.    The question has sometimes arisen upon the consolidation of different companies, and sometimes upon a sale under a mortgage foreclosure.    Among the former is the case of *Keokuk, etc., Railroad Co.* v. *Missouri,* 152 U. S., 301, where, under the laws of Missouri (sec. 4 of the act of March 2, 1869) there was a provision that the consolidated company should be 'subject to all the liabilities and bound by all the obligations of the companies within this state,' and 'be entitled to the same franchises and privileges under the laws of this state as if the consolidation had not taken place.'    The question was said to admit of doubt whether, under the name 'franchises and privileges,' an immunity from taxation passed to the new company.    Various cases are cited in the opinion, which was delivered by Mr. Justice Brown, showing the grounds taken by this court in such cases.    In *Chesapeake, etc., Railway Co.* v. *Miller,* 14 U. S., 176 (a foreclosure case), it decided that an immunity from taxation enjoyed by one railroad company did not pass to the purchaser under the foreclosure of a mortgage, although the act provided that the purchaser should forthwith become a corporation, 'and should succeed to all such franchises, rights, and privileges as would have been had by the original company but for such sale and conveyance.'    The case followed that of *Morgan* v. *Louisiana,* 93 U. S., 217 (also a foreclosure case), where it was held that the words 'franchises, rights, and privileges,' did not, necessarily, include a grant of exemption or immunity from taxation.    See

also, to same effect, *Memphis, etc., Railroad Co.* v. *Railroad Commissioners,* 112 U. S., 609. The case of *Pickard* v. *Tennessee, etc., Railroad Co.,* 130 U. S., 637, 642, may also be referred to, upon the point that exemption, although it might be granted, must be considered as a personal privilege not extending beyond the immediate grantee unless otherwise so declared in express terms, and it was therein declared that such immunity would not pass merely by a conveyance of the property and franchises of a railroad company, although such company might itself hold property exempt from taxation.    In that case Mr. Justice Field, speaking for the court, said: 'It is true there are some cases where the term "privileges" has been held to include immunity from taxation, but that has generally been where other provisions of the act have given such meaning to it.  The later, and we think the better, opinion, is that unless other provisions remove all doubt of the intention of the legislature to include an immunity in the term franchise, it will not be so construed. It can have its full force by confining it to other grants to the corporation.'  This language is referred to by Mr. Chief Justice Fuller, in the case of *Wilmington, etc., Railroad Co.* v. *Alsbrook,* 146 U. S., 279, where, at page 297, he says: 'We do not deny that an exemption from taxation may be construed as included in the word "privileges," if there are other provisions removing all doubt of the intention of the legislature in that respect,' citing the Pickard case.

"Looking at the other side, we find the case of *Humphrey* v. *Pegues,* 16 Wall., 244, where there was a grant to a railroad company of 'all the rights, powers, and privileges' granted by the charter of another company, which exempted the property of such other companuy from taxation, and it was held that the property of the first company was thereby also exempted.    Mr. Justice Hunt, in delivering the opinion of the court, said that: 'A more important or more comprehensive privilege than a perpetual immunity from taxation can scarcely be imagined.  It contains the essential idea of a peculiar ben-

efit or advantage, or special exemption from a burden falling
upon others.' Again, in *Tennessee* v. *Whitworth,* 117 U. S.,
139, it was held that a right to have shares in its capital stock
exempt from taxation within the state was conferred upon a
railroad corporation by a state statute granting to it 'all the
rights, powers, and privileges,' or granting it 'all the powers
and privileges' conferred upon another corporation named, if
the latter corporation possessed by law such right of exemp-
tion. The question in that case arose as to the meaning of cer-
tain statutes passed by the legislature of Tennessee, resulting
in the consolidation of certain railroads therein mentioned.
In the course of his opinion, Mr. Chief Justice Waite cites the
case of the *Philadelphia, etc., Railroad Co.* v. *Maryland,*
10 How., 376, 393, where Mr. Chief Justice Taney, speak-
ing of a statute which authorized the union company to
have 'the property, rights, and privileges which that law, or
other laws, conferred on them' (the separate companies, or
either of them), said that such language extended to the union
company the exemption from taxation contained in the charter
of one of the united companies. Mr. Chief Justice Waite, con-
tinuing in his opinion, said: 'As has already been seen, the
word "privilege," in its ordinary meaning, when used in this
connection, includes an exemption from taxation.' The decis-
ion of this last case should be confined to the peculiar language
used in the various statutes therein cited, wherein, aside from
the word 'privilege,' it may be argued that, considering all
the language used in those statutes, the intention of the legis-
lature to exempt the company named from taxation may fairly
well be made out.

"The later cases of *Pickard* v. *Tennessee, etc., Railroad Co.,*
130 U. S., 637, and *Wilmington, etc., Railroad Co.* v. *Alsbrook,*
146 U. S., supra, show that there must be other language than
the mere word 'privilege,' or other provisions in the statute
removing all doubt as to the intention of the legislature, before
the exemption will be admitted. The case of *Mobile, etc., Rail-*

*road Co.* v. *Tennessee,* 152 U. S., 486, adds nothing to the discussion on either side. The particular point was not in that case, but it seems to be cited by counsel for plaintiffs in error for the purpose of showing what was the general condition of the state at the time of the adoption of the constitution in 1834, and what was the policy of the state in regard to internal improvements, which the constitution declared ought to be encouraged. The incorporation of an insurance company would hardly come within the most liberal meaning of the term 'internal improvements.' If this were an original question, we should have no hestitation in holding that the plaintiff in error did not acquire the exemption from taxation claimed by it, and we think at the present time the weight of authority, as well as the better opinion, is in favor of the same conclusion which we should otherwise reach."

It is impossible for us to add to the elegance, clearness, or force of this reasoning. It will be noted, too, that the court says that the case of *Tennessee* v. *Whitworth,* 117 U. S., 139, "must be confined to the language used in the various statutes therein cited, wherein, aside from the word privilege, it might be argued that, considering all the language used in those statutes, the intention of the legislature to exempt the company named from taxation may fairly well be made out." *Tennessee* v. *Whitworth* seems fairly to be shaken as authority by the later decisions of the supreme court of the United States, and whether it is sound or unsound cuts no figure in this case, since, in that case, no new constitution intervened. The material fact, that in this case a new constitution does intervene, constitutes the decisive difference between this case and *Tennessee* v. *Whitworth,* and makes this case fall within the principle of *Keokuk* v. *Missouri,* and *St. Louis* v. *Berry,* supra. See, also, *Morgan* v. *Louisiana,* 93 U. S., 223; *Mobile, etc., Railroad Co.* v. *Miller,* 114 U. S., 186. We therefore reach the conclusion that the consolidation of the L., N. O. & T. with the Y. & M. V. Railway Co. resulted in the creation of a new

corporation, the present Y. & M. V. R. R. Co., and that consolidation having been effected October 24, 1892, some two years after the constitution of 1890 went into effect, sec. 180 of that constitution effecually cut off the exemption claimed. We entertain no doubt whatever of the entire correctness of this view, but if the doubt existed, the same result must follow in accordance with the well-settled principle that all doubt must be resolved in favor of the taxing power. This principle has never been more emphatically declared than in *Yazoo & Mississippi Valley Railroad Co.* v. *Thomas,* 132 U. S., 174, in the following clear-cut language: "Exemptions from taxation are regarded as in derogation of the sovereign authority and of common right, and therefore not to be extended beyond the exact and express requirement of the language used, construed *strictissimi juris.*" It necessarily follows from these views that on this ground alone, standing by itself, apart from all other considerations in this case, we must, and do hold the railroad company not entitled to the exemption claimed except in the particular hereinafter to be mentioned, and this independent ground of decision disposes of the case regardless of all other grounds. It will be observed that we have, in reaching this conclusion, treated consolidation not as in itself meaning necessarily that a new corporation must be created, but have allowed it the latitude of definition sometimes given it, very loosely and improperly, as we think, according to which consolidation may mean merger, the absorption of one corporation by another. Taking the word even in that sense, as we have done thus far throughout this discussion, we have, nevertheless, found that the purpose of the legislature was such consolidation as meant not merger but the creation of a new corporation, and that the articles of consolidation, together with the action of the stockholders and directors of the two companies, show that what was actually effected was the creation of a new corporation. It is not necessary, therefore, to say that the term consolidation, *ex vi termini,* imports a creation of a new

corporation, though, in our judgment, such is its true meaning, as shown by the best considered cases. The loose phrase—"consolidation by merger"—is too vague and confusing to signify anything clearly; one might as well say merger by consolidation, and that equivalency of phrase would give us the equation consolidation=merger, which manifestly is nonsense. The term consolidation, where such phrase as consolidation by merger occurs, has, it seems to us, been carelessly confounded with the term amalgamation, as used in England. Amalgamation, in the English sense, probably means about what merger does with us, but it is not consolidation in any proper sense of the term; it is in the interest of clearness of definition that consolidation should be limited to signify such union of two or more corporations as necessarily results in the creation of a third new corporation, and as we understand the decisions, this is what is known as the American doctrine, and the better view. Thus, in Green's Brice's Ultra Vires, p. 538, Mr. Green says, summing up in a most learned note: "The term 'amalgamation' is seldom applied to corporations in this country. That which takes its place as much as any is 'consolidation.' But, though it is difficult accurately to define amalgamation, as commonly used in English law, it certainly has a wider meaning than consolidation has with us. Consolidation would, *e. g.,* be inapplicable to a union of two or more companies, in such way that one of the original corporations only was continued in existence, while the other were merged or absorbed in it. The absorption of one corporation by another would, according to some of the decisions, be an amalgamation in England, but it would not be a consolidation here. In *McMahan* v. *Morrison,* 16 Ind., 172, a case frequently cited with approval in the later decisions, it was said that the effect of the consolidation 'was a dissolution of the three corporations named, and, at the same instant, the creation of a new corporation, with property, liabilities, and stockholders derived from those then passing out of existence.' Similarly, in *Lauman* v. *Lebanon,*

*etc., Railroad Co.,* 30 Pa. St., 42, consolidation is said
to amount to 'a surrender of the old charters by the companies,
the acceptance thereof by the legislature, and the formation of
a new corporation out of such portions of the old as enter into
the new.' Where, by the terms of the statute and deed, the first
corporation was extinguished, the second only continued in
existence, this was held not to be 'an amalgamation or consol-
idation of the two corporations into one.' *Powell* v. *Northern
Missouri Railroad Co.,* 42 Mo., 63. In the American view,
therefore, it would seem that the dissolution of all the old corpo-
rations and the creation of one new one are essential to con-
solidation."

Mr. Chief Justice Fuller, in *Railroad Company* v. *Alsbrook,*
146 U. S., 279, clearly has this view of consolidation. He says:
"And, although the transaction is called by the legislature
in the act of 1875, a consolidation, it amounted rather to a
merger or an amalgamation, and need not be held to have
resulted in a new corporation," clearly distinguishing between
consolidation on the one hand and merger or amalgamation
on the other hand as two things in their essential nature wholly
different from each other, as undoubtedly they are. So the
supreme court of Arkansas distinctly hold in *St. Louis* v. *Berry,*
41 Ark., at p. 518, afterwards affirmed by the United States
supreme court, saying: "And in the absence of a contrary
intention clearly expressed in the law authorizing it, the legal
effect of a consolidation is to extinguish the constituent com-
panies and to create a new corporation, with property, liabili-
ties, and stockholders derived from those then passing out of
existence," citing *McMahan* v. *Morrison,* 16 Ind., 172; *Lau-
man* v. *Lebanon R. R. Co.,* 30 Pa. St., 42; *Clearwater* v. *Mer-
idith,* 1 Wall., 25; *Shields* v. *State,* 26 *Id.,* 86; same case on
error, 95 U. S., 319; *Central R. R. Co.* v. *Georgia,* 92 *Id.,* 665;
*Railroad Co.* v. *Maine,* 96 *Id.,* 499; *Railroad Co.* v. *Georgia,* 98
*Id.,* 359.

Mr. Justice Strong says in *Central Railroad Co.* v. *Georgia,*

98 U. S., 360, that this view of consolidation accords with sound reason, and to the same effect is the *Arkansas Milling Co.* v. *Berry,* 44 Ark., 22; *Atlanta, etc., Railroad Co.* v. *Georgia,* 63 Ga., 486. As before remarked, however, it is not necessary for us to hold that the true definition of the word consolidation is such union of two or more corporations as necessarily results in the creation of a new corporation. We merely remark upon what we think the true definition of the word should be held to be, in the interest of clearness and definiteness in legal phraseology, adding the authorities which restrict its signification, as indicated above.

But it is most earnestly insisted by learned counsel for the railroad company that the case of *Railroad Company* v. *Lambert,* 70 Miss., 781, is *res adjudicata* of this entire controversy. Except in the single particular to be hereinafter mentioned, this position is wholly untenable. The rule laid down by Mr. Justice Field, of the United States supreme court, in *Cromwell* v. *Sac County,* reaffirmed in *Keokuk, etc., Railroad Co.* v. *Missouri,* supra, and in *New Orleans* v. *Citizens' Bank,* 167 U. S., 397, and in *So. Pac. R. R. Co.* v. *U. S.,* 168 U. S., at p. 48, is this: "That where the parties are the same, and the subject-matter and cause of action are the same, the estoppel extends not only to what was decided, but to all that might have been decided in that case; but where the parties are substantially the same, but the cause of action different, it only extends to what was necessarily involved, and was actually decided in the first suit," which is the doctrine laid down in the Duchess of Kingston's case. The parties in the Lambert case were the Natchez, Jackson & Columbus Railroad Company and the sheriff of Adams county, and the subject-matter or cause of action was the tax, state and county, on the part of the Natchez, Jackson & Columbus Railroad within Adams county; the exemption asserted was under the charter of the Natchez, Jackson & Columbus Railroad Company. In this case the parties are the Illinois Central Railroad Company and the Yazoo & Mississippi Valley

Railroad Company on the one hand, and the state revenue agent
on the other, and the subject-matter is state and county taxes of
an entirely different railroad, the L., N. O. & T. Railroad, and
an exemption is claimed under the charter of the L., N. O. &
T. Railroad Company, an entirely different charter.  It is
perfectly manifest, therefore, that neither the parties nor the
subject-matter are the same, except in the  particular to be
hereafter mentioned.  The thing adjudgd in the Lambert case
was that state and county taxes were not due on that part of
the Natchez, Jackson & Columbus Railroad Company lying
within Adams county.  It is true the principle of the decision
would extend to the exemption of the whole property of the
Natchez, Jackson & Columbus R. R. Co., but that was not the
thing adjudged, and that feature of the decision is persuasive
under  the doctrine of *stare decisis,* but not binding  as  an
estoppel under the doctrine of *res adjudicata.*  It is also true
that to claim the benefit of *res adjudicata* as estoppel in the
strict and technical sense, it must be pleaded or offered in
evidence.  It is further to be remarked that it is not the reason
which a court gives for its decision which constitutes estoppel,
but the thing it adjudges.  This is well settled in *Buckner* v.
*Calcote,* 28 Miss., 432.  The property adjudged by a court to a
litigant is his thenceforward under the doctrine of *res adjudi-
cata* as a rule of property as against the parties in that same
litigation, but the reasons which the court may give for the
decision are thereafter simply persuasive under the doctrine of
*stare decisis,* and not in themselves to be invoked as the estoppel.
It is a mere confusion of thought to blend these two wholly
different principles underlying these legal doctrines, thus prac-
tically treating them as the same.  Nor are the taxes of any
one year the same cause of action as the taxes of any other
year in the only proper technical signification to be given to
the term *res adjudicata.*  It is so held by the United States
supreme court in *Keokuk, etc., Railroad Co.* v. *Missouri,* supra,

and in *Phoenix Ins. Co.* v. *Tennessee,* 161 U. S., at p. 186. A decision for the taxes of any one year may be invoked under the doctrine of *stare decisis,* where the taxes of any other year are involved under the same claim. But certainly never, on any clear thinking or correct reasoning, under the doctrine of *res adjudicata.*

On this very subject the supreme court of Iowa said, in the *City of Davenport* v. *C., R. T. & P. R. R. Co.,* 38 Iowa, pp. 639, 640: "Each year's taxes constitute a distinct and separate cause of action, and the determination of the matters involved in the injunction reached no further than the taxes for the years then in question. The cases are unlike those where two causes of action (as, two promissory notes) forming the subject-matter of successive actions between the same parties, both growing out of the same transaction, in which a defense set up in the first suit and held good will conclude the parties in the second. But the taxes of separate years do not, in any just sense, grow out of the same transaction. They are like distinct claims on two different promissory notes, made from two distinct and separate though similar transactions between the same parties. A judgment on one of such notes, it is quite clear, would not be of any force as an estoppel in an action on the other note between the same parties. In support of these views see the following cases," citing twelve cases.

Mr. Justice White says in *New Orleans* v. *Citizens' Bank,* 167 U. S., p. 371, that this was practically overruled in *Goodenow* v. *Litchfield,* 59 Iowa. But Seevers, chief justice, in that case, says, at p. 236, that the cases are not in conflict. And Rothbroch, judge, in delivering the opinion of the court in the Goodenow case, says, at p. 234: "That (the case in 38 Iowa) was a direct proceeding by the taxing power to collect its revenue, and it may well be questioned whether any decree could operate upon future assessments and levies," the very principle announced in *Keokuk, etc., Railroad Co.* v. *Missouri,* 152 U. S., 301.

It will, however, be distinctly observed, and we direct emphatic attention to this statement, that whether the decision for taxes of one year is *res adjudicata* as to taxes for another year preferred under the same claims, as held in *New Orleans v. Citizens' Bank,* 167 U. S., 397, is wholly immaterial here, since the parties to this litigation are not the same with the parties to the litigation in the Lambert case, except, perhaps, as hereafter indicated. There is, therefore, no *res adjudicata* arising out of the Lambert case, except as will be indicated, and that exception is this: Perhaps the state revenue agent, as to the taxes, state and county, on the property of the Natchez, Jackson & Columbus Railroad Company, in Adams county, for the year 1892, may be regarded properly and substantially as the same party with the sheriff of Adams county; and the Natchez, Jackson & Columbus Railroad Company, as to the same taxes on the same part of its property, may properly be regarded as substantially the same party with the Yazoo & Mississippi Valley Railroad Company, into which the property of the Natchez, Jackson & Columbus Railroad Company has been integrated. Substantially, in this small particular, as to the state and county taxes for the year 1892, on that part of the property of the Natchez, Jackson & Columbus Railroad Company lying in Adams county, the parties may be said to be the same, and the cause of action the same, and we hold, accordingly, that as to that the railroad company is entitled to claim the exemption under the Lambert case as *res adjudicata.* Except as to this alone there is clearly, as we think, no right to invoke the Lambert case as *res adjudicata,* for the reason that the parties are not the same without reference to other considerations, and let it be further specially noted that the Lambert case went off on demurrer, and the evidence in this case was not before the court. It is well said by the supreme court of the United States in *Keokuk, etc., Railroad Co.* v. *Missouri,* 152 U. S., 313, in an opinion of unusual clearness and power, that "it is not to be tolerated that the state should be forever debarred of its taxes by

an erroneous decision" (p. 316). But it is said if the Lambert
case is not *res adjudicata* it should control this case, under the
doctrine of *stare decisis.* There is one view of the Lambert case
which authorizes the appeal to the doctrine of *stare decisis;* it
did distinctly decide that what occurred between these compa-
nies was merger and not consolidation, and that no new corpora-
tion was created thereby, applying the principles of the *Rail-
road Company* v. *Maine.* 96 U. S., 499, to the facts of this case,
which are, in our judgment, wholly different from the facts
in the Maine case. It did not decide, of course, holding that
the case was one of merger, whether sec. 180 of the constitution
of 1890 would have cut off the exemption had there been a
consolidation creating a new corporation. Holding that it was
a case of merger, the court very naturally held that sec. 181 of
the constitution of 1890 had no effect on the exemption claimed
in that view. The court most emphatically did not decide that,
had there been a consolidation resulting in the creation of a
new corporation after the constitution of 1890 went into effect,
such new corporation could claim that an exemption belonging
to one of its constituents prior to that constitution, as the prop-
erty of the absorbed company alone, was continued by virtue of
sec. 181. There is no process of interpretation by which the
decision in the Lambert case can be so distorted as to mean
any such thing. The court proceeded throughout upon the
proposition that, it being a mere case of merger, the Yazoo &
Mississippi Valley Railroad Company absorbing the L., N. O.
& T. Railroad, sec. 181 had no effect upon the exemption, and
that such exemption passed to the Y. & M. V. Co. so far as the
property of the Natchez, Jackson & Columbus Railroad Co.
was concerned. If it had been a mere case of merger, as held
by the court, we think it clear, as hereinbefore pointed out, that
that exemption did not pass, and that the court was in error in
so holding, because of the well-settled proposition hereinbefore
stated and supported by the authorities, that, under the general
law alone, without reference to the constitution, an exemption

will not pass in a case of merger to the absorbing company which attached to the property of the company merged alone, unless the legislation authorizing in such case merger either expressly declared that the exemption, shall pass, or used the word "immunity," or an equivalent word. It was correct, in fact, to say that the exemption of the property of the Natchez, Jackson & Columbus Railroad Company passed to the L., N. O. & T. Co. by virtue of the word "immunities," used in the act of 1890, authorizing a sale or consolidation of the Natchez, Jackson & Columbus Railroad Company with the L., N. O. & T. Railroad (Laws of 1890, p. 675), provided, always, that exemption was legal in its origin, the validity of which exemption was not contested but conceded in the Lambert case, but which was clearly invalid, as we shall show later in this opinion. The power of the word "immunities" in said act to pass such exemption to the L., N. O. & T. Railroad under said act of 1890, was exhausted by that consolidation, and had no virtue to carry that exemption into the new company, the present Y. & M. V. Railroad Company, resulting from the consolidation, even had sec. 180 of the constitution of 1890 not been adopted. We have most carefully considered the Lambert case, giving all due weight to the doctrine of *stare decisis,* and as to the two propositions that what occurred here was merger and not consolidation creating a new corporation, and that the exemption consequently of the Natchez, Jackson & Columbus Railroad properly passed to the Y. & M. V. Railroad Company, even in the view of merger under the legislation alone, we hereby expressly overrule the Lambert case. Exemptions, where proper, should be expressly granted, not stealthily referenced in.

2. We turn now to a second ground of decision, wholly independent of, and disconnected from, all that we have said in the first ground, from which we think the same result must follow. The exemption asserted here is that contained in the twenty-first section of the Mobile & Northwestern Railroad Company's charter, which is as follows:

"Section 21. *Be it further enacted,* That in consideration of the construction of the railroads provided for herein, and of the great benefit which the state will receive in the development of its agricultural resources by means of said railroads, as works of internal improvement, and also of the increased value which will thereby be added to the property of the state, thus enabling the state to greatly increase its revenue without additional and burdensome taxation upon the people, the state hereby agrees with said company (and which agreement is irrepealable), that all taxes to which said company shall be subject for the period of thirty years are hereby appropriated and set apart, and shall be applied, to the payment and debts and liabilities which the said company may have incurred in the construction of said road, or for money borrowed by said company upon lands, or otherwise, to be used in constructing the same, and it shall be the duty of the tax collector in every county, in each and every year, to give to said company a receipt in full for the amount of said taxes upon receiving from said company an affidavit, made by the president or cashier of said company, that the amount of said taxes have actually and in good faith, been paid and applied by said company during the year in payment of the debts incurred, or money borrowed, as aforesaid, and which receipt so given shall be in full of all taxes, county, state, and municipal, to which said company shall be subject; *provided however,* That whenever the profits of said company shall enable it to declare and pay to the stockholders an annual dividend of eight per centum upon its capital stock, over and above the payment of its debts and liabilities, then the appropriation of the taxes aforesaid shall cease, and said taxes shall be paid by said company to the tax collector, to be by him paid over as required by law."

That act was passed in 1870, after the constitution of 1869, sec. 13, art. 12, and sec. 20, art. 12, had been adopted, and it is expressly decided in Lambert's case, 70 Miss., p. 786, 789, that this was "a thin disguise to evade constitutional restraints

apprehended to be contained in said sec. 13, art. 12, of said constitution," and the Lambert case further declares—what is manifest—that the pretended exemption was irrepealable on the face of said section. Unquestionably, said twenty-first section did provide for an irrepealable exemption on its face, and we hold it, therefore, to have been in violation of sec. 13, art. 12, and sec. 20, art. 12, of the constitution of 1869.

The case of *Mississippi Mills* v. *Cook,* 56 Miss., p. 40, expressly held that the legislature had no power to grant an irrepealable exemption, and under that decision the exemption claimed under this section is manifestly unconstitutional. Sec. 13, art. 12, of the constitution of 1869, is in these words: "The property of all corporations for pecuniary profit shall be subject to taxation the same as that of individuals." Sec. 20 is in these words: "Taxation shall be equal and uniform throughout the state. All property shall be taxed in proportion to its value, to be ascertained as directed by law." *Mississippi Mills* v. *Cook* decided that the property of private corporations for pecuniary profit was and should remain subject to taxation; it expressly held that, while an exemption might be granted, yet it might, at any time, be repealed by the legislature, and, further, that no exemption could be granted to any private corporation for pecuniary profit by a special act extending a special exemption to that special corporation alone; but that, in order to make any such exemption valid, it must be extended to all corporations for pecuniary profit, of the same class, and in the same situation. And the precise exemption asserted in that case was asserted distinctly under the acts of April, 1872, and 17th of April, 1873, amendatory thereof, set out at pages 42, 43, of 56 Miss. The Mississippi Mills did not claim that it had a valid exemption by virtue of a special act granting such special exemption to the Mississippi Mills alone, but that it had such exemption in common with all other factories similarly situated by virtue of said general law. The exemption set up here under the twenty-first section of the Mobile &

Northwestern charter is wholly different. The claim here is that this particular railroad is entitled to this special exemption, which it is conceded is not now, and never was, extended to all other railroads similarly situated in this state. And, further, this exemption is irrepealable on its face, and the Mississippi Mills case decided no irrepealable exemption was constitutional. It is certainly obvious, from these considerations alone, that the *Mississippi Mills* v. *Cook* is no authority to sustain the exemption set up here. It is further clear that the constitutionality, under the constitution of 1869, of a legislative grant of exemption to private corporations for pecuniary profit, if it embraced all of the same class—the property of individuals being at the same time taxed—was not argued, considered, or decided in *Mississippi Mills* v. *Cook,* but was conceded by the attorney-general and the judges who wrote the majority opinions. One of the vices of the decision in *Mississippi Mills* v. *Cook* is that it did not hold that all the property of private corporations for pecuniary profit was required to be taxed by the terms of the constitution, secs. 13 and 20, art. 12, just as, and when, the property of individuals was. Instead of doing this, the court decided that all such property was free from taxation unless the legislature expressly subjected it to taxation, even though the property of private individuals was taxed, inverting the rule of the constitution. It was certainly an idle performance to declare, as the court did declare, that the whole effect of the constitutional provision was to render the property of private corporations for pecuniary profit liable to taxation; that everybody knew, and to so limit the constitutional declaration was to emasculate it. More than thirty-five years had intervened between the previous constitution of the state and the constitution of 1869. When that previous constitution was adopted—in 1832—the state was young, and had had little experience with the grasping demands of corporations for grants of exclusive privileges, but the experience of more than thirty-five years had taught it wisdom in this regard, wisdom

77 Miss.—18

learned long prior by older commonwealths like California and Iowa, from the constitution of which latter state the provisions of the constitution of 1869, in question, were doubtless borrowed, and so sec. 13 of art. 12 was put in the organic law of the land, beyond the reach of legislative control, for the express purpose of formulating a fundamentally great line of public policy prohibiting any difference in the exercise of the taxing power between the property of individuals and the property of private corporations for pecuniary profit. The court in *Mississippi Mills* v. *Cook,* at pp. 51, 52, looked too narrowly at the mere word, "subject." It should have taken broadly the whole section into view, and deduced from all its terms the meaning of the provision. Judge Campbell, in *Beck* v. *Allen,* 58 Miss., 177, most wisely said: "Subtlety and refinement and astuteness are not admissible to explain away the expression of the sovereign will. The framers of the constitution, and the people who adopted it, must be understood to have intended the words employed in that sense most likely to arise from them on first reading them." This is the doctrine announced by Cooley and Story, and our construction of the meaning of sec. 13, to wit: that it required the property of private corporations for pecuniary profit to be taxed just as—"the same as"—the property of individuals, so that one would not be exempt and the other taxed, is the identical construction placed upon the same words by the supreme court of the United States, and the supreme courts of Alabama, Arkansas, California, Florida, and Iowa. We prefer now to distinctly align ourselves with the supreme court of the United States on this important question, and overrule *Mississippi Mills* v. *Cook* in so far as it held that the property of private corporations for pecuniary profit was not, by the constitution of 1869, secs. 13 and 20, of art. 12, expressly directed to be taxed just as the property of individuals. The decisions of the United States supreme court, to which we refer, are as follows: *Louisville* v. *Palmes,* 109 U. S., 248; *St. Louis, etc., Railroad Co.* v. *Berry,* 113 U. S., 475;

*Schurz* v. *Cook,* 148 U. S., 408; *Keokuk, etc., Railroad Co.* v. *Missouri,* 152 U. S., 303, and 310–312.

The decisions of the state supreme courts to which we have referred are as follows: 38 Iowa, 635; 34 Cal., 432; 25 Ark., 289; 19 Fla., 231, which collates the constitutions of Wisconsin, Missouri, Illinois, Kansas, Mississippi, Alabama, Arkansas, and Louisiana. In *Mobile* v. *Stonewall,* 53 Ala., 570, Judge Brickell, in a most masterly opinion, says: "The constitutional provision supposed to have been offended by the enactments under which the appellee claims immunity from the taxation the appellant seeks to recover, has a history which must be consulted in determining its just interpretation. Its purpose was not an adaptation only of the organic law to the changed political condition of the people, and to conform it to the new relations springing from the amendments of the federal constitution and the conditions imposed by congressional enactment. It was intended also to cure defects time had developed in former constitutions, to narrow and restrain legislative power in the instances experience had shown it most liable to abuse. Under former constitutions the taxing power was not defined, qualified, or restrained by any other provision than the simple declaration: 'All lands liable to taxation in this state shall be taxed in proportion to their value.' There cannot be a just interpretation—an interpretation which will consummate the intent of the people in the adoption of these and other constitutional provisions—which is not deduced, not only from their language, but from their history, from the causes to which they owe origin, the mischief they were intended to remedy. In respect to the constitution of the United States, it is said 'the safest rule of interpretation is to look to the nature and objects of the particular powers, duties, and rights, with all the lights and aid of contemporary history, and to give to the words of each just such operation and force consistent with their legitimate meaning as may fairly secure and attain the ends proposed.' In the creation of the greater part,

if not all, of the private moneyed or commercial corporations which were created prior to 1861, a commutation of taxation was a prominent feature of the charter. Entire or partial exemption from taxation, temporarily, has been frequently granted corporations formed to pursue branches of industry the encouragement of which it was believed a wise public policy required. All exemptions from taxation necessarily increase the burdens imposed on the property not exempt, and are directly injurious to the taxpayer. The incidental benefits which it is supposed may result to him, in common with the community at large, are speculative, and not often a compensation for the immediate injury sustained. Invidious exemptions or discriminations, by which the property of an individual or of a corporation is relieved from bearing a just proportion of the common burden taxation is intended to discharge, are violative of the equality of right of the citizen, which is a fundamental principle of our institutions. To prevent any exemption or discrimination in favor of corporations, to subject their property to the same rate of taxation to which the property of individuals of the same kind is subject, is the purpose of the constitutional provision, clearly expressed: 'The property of corporations now existing, or hereafter created, shall forever be subject to taxation the same as property of individuals,' etc. The argument of appellee, that it was intended only to reserve to the legislature the power of subjecting corporate property to the taxation imposed on individuals, and to avoid the introduction into charters of irrepealable exemptions, or discriminations, cannot be supported. Reading these constitutional provisions in the light of their history, and with a due regard to the words in which they are expressed, it is impossible for us to doubt that it was not competent for the general assembly, in the imposition of taxes, to distinguish or discriminate in favor of corporate property subject to taxation. If property of a particular kind is subjected to taxation, and owned by a corporation, it must bear the rate of taxation imposed on indi-

viduals. While the constitution inhibits the exemption or discrimination in favor of corporations, it equally inhibits a discrimination against them. Equality in bearing a common burden, which is natural right and equity, is secured alike to the corporation and to the citizen.

"The constitution of Iowa contains a provision identical in meaning, if not in words, with the provision of the constitution of 1868, under consideration. It reads: 'The property of all corporations for pecuniary profit shall be subject to taxation the same as that of individuals.' In *The City of Davenport* v. *C. R. J. & P. R. R. Co.,* 38 Iowa, 633, it was the subject of construction, and was declared mandatory, requiring the legislature to provide for taxation of the property of corporations for pecuniary profit the same as that of individuals. A statute releasing railroad companies from certain taxation to which individuals were subject was declared violative of it. The court says: 'What are we to understand to be intended by the language "the same as that of individuals?" We need not determine whether this language requires that corporate property shall be taxed in the same manner as that of natural persons. It seems, however, quite clear that it was intended by this language to require the legislature to impose the burdens of taxation upon the property of corporations for pecuniary profit, the same as, or equally with, that of individuals; that each shall be taxed for the same objects, and in the same degree, so that individuals shall not be required to pay any taxes on their property which have not also been assessed and laid upon the property of corporations of the class named, or in any greater proportion. When the legislature provides for taxing the property of individuals, this clause of the constitution requires it to tax the property of corporations for pecuniary profit to the same extent and for the same purposes. If the property of individuals be taxed for state, county, school, and municipal purposes, the property of this class of corporations must be subjected to the same taxes, and at the same rates. The one cannot be exempt, and the other liable.' "

It will thus be seen that on the particular holding of *Mississippi Mills* v. *Cook,* which we now overrule, this court stood absolutely alone: its decision in direct conflict with all the decisions we have just above cited. So much for the mere inaccuracy of that holding.

We turn now to the proposition that the overruling of *Mississippi Mills* v. *Cook,* as to the holding which we have particularized, overturns a rule of property and destroys a vested right on which the railroad company has a right to rely. The alleged vested right is this: That the twenty-first section of the Mobile & Northwestern charter, containing this alleged exemption, has been declared repeatedly in this state by the *Mississippi Mills* v. *Cook,* and other cases down to and including the Lambert case, not to have been violative of the constitution of 1869. This statement is wholly inaccurate, and is the result alone of a careless study of the decisions of this court. There are some primary rules on the subject of *stare decisis* to which we shall first call attention. They are formulated by the supreme court of the United States as follows:

1. The court is not bound by expressions in former decisions on points which were not contested. *Cross* v. *Burke,* 146 U. S., 86.

2. The doctrine of *stare decisis* cannot be invoked in favor of decisions on former statutes which were merely similar to but not identical with the one under review. *Wood* v. *Brady,* 150 U. S., p. 20. This rule was relied upon by the supreme court of the United States in the celebrated income tax case. *Pollock* v. *Farmers' Loan & Trust Co.,* 157 U. S., 574, the court pointing out that whilst the language of former decisions was sometimes very broad, yet the exact points involved in all former decisions were different.

3 It is expressly held that a decision that a statute constitutes a contract, and that an act repealing it is void, is not an estoppel to a subsequent decision holding that the former statute itself is unconstitutional, and this is the exact case now before us. *Boyd* v. *Alabama,* 94 U. S., 645.

Keeping these principles steadily in mind, a review of the decisions of this court will show that no charter identical with that of the Natchez, Jackson & Columbus Railroad was ever passed on in this state until January, 1891, a period subsequent to the purchase of that road by the L., N. O. & T. Railroad Company, from which it necessarily follows that that purchase could not have been made on the faith of that decision rendered in 1891. It will further be seen that the question whether the twenty-first section of the charter of the Mobile & North-western Railroad Company violated the constitution of 1869, as we hold it did, has never been passed on in this state up to this time. The cases in this state relied on to show the opposite of these facts are as follows: *Mississippi Mills* v. *Cook,* 56 Miss., p. 40, decided at the April term, 1878, where the sole question was, according to the opinion, whether exemption under general law, was repealable or irrepealable; the constitutionality of the exemption was not argued or decided. But much more than this is to be said about *Mississippi Mills* v. *Cook.* An examination of the original record in *Mississippi Mills* v. *Cook* shows that it was a bill for injunction by the Mississippi Mills against Cook, tax collector, averring the establishment of its factory after and on the faith of the acts of 1872-3, granting an exemption in consideration of the construction of factories, etc., and that Cook was willing to accept the affidavit for the taxes of the mill proper, but refused to accept the affidavit for taxes on outlying land, and the bill prayed an injunction against Cook, prohibiting the sale of its property for these taxes assessed on outlying lands on the ground that they were essentially part of the mill property for wood, etc. The bill averred that under the act of 1877, Cook himself insisted on collecting these taxes on these lands. There was a general demurrer to the bill sustained by the court below, and the bill was dismissed, and an appeal taken to the supreme court. The sole question involved, therefore, as thus clearly shown by the record itself, arose under the general exemption

law applicable to all the factories of the class described, and not
to a special grant of a special exemption to a particular corpo-
ration. All, therefore, that appears in the opinion beyond what
would relate to the right to collect these taxes on outlying land
is mere dictum, for in determining what has been adjudged
courts look to the decree and the record, and are not controlled
by the mere opinion. Herman on Res Adjudicata, p. 470.
Another striking difference between the exemption claimed in
that case and in this, is that the act of 1872, under which that
exemption was asserted, did not attempt to preserve exemptions
granted to corporations or individuals establishing factories
under its provision from legislative repeal; whereas, in the act
of 1870, this twenty-first section is declared in the Lambert
case a miserable attempt to evade the constitution of 1869, and
secure an irrepealable grant of exemption, and that, too, to a
particular corporation. The next case is *McCulloch* v. *Stone*,
64 Miss., 378, decided in 1886, in which the only question in-
volved was whether outlying lands of a railroad company were
embraced in an exemption contained in that charter, the court
holding that they were not. The next case is the *Yazoo & Mis-
sissippi Valley Railroad Company* v. *Thomas*, 65 Miss., 553,
decided in 1887, in which the only question involved was
whether the property was exempt before completion of the rail-
road to the Mississippi river. The charter provided for a
twenty years' exemption after such completion, the court hold-
ing that it was not exempt. The next case is the *Vicksburg
Bank* v. *Worrell*, 67 Miss., p. 47, decided at October term,
1889, where the legislature had provided for what the court
calls a privilege tax on all banks in the state, and the question
was whether this violated art. 12, sec. 20, of the constitution
of 1869, providing that taxation shall be equal and uniform
and in proportion to value, and the court held that it did not.
The next case is *Attala County* v. *Kelly*, 68 Miss., 44, decided
at October term, 1890, a case in which the bank had paid in
advance a commutation tax of $1,000, called by the court a

privilege tax, and the legislature in the same year repealed that
law and provided for an *ad valorem* tax.   The court held it
was liable to the *ad valorem* tax, notwithstanding it had paid
the commutation tax, and that was the only point involved.
The next case is the *Louisville, New Orleans & Texas Railroad
Co.* v. *Taylor,* 68 Miss., 361, decided at October term, 1890; not
actually decided, however, till January 26, 1891, as the records
of this court show.   No question was raised in that case by
counsel or the court as to the constitutionality of the exemption
contained in such sec. 21 of the Mobile & Northwestern charter.
The sole question involved was the right to exemption of a
gravel pit claimed by the L., N. O. & T. Railroad Company
under the charter of the Vicksburg, Pensacola & Ship Island
Railroad Company (afterwards the Mississippi & Ship Island
Railroad Company) which never was a part of the L., N. O.
& T. Railroad Company, and the court decided that the exemp-
tion should be allowed under that charter!   This was a most
extraordinary mistake, for it is now conceded by counsel for
the railroad and everybody else that the charter of the Vicks-
burg, Pensacola & Ship Island Railroad Company (afterwards
the Mississippi & Ship Island Railroad Company) had noth-
ing on earth to do with the charters of the L., N. O. & T. Rail-
road Company.   Nor was that railroad any constituent of the
L., N. O. & T. Railroad Company.   It appears that the court
was led into this mistake by an assumption of counsel to that
effect in the case.   Certain it is that it was a tremendous mistake
of fact, and one against the sovereign right of taxation.   It is
perfectly obvious that this case is wholly fictitious, and is of no
authority for any purpose.   It is further to be observed, how-
ever, that inasmuch as the L., N. O. & T. Railroad Company
purchased the Natchez, Jackson & Columbus Railroad Com-
pany in March, 1890, and the decision in the Taylor case was
not rendered until January, 26, 1891, the L., N. O. & T. Rail-
road Company could not possibly have made said purchase on the
faith of the Taylor case, nor on the faith of sec. 181 of the con-

stitution of 1890, because that was not adopted until November
1, 1890, and then continued only legal exemptions to corpora-
tions retaining the precise identity they had before the constitu-
tion was adopted. The next case is *State* v. *Simmons,* 68 Miss.,
361, decided at October term, 1890, which involved the mere
question as to whether the capital stock was exempt under the
charter, and the court held that it was not. The next case,
and the last, is the *Natchez, Jackson & Columbus Railroad
Company* v. *Lambert,* 70 Miss., 779, decided at the March
term, 1893, and the question contested in that case was
whether the exemption of the *Natchez, Jackson & Columbus
Railroad Company* v. *Lambert,* which had been purchased by
the L., N. O. & T. Railroad Company, passed to the Y. & M.
V. Railroad Company, the court deciding that it did. The
question whether that exemption violated the constitution of
1869 was not argued by counsel or considered or decided by
the court. These are the cases on which so much reliance has
been placed to show a vested right, a rule of property, and it
is perfectly manifest that in none of them was it proper to
have decided upon the constitutionality of this sec. 21, unless
in the Taylor case and the Lambert case, because in none of
the other cases was that question involved, and they could all
have been decided without reference to that question, and con-
sequently, under the authority of *Pollock* v. *Trust Company,*
157 U. S., and *Boyd* v. *Alabama,* 194 U. S., supra, they are
not binding, under the doctrine of *stare decisis* even, on this
court in this case; and while the question of the constitution-
ality of said sec. 21 was involved in the Taylor case and the
Lambert case, the constitutionality of the exemption was con-
ceded on all hands, and not contested, and not having been
contested, these cases, as held in *Cross* v. *Burk,* 146 U. S.,
supra, are of no force on us in this case under the doctrine of
*stare decisis.* It will thus be clearly seen (1) that the exemp-
tion claimed in the *Mississippi Mills* v. *Cook* was one claimed
under a general law, applicable to all the factories in the state

of the same class; whereas, the exemption claimed here, to wit, sec. 21 of the charter of the Mobile & Northwestern Railroad Company, is an exemption attempted to be granted to this special corporation, and not to all the other railroads in the state—a special privilege under a special charter to a special corporation; (2) that the Mississippi Mills had established their factory after the passage of the act of 1872-1873, on the faith of those acts as a rule of property; whereas, the L., N. O. & T. Railroad Company never came into existence, as admitted by counsel for the railroad, until the 12th day of August, 1884, by the consolidation of the Baton Rouge Railroad and the Vicksburg & Memphis Railroad, after the construction of the road had been practically finished in July, 1884; (3) that the exemption claimed in *Mississippi Mills* v. *Cook* had no irrepealable feature, whereas the exemption set up under the said sec. 21 is, on its face, irrepealable, and was so judicially declared to be in the Lambert case itself; (4) that the L., N. O. & T. Railroad Company claims under charters granted in 1882 and 1884, asserting as its exemption this sec. 21, the unconstitutionality of which, as violative of sec. 13 of art. 12 of the constitution of 1869, was not only not considered, argued, or decided in *Mississippi Mills* v. *Cook*, but which, by virtue of its irrepealable feature and its special grant of an exclusive privilege to a special corporation, would have been condemned by the reasoning of that very case; (5) and not only is it true that the particular exemption claimed here, under this sec. 21, was not argued or decided in *Mississippi Mills* v. *Cook,* but no other decision was ever rendered in this state in which the constitutionality of this sec. 21 was even involved until *McCulloch* v. *Stone,* decided in 1886, four years after the grant of the charter of the L., N. O. & T. Railroad Company; (6) from which it necessarily follows that that road was not built on the faith of any decision ever rendered in this state up to the time of the grant of its charter, which even involved the constitutionality of said sec. 21, and that the claim

that it was organized or built on the faith of such decision operating as a rule of property is utterly unfounded and absurd; (7) that the Taylor case was neither more nor less than a fictitious case, which misled the court by the misstatement of fact that the Vicksburg, Pensacola & Ship Island Railroad, afterwards Gulf & Ship Island Railroad, was one of the constituent members of the L., N. O. & T. Railroad, and its charter was a constituent charter of that railroad, and that the Taylor case is authority for nothing; (8) that the Lambert case was decided at the March term, 1893, eleven years after, not before, the grant of the charter of the L., N. O. & T. R. R. Co., and it is hence utterly incomprehensible to the legal mind how anybody could invoke that case under the doctrine of *stare decisis* as affording a rule of property to a company constructed under a charter granted before it was rendered. Such claim becomes more incomprehensible still when the further facts are recalled that the consolidation of the L., N. O. & T. and Y. & M. V. into the present Y. & M. V. R. R. Co. took place October 24, 1892, long before the decision in the Lambert case.

Let us get out of the realm of idle and reckless assertion into the realm of fact, and inquire more particularly and accurately exactly what was decided, even in the opinion of the court, which went far beyond the record, in the *Mississippi Mills* v. *Cook*. The vice of that decision is that it looked exclusively to the word "subject" in sec. 13, art. 12, and failed to give force and effect to the words "the same as that of individuals." When we say that the court's construction of the word "subject" attributed to it some supposed magical effect, we are simply reiterating the language of Chalmers, justice. He said (56 Miss., p. 59):

"I find no such magic as my colleague in the words 'shall be subject to taxation the same as that of individuals.' To me they have no meaning other than that which would be conveyed by the equivalent phrases shall be treated or shall be dealt with the same as that of individuals, or shall be

liable to taxation the same as that of individuals. This, and many similar phrases which might perhaps be suggested convey one and the same idea—namely, that the lawgiver, in the imposition of taxes, shall know no difference between the property of individuals and that of corporations for pecuniary profit."

The opinion of the court declares as its gist that sec. 13 was not mandatory upon the legislature to tax the property of private corporations for pecuniary profit whenever the property of individuals was taxed. It distinctly put the property of such private corporations, as to the power to tax them or exempt them, in a class by themselves distinct from the class of individuals. In other words, it held that although the property of individuals might be taxed, yet the property of such corporations might be at the same time exempted by the legislature from taxation, provided such exemption extended to all corporations of the same class in the state. We think it is perfectly manifest that the language, "the same as the property of individuals," imperatively commanded the legislature, whenever they tax the property of private individuals, to tax also the property of such corporations, and under the same rules of equality and uniformity. It was well said by Justice Campbell that this provision of sec. 13 "sprang from the experience that corporations were in the habit of asking and obtaining legislative exemption from liability to taxation." That experience the state had acquired in the thirty-seven years elapsing between the constitution of 1832 and the constitution of 1869, and that experience was wisely availed of to put an end to the grant of exclusive privileges to such corporations. It marked a new era in the history of corporate taxation in this state; it laid down a fundamental new line of great public policy, one that will be found essential to the preservation of the rights of the people, as is abundantly attested by the experience of older states dealing with such corporations. It is that feature of the decision thus

holding that this sec. 13 merely permitted the taxation of such corporations, but did not require that taxation whenever the property of individuals was taxed, and in just the same manner in all respects as the property of private individuals was taxed, which we now condemn and overrule. In no other respect do we interfere with the decision in that case. That case decided, and properly decided, that under the constitution of 1869 the legislature had the power to select for exemption from taxation certain designated kinds of property, such as the agricultural implements of farmers, the tools of the mechanics, etc. Such exemption of particular kinds of property, for reasons of public policy, the constitution allowed the legislature to grant, and, when granted, it applied to such property, whether owned by individuals or such corporations. And to permit such exemptions was perfectly consistent with holding that said section mandatorily required the legislature to tax the property of such corporations whenever and just as it taxed the property of individuals. The vice of the holding of the court was in disregarding and repudiating the correlation by the constitution of the property of such corporations and the property of private individuals in the same category as to the right to tax and the duty to tax, and in declaring that under that section the legislature might put into operation a scheme of taxation which taxed property of all the private individuals in the state, and at the same time, at the will of the legislature, exempted all property of such corporations from any taxation whatever. The constitution plainly and clearly yoked together indissolubly the property of such corporations and the property of individuals, and subjected both alike to the same taxation, to be imposed under the same rules of equality or uniformity. The legislature might not exempt all the property of private corporations for pecuniary profit and tax all the property of private individuals, but it might exempt certain selected kinds of property, in pursuance of a wise public policy, whether that property belonged to such

corporations or to private individuals.    One other observation:  The case before us most emphatically does not present a claim to exemption under a charter identical with the charter in the *Mississippi Mills* v. *Cook*, nor the case of any corporation which has acted on the faith of a decision construing a charter identical with the charter in the case of *Mississippi Mills* v. *Cook*, and which might thus be said to constitute for such corporation, acting on it and investing its capital on it, a rule of property.    It will be time enough to decide that precise question when that question shall be presented.    Whence did we get sec. 13, art. 12, of the constitution of 1869?    It is said in the *Mississippi Mills* v. *Cook* that we get it from the constitution of Iowa.    The clauses in the constitution of Iowa and constitution of Mississippi, 1869, are identical on this subject, and the supreme court of Iowa, in *The City of Davenport* v. *Railroad Company*, 36 Iowa, 635, and *The City of Dubuque* v. *Illinois Central Railroad*, 39 Iowa, expressly decided that this identical section prohibited the legislature from exempting the property of corporations from the same taxes imposed on the property of individuals, and that the property of corporations must be taxed whenever that of individuals was taxed.    The constitution of Alabama, in *Mobile* v. *Stonewall Insurance Company*, 53 Ala., 70, declared that the provision was in itself self-executing, without the aid, in fact in restraint of, legislative power subjecting corporate property to the taxation imposed on individuals, and expressly declared, further, that if property of a particular kind is subjected to taxation and owned by a corporation, it must bear the rate of taxation imposed on individuals.

The constitution of California contains an identical provision, and in the case of *People* v. *McCrary*, decided at January term, 1868, the supreme court of California announced the same construction held in Iowa and Alabama, expressly overruling early decisions to the contrary, just as we do here. The constitutions of Arkansas and Florida contain similar

provisions, and the supreme courts of those states announced the same construction which we here announce. When, therefore, sec. 13 of the constitution of 1869 was adopted in this state, it was written in the organic law of our land, bringing with it the same meaning precisely, under well-settled rules of construction, which it had in the state from which it came here; and the same construction was unanimously approved by the supreme court of the United States in four concurring decisions, rendered in November, 1883; March, 1885; April, 1893, and March, 1894, to wit: *Louisville, etc.,* v. *Palmes,* 109 U. S., 248-254; *St. Louis, etc.,* v. *Berry,* 113 U. S., 475; *Schurz* v. *Cook,* 148 U. S., 408; *Keokuk* v. *Missouri,* 152 U. S., 303, 304, 310-312.

In overruling this feature of the decision in *Mississippi Mills* v. *Cook,* therefore, we were announcing a rule of construction supported by four decisions of the United States supreme court and by the decisions of five state supreme courts, as against a rule of construction announced in no case in this union except *Mississippi Mills* v. *Cook.*

We have all proper respect for the doctrine of *stare decisis,* but it is a doctrine not inflexible and departed from over and over by the wisest courts in proper cases; and if the doctrine of *stare decisis* can be disregarded in proper cases, where the question is one merely of property rights between individuals, how much stronger is the reason for disregarding it when so to do results, as here, in merely restoring to a sovereign state the right to tax corporations and make them bear their just share of the burdens of that government whose protection they so constantly and persistently invoke. This distinction is not one of our invention. It is well settled in the law and it was voiced in words which we quote to approve by Chief Justice George, in *Lombard* v. *Lombard,* 57 Miss., 177, who said: "Speaking for myself alone, I would say that on constitutional questions, where the former decision refused a right reserved to individuals as against the power of the government,

or where it impaired the powers of the people or their repre-. sentatives to prevent maladministration by their officers and agents, or sanctioned an alienation by the legislature of powers conferred for the public good, I should feel little hesitation in departing from it, when satisfied of its incorrectness."

And in *Beck* v. *Allen,* 58 Miss., 173, Judge George, deliv- ering the opinion of the court, overruled two previous de- cisions on the same point, justifying departure from the rule of *stare decisis* by the very distinction here referred to, the case being one involving the taxing power. In concluding this ground of decision we repeat that it is wholly independent of the first ground of decision hereinbefore elaborated, and whether we are right or wrong in the view announced in this second ground, the exemption must be denied, looking to the first alone.

In our summary of the holdings in this case we said there were other views leading to the same conclusion which we might embrace in the opinion. We proceed to notice these. We come, now, to a third ground of decision, and that is this: that the exemption claimed here under said sec. 21 of the Mobile & Northwestern charter, whether applied to the prop- erty of the Natchez, Jackson & Columbus Railroad alone, or to the other property of the L., N. O. & T. R. R. Co., has been repealed by legislation, certainly since the code of 1892 went into effect. It was declared in the Lambert case (70 Miss., 787), through Judge Campbell, the author of the code of 1880, that, by the code of 1880, each railroad in this state was subjected to taxation. That code, therefore, repealed all railroad exemptions then existing. The Lambert case further held that by the act of 1884, p. 29, the exemption of the Natchez, Jackson & Columbus Railroad was restored, and that by the act of 1890, p. 12, if it then existed, it was continued. An examination of all the statutes on the subject (which are as follows: Code of 1880, §§ 596-606, inclusive, and §§ 607, 608; acts of 1886, sec. 6, p. 23; acts of 1888, p. 49;

acts of 1890, p. 12; code of 1892, §§ 3379, 3875, 3744), will show that the scheme propounded by the legislature was, up to the code of 1892, this: That railroad companies should pay *ad valorem* taxes, unless they should accept the conditional exemption provided in the privilege tax law in lieu of the *ad valorem* tax and manifest their acceptance of the law providing· this conditional exemption from *ad valorem* taxation by putting such acceptance in writing and annually paying the privilege tax specified. The provisions of law respecting such conditional exemption from *ad valorem* taxation, by accepting the privilege tax imposed in lieu thereof and paying it, run side by side through all the legislation from the code · of 1880 to the code of 1892. The scheme was that *ad valorem* taxes should be paid by all railroads in the state, but that any railroad should be exempt from such *ad valorem* taxes which would pay the privilege tax provided in the various acts, provided it manifested its acceptance of such exemption in writing and paid such privilege tax. As to the Natchez, Jackson & Columbus Railroad Company, the code of 1880, as shown, repealed its special exemption in its special charter by § 597 through § 606, and placed its conditional exemption from *ad valorem* taxation upon acceptance manifested in writing, and upon payment of the privilege tax thenceforward, under the general law of the state, thus withdrawing any right that railroad company had to claim a special exemption under this special charter; and whether it had an exemption from *ad valorem* taxes thenceforward was to be determined, not by reference to a special charter, but by reference to the general law on the subject of privilege taxes enacted from time to time. The act of 1884, in fixing the privilege· taxes, did, however, restore, by recognition, to the Natchez, Jackson & Columbus Railroad Company the exemption of its charter, according to the opinion in the Lambert case. As the act of 1884 did not pretend to affect § 597 through § 606, of the code of 1880, in imposing *ad valorem* taxes, but only §§ 606-608, relating to

the privilege taxes, it is to our mind quite doubtful whether the act of 1884 did have the effect to restore the charter exemption; but conceding that it did, it is strange that the court, in the Lambert case, overlooked the act of 1886, sec. 6, p. 23, amending the privilege tax chapter, code of 1880, fixing the privilege taxes to be paid by each railroad in the state, and expressly declaring, "that hereafter said railroad companies shall. pay privilege taxes, respectively, 25 per centum greater per mile than is fixed in said acts," without once alluding to any exemption of the Natchez, Jackson & Columbus Railroad, or any other railroad. Clearly, if the exemption of the Natchez, Jackson & Columbus Railroad Company was restored by the act of 1884, it was repealed by said act of 1886, and was not in existence from that time until the act of 1890 was passed. The act of 1890, p. 12, amended the act of 1884 and then re-enacted it as amended. This seems to have been an ingenious effort on the part of some one who knew that the act of 1886. had repealed the exemption of the Natchez, Jackson & Columbus Railroad Company, recognized in the act of 1884, to again restore it by an effort to repeal the act of 1886, without disclosing the fact or referring to the act of 1886. But the holding in the Lambert case is that the act of 1890 continued the exemption, if it existed; and since it is clearly shown that no exemption existed when the act of 1890 was passed, there was no exemption to be continued, and the act of 1890, under the rules of construction with reference to taxation most certainly cannot be held to have created then anew such exemption. It follows from this that when the constitution of 1890 was adopted the Natchez, Jackson & Columbus Railroad had no exemption, and consequently sec. 181 of the constitution had no effect to continue the exemption, which was not then in existence. When the code of 1892 was adopted, the legislature, carrying out the mandate of the constitution of 1890, paragraph 90 (h), expressly provided in § 3379 that the privilege tax should be imposed on all railroads, without a suggestion

of any exemption to any, and this code was a revision of all general laws on the subject and wholly omitted all the provisions of the acts of 1884 and 1890 in respect to exemptions. The scheme of the taxation up to the code of 1892 was that railroad companies might escape *ad valorem* taxation by accepting the provisions of the law as to privilege taxes, in writing, and paying the same. The scheme of taxation under the code of 1892 changed all this and repealed all former exemptions of all railroads from taxation by said § 3379 and said § 3875. A consideration showing that this was the purpose of the legislature is the smallness of the privilege tax under § 3379, no longer in lieu of *ad valorem* taxes as compared with its amount under former laws. The code of 1892 provides for the exemption of all property, which is to be exempted, in § 3744, and railroads are not mentioned in that section. The provision of that section is as follows: "The following property, and no other, shall be exempt from taxation," which declaration is as positive and emphatic an exclusion of all railroad exemptions as language can furnish. But not only did § 3379 of said code impose privilege taxes, but § 3875 imposed *ad valorem* taxes. By that section every railroad company in the state, without exception, was required to return all its property, within and without this state, with its value, so that the assessors might know what value should be the basis of state, county, and municipal taxation, and the section further declares as to railroads, that all of its property, real and personal, taxable and nontaxable, shall be included. The word "nontaxable" in this connection does not mean exempt property, but property like government bonds, that are not taxable at all, and this is made plain by the provision at the close of the section "that if the said property is claimed to be exempt from taxation, it shall be separately stated and the law cited under which the claim is made." In other words, they were to return three classes of property: taxable property, nontaxable property—that is, property that

could not be taxed in its nature—and exempt property, if any, citing the law for the exemption. The word "nontaxable." therefore, creates no exemption and does not describe exempt property, which is otherwise provided for, but means merely, as stated, property like government bonds, that cannot be taxed at all. So that we hold that certainly since the code of 1892 went into effect, and, as we think, since the act of 1886, the exemptions set up by the railroad company in this case were repealed by the legislature, and on this ground, independently of any other ground heretofore set out, the exemptions must be denied.

4. Counsel for the state revenue agent presents another very ingenious view, to this effect: that sec. 21 of the Mobile & Northwestern charter was plainly prospective and intended to carry the benefit of the exemption therein provided only to a company which should build a railroad after the grant to it of the exemption. We think it is entirely clear that said provision was prospective, and that the consideration to the state for the grant of the exemption was that recited in the act, to wit: "The construction of the railroads provided for therein, and the great benefit which the state would receive in the development of its agricultural resources by means of said railroads as works of internal improvement, and also the increased value which would thereby be added to the property of the state, thus enabling the state to greatly increase its revenue without burdensome taxation upon the people." That was the consideration to the state; that clearly was the reason and object of the statute. So far we agree with counsel. Counsel's argument then proceeds to claim that the act of March 3, 1882, authorized the Memphis & Vicksburg Railroad Company and Mississippi Valley & Ship Island Railroad Company to consolidate, and that the object was to construct a railroad from Memphis, through Vicksburg, to Ship Island, a scheme well known to be dearly cherished by the people of Mississippi for years back. Coun-

sel then proceeds to claim that sec. 1 of the act of March 3, 1882, in providing that the consolidated company should have all the rights, property, immunities, etc., now possessed by the companies which may enter into such consolidation, merely meant such rights, etc., as belonged to the companies existent at the date of the passage of the act; that as the Baton Rouge Railroad Company was not chartered until March 9, 1882, it was not contemplated that that company should be a constituent member of the consolidation, and that sec. 5 of the acts of 1882, p. 1015, was meant by the legislature to extend the exemption of said sec. 21 to such road only as the consolidated company—the L., N. O. & T. R. R. Co.—might build after it came into existence; and that as said company did not come into existence until after the road from Memphis to New Orleans was completed, it is a perversion of the spirit and purpose of the legislature to allow the L., N. O. & T. R. R. Co. to blanket this exemption over a road which was never built by it, and in the construction of which it incurred no indebtedness. This is certainly very persuasive, but we do not now decide whether it is a correct contention or not. Another contention of counsel for the revenue agent worthy of serious consideration is this: that, taking the charter of the Baton Rouge Company and the Memphis & Vicksburg Company as written into the charter of the L., N. O. & T. Co., as part thereof, the legislation of the state shows that it was the purpose of the legislature to extend this exemption of sec. 21 to the company created by the first consolidation, the L., N. O. & T. R. R. Co., but to exclude it from the present Y. & M. V. R. R. Co., the result of the second consolidation. Counsel's argument on this point is about as follows: That conceding that the first section of the act of March 3, 1882—the L., N. O. & T. charter—contained the word "immunity," and that by virtue thereof the exemption of the said sec. 21 passed to the L., N. O. & T. R. R. Co., the only authority for any future consolidation of the said L., N. O. & T. R. R.

Co. with the Y. & M. V. R. R. Co. is to be found in sec. 16 of the Baton Rouge charter and sec. 25 of the Memphis & Vicksburg charter, and that in both these sections the legislature intentionally omitted the word "immunity," and any other words equivalent thereto, and that this omission conclusively shows that it was the purpose of the legislature to limit the existence of the exemption provided by said sec. 21 to the L., N. O. & T. R. R. Co., the result of the consolidation of the Memphis & Vicksburg Railroad Company and the Baton Rouge Railroad Company, only so long as it retained its existence as the said L., N. O. & T. R. R. Co., and not indefinitely to pass this exemption along to all future consolidations. Counsel has so succinctly stated the facts on this subject that we cannot do better than to quote that part of his brief, which is as follows:

"All of these sections, thus put in the same charter, demonstrate that it was the purpose of the legislature to pass the exemption into the L., N. O. & T. under the wird 'immunities,' but to withhold it from any future consolidation by omitting the word 'immunities' in said secs. 16 and 25, and by using therein no words to indicate the intention of passing the exemption to any future consolidation. But, in this connection, the court will bear in mind that the act of 1890, as to the sale of the N., J. & C. R. R., on which the Lambert case is based, used the word 'immunities,' as elsewhere shown. When the legislature passed the act of March 3, 1882, the L., N. O. & T. charter, it necessarily had in mind the provisions of the charters of the M. & V. Co. and the Mississippi Valley & Ship Island Company, because both of these companies are mentioned in the very beginning of the act, and it was passed for their express benefit; and the legislature made these charters necessary parts of the act, because, by its terms, it could not be made effectual without the charters of said consolidated company be taken and held to be parts of this act. . . . Said M. V. & S. I. R. R. Co. was incorporated in 1871

(Acts of 1871, p. 237), as the Vicksburg, Pensacola & Ship Island Railroad Company. In 1873 its name was changed to M. V. & S. I. R. R. Co. Acts of 1873, p. 562. The fifteenth section of the original charter of this company gave the power of consolidation (Acts of 1871, p. 247), but omits the word 'immunities,' and gives no power to vest in the consolidated company the exemption from taxation contained in sec. 21 of the charter. Besides the amendatory act of 1873, which vested this exemption from taxation in the charter as amended, uses the word 'immunities' in sec. 1, p. 562, acts of 1873. The charter of the Y. & M. V. Co. uses the word 'immunities' to embrace exemption from taxation. Acts of 1881, p. 843, sec. 5. The amendment of the Y. & M. V. Co. charter (Acts of 1884, sec. 3, p. 985) uses the word 'immunities' for the same purpose. The amendment of the L., N. O. & T. charter (Acts of 1884, p. 936) uses the word 'immunities' for the same purpose. All these things were in the mind of the legislature as parts of said act of March 3, 1882, and show they used the word 'immunities' advisedly, and did not intend that any exemption should pass into any future consolidation, after the formation of the L., N. O. & T., and this sec. 15 of the M. & V. & S. I. R. R. Co. expressly provided that any consolidation should form one company and have a joint common stock."

Certainly the significance counsel seeks to have attached to the omission of the word "immunity," in the act referred to, seems fully borne out by the opinion of Mr. Justice Peckham in *Phoenix Ins. Co.* v. *Tennessee,* 161 U. S., 177; but we decline now to pass definitely upon this contention. There is also much force in another view presented by counsel for the revenue agent to the effect that since 1888 the proof in the record shows that the railroad company had been able to declare and pay the annual dividend of eight per centum upon even its fictitious capital stock over and above its fixed charges on the proper construction debt. But to go into this would protract this

opinion beyond anything necessary for present decision.  There is a rather curious proposition of counsel for the railroad companies in his brief at page 118 et seq.  The argument is that what was provided by the twenty-first section of the Northwestern charter was not an ordinary exemption at all, although counsel admits that the Lambert case expressly so decided, but that it was a contract of appropriation irrepealable in its nature, and not an exemption at all.  If counsel's contention as to this is sound, then it is perfectly plain that the claim of rule of property and vested right under former decisions of this court falls at once to the ground; for no one will contend that this court has ever treated the said twenty-first section as an appropriation by contract irrepealable in its nature.  Counsel's construction is therefore utterly inconsistent with the reiterated claim that the view we take is trenching upon any rule of property laid down in any previous decision rendered by this court.  This is the first time that such a construction was ever presented to this court or asserted in any form.

Finally, all the judges concur that because of the inconsistent compromise verdict, the judgment must be reversed both on appeal and the cross appeal.

*The judgment is reversed, both on appeal and the cross appeal, and verdict set aside, and the cause remanded for a new trial.*

WOODS, C. J., dissented as to so much of the decision as overruled *Mississippi Mills* v. *Cook,* 56 Miss., 40, and *Railroad Co.* v. *Lambert,* 70 *Ib.,* 779.

Upon the filing of the opinion outlined by the summary, on the 22d day of November, the defendants moved to strike the opinion from the files on the ground that it was filed too late; that it was not such an opinion as the statute contemplated to be filed, the cause having been remanded and having been reheard in the court below, under the "summary of hold-

ings," and a second appeal taken before the filing thereof; and, on the further ground that said opinion presented new grounds of decision, which were not implicated by the said "summary of holdings," on which the second judgment of the court had been based.

The motion was overruled, the court delivering the opinion which follows the briefs of counsel.

The brief of *Messrs. Mayes & Harris,* in support of the motion cannot be found by the reporter after diligent search.

*Critz & Beckett,* contra.

We do not think this motion is germane to this case, or that this court has any jurisdiction to entertain such a motion. This case, No. 8629, as a case, was decided on June 20, 1898. It was then reversed and remanded, and this court adjourned for the term on July 1, 1898, and thenceforward lost all jurisdiction of this case.

It was the judgment of this court reversing and remanding the cause which reinvested the lower court with jurisdiction to proceed, and the mandate was at most simply an official notification. *Foster* v. *Jordan,* 54 Miss., 510.

We think the court or the judges have a right to correct their opinions at any time. It is a mere matter of taste and accuracy; and even if new grounds are added, they cannot prejudice either party in that case, for the simple reason that the judgment remains the same, and that is all that the litigants are concerned with or have a right to demand or require. If any objection can be made, it is not in that case, but in some other case in which the new decision or finding is attempted to be used, when it might be claimed that it could not be used as *res adjudicata,* because the party has not been heard on it, and has not had his day in court.

There is a second appeal pending in this litigation, but not in this case, and when that appeal comes on to be heard, then

it will be in order to claim that any new ground in the opinion in this case, inserted after the trial in the lower court, shall not be used on that appeal, except as an original proposition, and on its merits, as applicable to the second appeal, and not by virtue of the fact that it appears in the corrected opinion. If it is a new ground, the defendants may have a right to be heard on it, as if it had not been passed on, but we fail to see the propriety of starting up a fresh litigation with the court about the language in which its opinion is expressed, when its decision, one way or the other, could not have the least effect on the case decided.

We think an *amicus curiae*, or any outsider, would have as much legal interest in the result of such a motion, and as much right to make it, as the defendants.

*J. A. P. Campbell,* contra.

This motion is without precedent or merit, and is a direct attack on the right of the judges and on the power and dignity of the court. No law prescribes when an opinion shall be delivered. The only provision is that, in certain cases, the opinion shall be in writing, stating the reasons upon which the decision is made. All else is left to the court. Another and distinct provision is that a copy of the opinion, in cases remanded, shall be certified to the court below. The sole purpose of this is to inform the lower court of the ground on which its judgment or decree was set aside, and to make the cost of the opinion a part of the taxable costs of the case, but for which information of the reason for reversal would have to be ascertained by other means. These are mere matters of practice, in no way affecting jurisdiction or the validity of proceedings or judgments. Were the supreme court to reverse and remand without giving an opinion in writing, or with a mere statement that the judgment or decree was found to be erroneous, the validity of the reversal and consequent proceedings would be unquestionable. Were the court below to proceed with a

case remanded, in which the most elaborate opinion was written, without having a copy of the opinion, no objection could be sustained for that. The matter of opinions must, from necessity, be left to the discretion and control of the court as mere matter of practice, the statutes directing certain things, but not making validity to depend on their being done. Usually the opinion precedes and directs the decision, but the validity of the decision does not depend on the opinion. The opinion might be ever so erroneous and indefensible, but that would not affect the validity of the decision. They are quite independent of each other as to this. It is not uncommon to enter the decision, and deliver the opinion afterwards at leisure, and no law prohibits this or is contravened by it. It is within the control of the court, and hitherto unquestioned.

The motion does not accurately state the case. There was an opinion in writing stating the reasons for the decision, before it was made, and this opinion stated "there are other views leading to the same conclusion which we may embrace in the opinion yet to be filed." Thus the law requiring an opinion was complied with, and, with the several reasons given in it, there was notice of more to follow in a more elaborate opinion thereafter given.

The complaint is that the after opinion "announces decisions on points of law alleged to be controlling in this case additional to and different from any decision announced in the abstract (summary) of June 26, 1898, and certified to the court below with the mandate as the opinion of this court." If this be true, it affords no ground for complaint. A comparison of the opinion (summary) which preceded the decision and the more elaborate opinion subsequently delivered, will show that the latter is but an amplification of the views of the judges in sustaining their conclusions formulated in the former, only an extension of the argument, with some additional views reinforcing it. The summary held that "because of the incon-

sistent compromise verdict, the judgment is reversed and cause remanded on the appeal and cross appeal."

2. Disposed of the claim of *res adjudicata.*

3. Held that there was consolidation by the companies, and a loss of exemption from taxes, by virtue of sec. 180 of the constitution of 1890.

4. That sec. 21 of the Mobile & Northwestern Railroad Company charter, relied on, was in violation of the constitution of 1869, and therefore void.

5. That *Mississippi Mills*. v. *Cook* and the Lambert case were unsound and overruled.

There is little else in the latter opinion, which reaffirms the above propositions, and whatever added reasons may be in it are surely covered by the announcement of the "other views" indicated by the summary as probably forthcoming.

Apart from the undoubted right of the court to deliver its views when and in what form it pleases, what harm has been done, and what right has a litigant to complain? What can be gained were the motion sustained? The object in making it is transparent, but it is not perceived how the mover would be advantaged by its being sustained. The summary or first opinion is quite sufficient. It shows sufficient reasons for the decision, and that consolidation caused loss of exemption by sec. 180 of the constitution of 1890. This is strictly a question for this court to decide finally, and with which the supreme court of the United States can have nothing to do. This is a distinct and independent ground of the decision, supporting it and placing it beyond federal interference; and if all else was stricken from the summary, and if the latter opinion was withdrawn, or this motion sustained, the decision would be unassailable. Can it be that the mover hopes to keep the elaborated opinion from being considered by the supreme court of the United States? The effort made by this motion will insure its consideration by that court, if the case shall ever get before it. It is apparent that the object is to inject into the

case a federal question, as is shown by the second ground of the motion, which is that the fourteenth amendment of the constitution of the United States was violated by what occurred. How, is not discoverable.

Wherein the trial of the remanded cause by the circuit court, and rendition of judgment against the appellants without the benefit of the full opinion recently given, was "without due process of law," is a profound mystery. The summary cut the defense up by the roots, and that there were other reasons for the decision was immaterial. One is enough, and addition made no difference. If there had been no opinion by this court, and the circuit court, groping in the dark, had ruled in accordance with the views of this court, all would have been well, and the judgment would have been unaffected by that.

The law requiring opinions in writing is simply advisory. It is not obligatory. *Houston* v. *Williams,* 13 Cal., 27, announces the true view, and fully vindicates the action of this court in this case. I cannot add anything to its vigorous presentation, and rest the resistance of the motion on it.

A new definition of "due process of law" will have to be framed to warrant the granting of this motion.

WHITFIELD, J., delivered the opinion of the court.

Sec. 4352 and § 4381 of the code of 1892 were fully complied with by the summary of holdings handed down in June last, certified to and used in the circuit court on the trial of the case after it was remanded. Every reason for decision contained in that summary is also set out in the opinion filed recently, insisted on, and enforced. 24 South., 200. The court has receded from no position in that summary announced. It has added one new reason, and one only, for the decision: That the exemption was repealed by legislation, to wit, the act of 1886, and the provisions of the code of 1892. With this single exception, the reasons given for the decision in the summary are identical with the reasons given in the opinion now

on file; and it is too plain for argument that, had the new reason for decision now set out in the opinion been also set out in the summary, the circuit court would merely have had one more reason for sustaining the action it took. The railroad companies were not, and could not possibly have been, prejudiced by the fact that the summary did not contain this additional reason. Nor is it now, nor can it be, prejudiced by the fact that the opinion does not contain this one additional reason for our decision.

Other views of counsel are adverted to in the opinion, but it is distinctly declared that as to them we decide nothing—not adopting them in anywise as reasons for decision. Moreover, we distinctly stated in the summary: "There are other views, leading to the same conclusion, which we may embrace in the opinion yet to be filed. What we have said is a mere summary of the holdings set forth." And at the last term of this court a motion was made to have a fuller opinion handed down then, before the trial in the circuit court, based on § 4352, code 1892, which we overruled on the ground that the summary was a sufficient compliance with that section, and should stand as the opinion of the court for the time being. The argument made then, and repeated now, as to this, was that the law requires the opinion to accompany the mandate, and that the court below could not proceed without both. This point was disposed of adversely to this contention in *Foster* v. *Jordon,* 54 Miss., 510, the court saying: "This is an erroneous conception of the province of the mandate. It is the judgment of this court reversing and remanding a case which gives the lower court authority to enter upon a new trial." And the opinion of this court is not more necessary to the jurisdiction of the circuit court than the mandate. Both are mere matters of practice. Beyond this, the scope of the motion is to assert the proposition that this court has not the power, after the trial of a remanded cause, in any way to revise, add to, or take from the mere reasons for its decision, even though the reason added or taken

away in nowise affected the party losing in the lower court prejudicially. That, precisely and exactly, is the proposition asserted. It is hardly necessary to say that this wholly novel and extraordinary proposition is untenable. This court, of equal and co-ordinate dignity with the legislative and executive departments in matters judicial, "uttering the voice and registering the will of the state," is reduced to no such pitiable plight. The very question here presented has been settled by authority over and over again.

In *Houston* v. *Williams,* 13 Cal., 24, Mr. Justice Field, afterwards on the supreme bench of the United States, says, for a unanimous court, after citing the statute there relied on, which provided that "all decisions given upon an appeal . . . shall be given in writing, with the reasons therefor, and filed with the clerk of the court:" "It will not be impertinent to say a few words as to the control of the court over its opinions and records. There are some misapprehensions on the subject, arising chiefly from a confusion of terms, and from a misconception of the relations of the different departments of government to each other, and the entire independence in its line of duties of the judiciary. The terms 'opinions' and 'decisions' are often confounded, yet there is a wide difference between them, and in ignorance of this, or by overlooking it, what has been a mere revision of an opinion has sometimes been regarded as a mutilation of a record. A decision of a court is its judgment. The opinion is the reason given for that judgment. The former is entered on record immediately upon its rendition, and can only be changed through a regular application to the court upon a petition for rehearing or a modification. The latter is the property of the judges, subject to their revision, correction and modification in any particular deemed advisable, until, with the approbation of the writer, it is transcribed in the records. . . . All these errors, whether in language, form or substance, should be corrected before a publication is permitted as an authoritative exposition of the law, and as such binding upon

the court. In no civilized state, except California, has the
existence of this power ever been doubted. Every judge, from
the chief justice of the supreme court of the United States
down, claims and exercises without question the right of re-
vision, including thereby modification and partial suppression
of his opinions. . . . When the opinions have been revised,
and finally approved and recorded, then they cease to be the
subject of change." There has been no suppression here. The
majority of the court have receded from no position announced
in the summary, but positively affirm every one of them in the
opinion. And that this is so, we here make part of this opinion
that summary, in its entirety, so that a comparison of it with
the opinion now on file may show the facts as they are. That
summary is as follows:

### "SUMMARY OF THE COURT'S HOLDINGS.

"WHITFIELD, J. 1. Because of the inconsistent compromise
verdict, the judgment is reversed, and cause remanded, on the
appeal and the cross appeal.

"2. The Lambert case, 70 Miss., 779, 13 South., 33, is *res
adjudicata* as to the taxes for the year 1892 on all the property
that originally belonged to the Natchez, Jackson & Columbus
Railroad Company, which was in Adams county; and, being
*res adjudicata,* it is, as to that, beyond our power to overrule it.

"3. The Lambert case is not *res adjudicata* as to any of the
other taxes here involved, on the property that once belonged to
the Natchez, Jackson & Columbus Railroad Company, or on
any of the other property here involved.

"4. The Lambert case did decide that sec. 180 of the con-
stitution of 1890 did not cut off the exemption from taxation
asserted in this case, on the ground that this is a case of mere
merger, and not of consolidation; that the resultant corporation
was not a new corporation, and applied the principles of *Ten-
nessee* v. *Whitworth,* 117 U. S., 139 (6 Sup. Ct., 649), which
is, beyond all controversy, a clear case of simple merger, and

77 Miss.—20

not of consolidation. Taking 'merger,' proper, to mean the absorption of one corporation by another, the autonomy of the absorbing corporation being preserved, without the formation of a new company, and 'consolidation,' proper, to mean such union of two corporations as results in a third new corporation, under whatever name, we hold that the clear legislative purpose was (using the words in the sense indicated) consolidation, and not merger, yet consolidation in such sense as to result in the formation of a new corporation, and, besides, that what was actually done here was necessarily the creation of a new corporation, and not mere merger; that, hence, the principles of the Whitworth case do not apply, but the principles of *Keokuk, etc., Railroad Co.* v. *Missouri,* 152 U. S., 301 (14 Sup. Ct., 592), do apply; that, consequently, the constitution of 1890, sec. 180, cut off the exemption; that the Lambert case cannot be upheld, and should be, and is hereby, overruled. If it be conceded that the purpose aimed at by the articles of agreement of the railroad company was mere merger, it is not to be permitted that the company could overthrow the purpose of the legislature to authorize consolidation, and not merger, nor to name that 'merger' which the actual things done show was consolidation. Consolidation is a privilege, to be exercised or not, not a contract. Section 181 of the constitution, and sec. 279 of the schedule thereto, merely mean that corporations existing at the adoption of the constitution, having then exemptions or other 'rights,' should have them 'continue' so long as such corporations retained the precise corporate existence they then had. The new corporation here takes its life, as from a new grant of corporate life, from the 'date of the consolidation.

"But we hold, further, that the twenty-first section of the Mobile & Northwestern Railroad Company's charter was an effort to secure, as is expressly recited in its face, an irrepealable grant of exemption, and violative of the constitution of 1869, art. 12, sec. 13, and art. 12, sec. 20, even as construed in *Mississippi Mills* v. *Cook,* 56 Miss., 40. The exemption

claimed in *Mississippi Mills* v. *Cook* had no irrepealable feature.

"But, again, we hold that such section violated said clauses of said constitution, even had it not been irrepealable. *Mississippi Mills* v. *Cook* turned upon some supposed magical distinction, in the particular connection, between the words 'subject' and 'subjected,' and sacrificed a great constitutional principle to a piece of mere verbal jugglery. Precisely the same clause, using precisely the same word, 'subject,' occurs in the constitution of Florida and Arkansas; and the supreme courts of both states held, in precisely identical contention, that the clause forbade exemption from taxation of 'corporations for pecuniary profit,' and both of these decisions were on this identical proposition affirmed by the United States supreme court. *Railway Co.* v. *Berry,* 41 Ark., 509; *Id.,* 113 U. S., 475 (5 Sup. Ct., 529); *Palmes* v. *Louisville, etc., Railroad Co.,* 19 Fla., 231; *Id.,* 109 U. S., 253, 254 (3 Sup. Ct., 193). And this construction is reaffirmed in *Keokuk, etc., Railroad Co.* v. *Missouri,* 152 U. S., 310, 311 (14 Sup. Ct., 592). The word 'subject' should have been given its plain, popular signification, occurring in the connection it did, in a great popular instrument, the constitution, the very signification attached to it by the supreme court of the United States. We prefer to align ourselves now with that court in this matter, and overrule *Mississippi Mills* v. *Cook* on that point. It passes all understanding how the court could gravely hold, in *Mississippi Mills* v. *Cook,* that a solemn declaration in the constitution of a state, its organic law, formulating fundamentally great lines of public policy, that 'the property of all corporations for pecuniary profit' should be subject to taxation the same as that of individuals, added no new feature, but merely stated what was the law before, and without the declaration, to wit, that the 'property of corporations for pecuniary profit' was liable to taxation. All the world knew that before!

"Judge Campbell, in his dissenting opinion in *Beck* v. *Allen,*

58 Miss., at page 177, most wisely said: 'Subtlety and refinement and astuteness are not admissible to explain away an expression of the sovereign will. The framers of the constitution, and the people who adopted it, must be understood to have intended the words employed in that sense most likely to arise from them on first reading them.' Doubtless the rule of *stare decisis* is a wise rule, and one not lightly to be infringed. But instances justifying its disregard find manifold illustration in the reports. And, surely, stronger reasons for not applying it can never arise than where, as here, to disregard it restores to the sovereign the exercise of one of the highest attributes of sovereignty, the taxing power, and merely requires that corporations for pecuniary profit, constantly demanding and securing the protection of the government, shall also bear their just share of the burdens of taxation. We feel, therefore, confident of the propriety of overruling, as we now expressly do, the Lambert case and the case of *Mississippi Mills* v. *Cook*, supra. There are other views, leading to the same conclusion, which we may embrace in the opinion yet to be filed. What we have said is a mere summary of the holdings set forth.

*"Reversed and remanded."*

But the California case is not the only authority. In the appendix to 131 U. S., at page 18, it is said: "Judges frequently correct their opinions in the hands of a reporter after a printed copy has been filed with the clerk. . . ." If one curious in such things would know how far back this corrective practice has existed, let him look as far back as the seventh volume of Cranch (1st ed.), where he will find corrections made by Mr. Justice Story in the opinion of the court delivered by him in *Barnitz's Lessee* v. *Casey*, 7 Cranch, at page 456. In later editions the changes are incorporated in the text. We have examined this first edition, and it is there stated on the page following the table of cases cited in that volume, as follows: "Since this volume was printed, Mr. Justice Story has

requested that the following corrections and additions should be made in the opinion delivered by him." So that illustrious judge actually corrected and added to his opinion in 7 Cranch after the official volume of reports had been published. So far as due "process of law is concerned," it is too obvious for discussion that it cannot be involved in mere matters of practice of the courts. We conclude with these words of Judge Field in the case cited: "The power over our opinions and the records of this court we shall exercise at all times, while we have the honor to sit on the bench, against all encroachments from any source, but in a manner, we trust, befitting the highest tribunal in the state." *The motion is denied.*

### STATEMENT OF SECOND APPEAL.

The mandate of the supreme court, pursuant to said summary, was promptly issued to the circuit court of Hinds county, which was then in session. Thereupon two other suits for taxes assessed against the same property for the years 1896 and 1897, respectively, which suits had been brought against the same defendants in the meanwhile, were consolidated with the principal case. Defendants then objected to the taking of any steps in the cause at the June term, 1898, first, for the reason that the supreme court had not yet delivered its opinion in the cause, as required by § 4352, code 1892; nor, secondly, had said opinion been certified with the mandate to the court below, as required by § 4381, code 1892, the "summary of holdings" in these respects not being a fulfillment of the law. These objections were overruled. Defendants then applied for a removal of the cause to the United States court, on the ground that the recent holdings of the supreme court overruling the Mississippi Mills case and the Lambert case, had for the first time introduced into the cause federal questions, and, therefore, for the first time the cause has become removable. The application was denied. Defendants then applied for a continuance of the cause for reasons assigned. The continuance was

refused.   Defendants then filed certain pleas to meet the new aspects of the case imported into it, as they claimed, by the recent decision of the supreme court, which pleas were, on motion of the plaintiff, stricken out.   Defendants then withdrew the pleas previously filed by them, and refused to plead further, and judgment *nil dicit* was entered for the taxes from 1892 to 1897, inclusive, from which judgment the defendants took an appeal to the supreme court.

The reporter has been unable, after diligent search, to find the briefs of *Messrs. Mayes & Harris,* and *Cooper & Waddell,* for the appellant, and *J. A. P. Campbell,* for the appellee, on second appeal.

*Critz & Beckett,* for appellee.

Since the defendants withdrew all their pleas on file, and permitted judgment *nil dicit* to go against them, it is evident that the matters involved in this appeal are reduced to mere matters of practice.   These questions are four, viz.: (1) The jurisdiction of the circuit court commencing its term on June 20, 1898, to try a case reversed and remanded to it on that day, the mandate being filed on July 4, 1898, and the case being reached and called for trial the same day; (2) the refusal to transfer to the federal court; (3) the refusal to continue; (4) striking out the additional pleas.

1. Some of the states have express statutes making causes triable at the next term after reversal, and some have statutes requiring a new notice of trial to be given, but ours has neither, and in the absence of such, the lower court has authority to proceed immediately.   *St. L. & M. S. Ry. Co.* v. *Sweet,* 60 Ark., 550; *In re Courts,* 100 Cal., 402, 403; *Baker* v. *Baker,* 87 Ky., 461; *Atkinson* v. *Dixon,* 96 Mo., 581, 582; *Schuman* v. *Helburg,* 62 Ill. App., 218; *Ogden* v. *Bosse* (Tex. Civ. App.), 23 S. W., 730; 13 Ency. Pldg. and Pr., 855, note 1; 6 Am. & Eng. Enc. L., 835, note 2.

Our statute provides that "an action shall, for all purposes,

be considered to have been commenced and to be pending from the time of filing the declaration," etc. Code of 1892, § 670.

The mandate is the official notification to the lower court of authority to proceed. It was filed before the case was called, but even the mandate is not necessary to confer jurisdiction. It is the judgment of the supreme court reversing the case that confers the jurisdiction on the lower court. *Foster* v. *Jordan,* 54 Miss., 509.

The only argument the defendants could use was that § 635 of the code required the clerk, before each term of the court, to set the trial cases, but this section itself refers to a decision of *Tift* v. *Virden,* 11 Smed. & M., 152, 163, which says it does not apply to exceptional cases, or those triable at the first term, and this case is not only triable at the return term under § 4194, but is entitled to precedence, and hence is not affected by the setting of the docket.

2. The refusal to transfer to the federal court was clearly proper, for two reasons:

First, the plaintiff is not claiming any right under the federal constitution, and it cannot be raised by the defendants in any proceedings for removal. *Tennessee* v. *Union & Planter's Bank,* 152 U. S., 454; *Chappell* v. *Waterworth,* 155 U. S., 102; *Postal Tel. Co.* v. *Alabama,* 155 U. S., 487; *East Lake* v. *Brown,* 155 U. S., 488; *Mex. Nat. R. R. Co.* v. *Davidson,* 157 U. S., 208; *Oregon* v. *Skottowe,* 162 U. S., 490; *Walker* v. *Collins,* 167 U. S., 57; *Galveston* v. *Texas,* 170 U. S., 226.

Second, the application was made too late, because made after the appearance term. U. S. Stat. at Large, 1887–1889, vol. 25, pp. 433–435; *Fox* v. *So. Ry. Co.,* 80 Fed. R., 945; 1 Desty Fed. Pro., sec. 96, and note; *Howard* v. *So. Ry. Co.* (N. C.), 29 S. E., 778, 781; 138 U. S., 303; 142 U. S., 439; 151 U. S., 673.

It is the same old story related by Mr. Justice Brewer: "They have gone through the state trial and appellate courts, and their rights have been finally declared by the supreme court of

the state, and though as yet no formal decree has been entered in the trial court, it is none the less true that they have experimented with the state courts and been beaten, and now seek a different forum." *Rosenthal* v. *Coates,* 148 U. S., 147, 148.

3. The continuance was properly refused. The principles of the case had been finally settled by the supreme court, and that decision was conclusive both in the lower court and on any subsequent appeal to this court. George's Digest, pp. 387, 388, sec. 183.

The continuance was asked on account of the absence of leading counsel. The record shows that he was not the leading counsel, but that Mr. Mayes, who was present, was, and no one will contend that this case could have been more faithfully attended to by anyone else. But the absence of "favorite counsel" is not ground for continuance. "It must further appear that there were probable merits which sustained prejudice in consequence of the absence of the particular counsel relied on." A case very much like this is *Garnett* v. *Kirkman,* 41 Miss., 97–99. See also *Tierney* v. *Duffy,* 59 Miss., 364; *Means* v. *Bank of Randall,* 146 U. S., 620, 629; *McGuire* v. *Commonwealth,* 3 Wall., 382.

4. There were four substantive grounds of the motion to strike out the additional pleas, viz.: (1) Because improperly filed; (2) the same defenses could be set up under the pleas already on file; (3) they were no defense; (4) they were vague, uncertain, etc.

(1) They were filed without leave of the court. In such a case pleas will be stricken out on motion. *Pool* v. *Hill,* 44 Miss., 306; *Wright* v. *Alexander,* 11 Smed. & M., 411; *O'Conley* v. *Natchez,* 1 Smed. & M., 31; *Peters* v. *Finney,* 12 Smed. & M., 449; *Hartford Ins. Co.* v. *Green,* 52 Miss., 338, 339; *McAdory* v. *Turner,* 56 Miss., 666; *Hunt* v. *Walker,* 40 Miss., 590; *Higdon* v. *Vaughn,* 58 Miss., 577; *Lewis* v. *Black,* 5 C., 425; *Shropshire* v. *Probate Judge,* 4 H., 142.

A refusal to strike out is equivalent to leave to file, but the striking out cannot be assigned for error. The remedy in such case is to ask for leave to file after they are stricken out, which was not done. *Pfeifer* v. *Chamberlain,* 52 Miss., 91.

(2) The same defenses could be set up under the pleas already on file. They had in fact been set up in the former pleas and in the suggestion of errors, and had all been overruled by the supreme court, and this was simply an attempt to plead before the circuit court that the decision of the supreme court, which was made in the same case, and for the direction of the circuit court, was revolutionary, and should not be regarded, and it is eminently proper to strike out such pleas. *Agne* v. *Seitsinger,* 104 Iowa, 485, 486.

(3) Everything attempted to be set up in these pleas had been fully heard and settled by the supreme court on the regular hearing, and in considering the suggestion of errors, and was *res adjudicata,* and not open to further question in this particular case. This is the settled law both in this court and in the supreme court of the United States. *McDonald* v. *Green,* 13 Smed. & M., 138, 445; *Bridgeforth* v. *Gray,* 10 G., 136; *Stewart* v. *Stebbins,* 1 G., 66; *Smith* v. *Elder,* 14 Smed. & M., 100; *Henderson* v. *Winchester,* 2 G., 290; *Chaffin* v. *Taylor,* 116 U. S., 567; *Clark* v. *Keith,* 106 U. S., 464; *The Lady Pike,* 96 U. S., 461; *Supervisors* v. *Kennicut,* 94 U. S., 498; *Norman* v. *Bradley,* 12 Wall., 121; *Roberts* v. *Cooper,* 20 How., 467; *Seizer* v. *Many,* 16 How., 98; *Sibald* v. *United States,* 12 Pet., 448; *Great Western, etc.,* v. *Burnham,* 162 U. S., 343, 344; see also 117 Ind., 27, 28.

It is perfectly apparent that the defendants are no longer willing to abide by what this court may say, but that this is an attempt now to fix up a record for the supreme court of the United States. A federal question cannot be raised in the arguments or briefs of counsel. *Layward* v. *Denny,* 158 U. S., 183, 184; *Zadig* v. *Baldwin,* 166 U. S., 485.

None was attempted to be raised in this case till the sugges-

tion of errors, and the supreme court of the United States have always held that to be too late. *Pim* v. *St. Louis,* 165 U. S., 273; *Layward* v. *Denny,* 158 U. S., 180; *Bushnell* v. *Crooke,* 148 U. S., 682; *Loeber* v. *Schroeder,* 149 U. S., 580; *Schuyler* v. *Bolling,* 150 U. S., 85; *Powell* v. *Brunswick Co.,* 150 U. S., 433.

Hence, we insist that there is no rule of law, or of the United States, which requires this court at this late day to take cognizance of any federal question attempted thus to be raised out of the regular order of pleading and practice. See also *Mexican, etc., R. R. Co.* v. *Pinckney,* 149 U. S., 194; *Stevens* v. *Nichols,* 157 U. S., 370, 371.

But if it is admissible to consider the pleas on their merits, they present no federal question. The contract clause of the federal constitution only applies to subsequent laws, and has no application to decisions of the state courts construing their antecedent constitutions, or overruling their former decisions. *Central Land Co.* v. *Laidley,* 159 U. S., 109–112; *Hansford* v. *Davis,* 163 U. S., 278, 279; *Winona* v. *Minnesota,* 159 U. S., 528, 529; *Wood* v. *Brady,* 150 U. S., 20–23.

There was another ground of decision, that the exemption, if it ever existed, was lost by the consolidation, and a plea simply setting up that the decision that the exemption was unconstitutional was a violation of the federal constitution, even if good, was no answer to the other ground of decision that it had been lost by the consolidation. Where there are two or more grounds of decisions, they must all violate the federal constitution, or else there is no violation within the meaning of the law. *Seneca Nation* v. *Christy,* 162 U. S., 289, 290; *Pierce* v. *Somerset Ry. Co.,* 171 U. S., 641.

(4) The pleas were vague, indefinite and uncertain, and § 704 of the code of 1892 expressly authorizes such pleas to be stricken out on motion. The pleas are long and voluminous, and no ordinary jury could tell what issue or issues they were called on to decide, whether to overrule the supreme court,

or what had been the policy of this state, or whether former legislatures had refused to repeal exemptions, or when the first railroad was built, or what the court had decided in the Mississippi Mills and other cases, or when the state was first settled, or a great many other things too numerous to mention. The policy of the law in the circuit courts, where jury trials abound, is to reduce each defense to a single issue in plain, ordinary, concise language, which a jury can easily comprehend and decide intelligently.

As to the first and second assignments of error attempting now to raise questions which could have been raised on the first appeal, it is only necessary to refer to *McKinney* v. *State,* 117 Ind., 27, 28.

Argued orally by *Tim E. Cooper* and *Edward Mayes,* for the appellant, and by *J. A. P. Campbell, R. C. Beckett,* and *F. A. Critz,* for the appellee.

WHITFIELD, J., delivered the opinion of the court.

The petition for removal of the cause to the federal court was properly denied. The decisions of the United States supreme court, cited in briefs of counsel for appellee, put this at rest. *Kansas City, etc., Railroad Co.* v. *Daughty,* 138 U. S., 303; *Tennessee* v. *Bank,* 152 U. S., 454; *Galveston, etc., Railroad Co.* v. *Texas,* 170 U. S., 226. The application for continuance was properly overruled. The court's action in striking out the special pleas stricken out was correct, for the obvious reason that they presented no defense to the action, in whole or in part. The former opinion of this court in this case settled definitely and conclusively all the issues involved, and the special pleas are, in effect, nothing else than an effort to have the circuit court disregard that opinion. The futility of that sort of pleading needs no comment.

These and all the other matters of practice and procedure assigned for error were correctly settled by the court. The

former opinion of this court in this cause, and its opinion on the motion to strike that opinion from the files, disposed effectively of such of these matters as are not here specifically adverted to.

So far as concerns the argument that the appellants relied on the case of *Mississippi Mills* v. *Cook,* 56 Miss., and that if the overruling of that case is correct, nevertheless the appellants should be protected from taxation accruing before the overruling of that case, it is enough to say that question is not material here, since all the taxes here sued for accrued after the consolidation of October 24, 1892, and the appellants were expressly held to have lost their exemption, if any they had, by their own voluntary act of consolidation. That was the first and main ground on which our former opinion was distinctly rested. It must be too clear for serious disputation, in this view, that all discussion of the case of *Mississippi Mills* v. *Cook* is wholly unavailing as to these taxes. Moreover, the twenty-first section of the Mobile & Northwestern charter was not passed on in *Mississippi Mills* v. *Cook,* and we held in our former opinion that its constitutionality was never squarely presented, as the point for decision, until the former judgment in this case. Whatever merit there may be in this line of argument in a proper case, it is clear that here it has, by reason of the fact of the consolidation when and as it occurred, no room for play.

The last proposition which we notice is the one that the Lambert case in 70 Miss. was erroneous, and ought not to be followed in its announcement that the code of 1880 repealed the exemption here claimed. It was said, *inter alia,* that the Mobile & Ohio R. R. Co. had an identical exemption with the twenty-first section of the Mobile & Northwestern charter, and that § 598 of the code of 1880, by providing for "a sworn statement of the capital expended in the construction of its road," recognized the exemption as meant by this § 598 to furnish the state with the means of knowing when the M. & O. R. R. Co.

should become liable to taxation; and that since it recognized the M. & O. R. R. Co.'s exemption, of course it must also have recognized the alleged identical exemption of appellants. Such was the argument gravely pressed upon the court. It is singular that learned counsel overlooked the easy and overwhelming answer springing from the fact that the twenty-first section of the Mobile & Northwestern charter was granted by an act of the legislature passed in 1870, after the constitution of 1869 was adopted, while the charter of the Mobile & Ohio R. R. Co. was granted in 1848, twenty-one years before that constitution was adopted, at a time when the legislature had full power to grant, so far as any constitutional restriction was concerned, an irrepealable exemption.

But it is said that § 8 of the code of 1880 provides that "no private act not revived and brought into this code shall be affected by its·provisions:" and that general laws as to taxation ought not to be held to repeal private grants of exemption, unless expressly so stated. The principle is correct enough. But we think the alleged exemption of the Natchez, Jackson & Columbus R. R. Co. expressly repealed. There were two bills of injunction in the Lambert case—rather, there were two cases. The court distinctly held that this exemption from taxation was an exemption both from *ad valorem* taxes and privilege taxes. Now, the scheme of railroad taxation propounded by the code of 1880 was primarily to subject "each railroad owning and operating a railroad in this state" to *ad valorem* taxes. That scheme is set forth in §§ 597--606 of code of 1880, inclusive. But secondarily, and as a substitute, each railroad was permitted, by §§ 607 and 608 of that code, to escape *ad valorem* state and county taxes by paying the privilege tax named in § 608. Now, the Natchez, Jackson & Columbus Railroad Co. is expressly named in § 608, and required to pay a privilege tax of thirty dollars per mile, if it would escape *ad valorem* state and county taxes. Manifestly no one can be found who would dispute the proposition that the exemption from privilege taxes·

of that railroad was expressly repealed by § 608. But since this privilege tax was provided only secondarily, and as a means of escaping the *ad valorem* state and county taxes due by each railroad in the state, primarily imposed by § 597 *et seq.,* it is plain that all the sections taken together expressly provide that the Natchez, Jackson & Columbus Railroad Company was to pay *ad valorem* taxes, state and county, unless it embraced the conditional exemption therefrom by paying the privilege tax assessed by § 608 *eo nomine* against it. There is no escape from this reasoning. If it be asked why, if the Natchez, Jackson & Columbus Railroad Company was expressly named in § 608, it was not so named in § 597 *et seq.,* the obvious reason is that it was necessary to expressly name it in imposing privilege taxes, since each railroad paid a different privilege tax, but it was unnecessary to name it in imposing *ad valorem* taxes, since the rate there was the same for all. And this leaves out of view whatever of force there may be in the suggestion that the phrases "each railroad," "every railroad," etc., might be effective to include this railroad, with all others, as fully as if named in § 597. But as to this we say nothing.

Finally, it is said that this twenty-first section was given the L., N. O. & T. R. R. Co. by independent grant in 1882, by its proper charter, after the code of 1880 had been adopted. But if the code of 1880 had the effect, as held in the Lambert case, to repeal by its provisions this section as applied to the Natchez, Jackson & Columbus Railroad Company, then *a fortiori* did the more emphatic provisions of the code of 1892 have the effect to repeal the same section as applied to the L., N. O. & T. R. R. Co. This last company could not be named in the code of 1880, since it did not come into existence until 1882.

It will be remembered that this third ground of our former opinion, that this alleged exemption was repealed by legislation, if it ever had a valid existence, was wholly uninfluential with the circuit judge on this second trial below, since it was for the first time made part of the opinion when the opinion

in full was written and filed, which was several months after the trial in the circuit court.

It is perfectly obvious, therefore, that the mere adding a new reason for the decision, which reason did not influence the second trial of the case, in no respect prejudiced the appellants in that trial. We discover no error, and the judgment is

*Affirmed.*

WOODS, C. J., while recognizing the authority of the former decision to the effect that the consolidation cut off the exemption, and not, therefore, dissenting, adhered to the view formerly entertained by him.